ESTATE OF MARIA C. DE LAVEAGA, DECEASED.
[No. 7508 (N. S.); June 28, 1911.]

Will—Capacity to Make.—Under the Statutes of California every person over the age of eighteen years may by last will dispose of his or her estate, provided he or she is of sound mind and free from undue influence, duress, or fraud.

Will.—The Tests of Testamentary Capacity are: 1. Understanding of what the testator or testatrix is doing; 2. How he or she is doing it; 3. Knowledge of his or her property; 4. How he or she wishes to dispose of it; and 5. Who are entitled to his or her bounty.

Will—When Capacity Lacking.—It is not Enough that the testator or testatrix have a mind sufficient to comprehend one of the above elements; his or her mind must be sufficiently clear and strong to perceive the relation of the various elements to one another, and he or she must have at least a general comprehension of the whole.

**Will—Immature Mental Development of Testator.**—Although a person may not be subject to delusions or mental aberrations, nor suffering from active insanity nor entirely destitute of understanding, yet he or she may not have arrived at that maturity of mind which qualifies him or her to make a will and is deficient in testamentary capacity.

**Will—Minimum Age Limit of Testator.**—A testator or testatrix need not be expected to know the exact legal scope and bearing of his or her will, but should have sufficient faculty to understand generally his or her circumstances and natural obligations. The age of eighteen years in this state is fixed as the minimum limit at which that faculty is developed in a normal nature; in some other states and countries it is twenty-one.

**Will—Mentally Undeveloped Testatrix.**—A woman who has reached the age of eighteen may make a will if she be otherwise qualified, but she may have arrived at this age without having emerged in mental growth from childhood. This does not import a disordered intellect or diseased mind, and is entirely consistent with the general fact that the family of the decedent was composed of persons of sound and strong mentality, and that her inherent traits were intellectually perfect, there being no suggestion of insanity in the blood. It is also consistent with the fact that the decedent was a woman in the full bloom of health; fully nourished bodily, with no serious corporal ailment, no congenital incapacity, physically a perfect woman, but short on intellect.

**Will—Evidence Willfully Suppressed Presumed to be Adverse.**—It is a satisfactory presumption that evidence willfully suppressed would be adverse if produced.

**Will—Presumption in Favor of—Beneficiaries Entitled to Protection.** In the absence of testimony to the contrary there is a presumption in favor of the validity of a will, and the beneficiaries of a will are as much entitled to protection as any other property owners, the due execution of the will being admitted.

**Will—A Will Does not Prove Itself.**—Even if there be no contest of a will, certain essential facts must be established before it is admitted, and these facts should be carefully inquired into on the original probate. In all cases of olographic wills the handwriting must be proved affirmatively by or on behalf of the proponent.

**Will—Contest—Evidence—Burden of Proof.**—While it would be incumbent on the proponent, if there were no contest, in a case such as the one at bar, to establish the authenticity of the handwriting of the decedent in the will, which is holographic, and the circumstances of the execution of the document to the extent of her knowledge, yet it is true, in a sense, that the burden of proof rests upon the contestant and he must bear his own burdens as to the issues set up by him; and where it is not denied that the instrument is in the handwriting

of decedent, so far as the contest is concerned, it is incumbent upon him to prove a negative, that she was not competent; that the will was not the voluntary emanation of her own mind, or that she was not free from circumstance of constraint. Any one of these facts established justifies the contest, but does not relieve the proponent ultimately from her burden of establishing all the elements necessary to entitle her to letters testamentary.

Will.—A Holographic Will must be Proved in the Same Manner as other private writings; that is, by one who saw the writing executed or by evidence of the genuineness of the handwriting of the maker, or by a subscribing witness.

Will Contest—Issues—Unsoundness of Mind and Undue Influence—Consistency of Issues.—In a will contest the issues of unsoundness of mind of the testatrix and undue influence exerted upon her are not inconsistent. While these issues are distinct as a rule, there may be a case where a person of immature intellect may be so influenced by one of superior power as to direct the manual performance of the mechanical act.

Will Contest—Evidence—Circumstances Before and After Admissible.—In such a case, the evidence should not be confined to the point of time of the testamentary act alone; it is proper to allude to the surroundings of the decedent at the time of making the will and for the years prior and subsequent thereto.

Will Contest—Evidence—Credibility of Witnesses.—In such a case, in determining the credibility of witnesses who testify as to the mental competency of the testatrix, their opportunities, their intimacies, their relations to the parties, and many other major and minor elements, must be considered before accepting as absolute their opinions upon a matter of such moment as the mentality of a person.

Will—Testamentary Capacity—Ability to Speak Several Languages. The fact that the testatrix in such a case was able to speak in several languages is not in itself proof of intellectual power.

Will—Mental Capacity—Undue Influence—Justness of Will.—While, if the testatrix be of sound mind, it matters not whether her will be equitable or inequitable, just or unjust, as she has the right to do as she pleases with her property, nevertheless, equity, justice, the relations of the parties, the surroundings of those benefited in connection with the testatrix and other points may be considered in connection with the transaction, where the competency is questioned or susceptibility to influence suggested.

Will—Mental Capacity—Undue Influence—Ignoring Benefactor.— In such a case the improbability of a person ignoring or discriminating against one who has been of great service to her for many years and who had conserved her estate without the diminution of a dollar, on the contrary with increase and without retaining anything for per-

sonal benefit, is a proper subject of inquiry, as to whether if she were of full faculty and free from the impediment of influence she would have done otherwise; and it might be inferable that those who had been in close propinquity and who were the beneficiaries of her bounty had improved their opportunities to their own advantage.

**Will—Mental Capacity—Ability of Testatrix to Write.**—The mere fact that one can write does not imply soundness of mind; and in a case like the one at bar the circumstances must be considered and inquiry made into all the facts and history, and the conduct and surroundings of the person whose mental condition is at issue, before passing judgment.

**Will Denied Probate.**—It is Held in This Case that the paper propounded should be refused and denied probate.

Application for probate of will; contest.

Timothy J. Lyons, for proponent, Maria Josefa Cebrian.

Pillsbury, Madison & Sutro, for contestant, Miguel A. de Laveaga.

Counsel appearing at hearing of contest and trial of issues:

E. S. Pillsbury and Oscar Sutro, for contestant.

Timothy J. Lyons, Peter F. Dunne, Samuel M. Shortridge, for Maria Josefa Cebrian, as proponent and respondent and executrix under the will, and also as heir, devisee and legatee and trustee, and also for others named in the will as devisees and legatees, respondents to the contest.

COFFEY, J. On March 29, 1909, came into court M. A. de Laveaga having filed his petition alleging that he was, and had been for many years, a citizen and resident of the state of California; that Maria C. de Laveaga died in the city of Madrid, Kingdom of Spain, on or about the 4th day of February, 1909, and that at the time of her death she was a resident of the city and county of San Francisco, state of California, but was temporarily residing in said kingdom of Spain; that she died leaving real and personal property in the city and county of San Francisco, state of California;

that she left as next of kin and heirs at law the following, and none others, namely: M. A. de Laveaga, over the age of twenty-one years, surviving brother; and Maria J. Cebrian, wife of J. C. Cebrian, residing in the city and county of San Francisco, California, over the age of twenty-one years, surviving sister.

Petitioner averred that he was informed that said decedent died leaving a will in which he was named and appointed as executor without bonds, but that the said alleged will, if in existence, is not in his custody and possession, and has never been seen by him, and cannot at the present time be obtained by him; that the property and estate left by her in San Francisco and elsewhere in California needs the care and attention of an administrator and that a considerable delay will ensue before the granting of letters testamentary, or letters of administration, as the case may be, he believes and therefore alleges, that as her surviving brother and as the person nominated in her will, if the same should exist, he is entitled to special letters of administration on her estate, to collect and take charge of her estate, exercise such other powers as may be necessary for the preservation of said estate.

Wherefore, he prayed that upon the filing of this petition, the court would give and make its order appointing him special administrator of her estate and order that special letters issue to him upon his giving bonds in such sum as the court may direct and upon taking the oath in accordance with law.

### GRANTING OF SPECIAL LETTERS.

Upon this petition evidence having been introduced and submitted in support thereof, and the matter having been fully heard and submitted, it was determined that its allegations were true and correct, and petitioner was appointed special administrator of the estate of deceased and letters ordered issued upon filing a bond in the sum of five thousand dollars.

The special administrator thereupon immediately qualified and entered upon his duties.

On June 12, 1909, Maria Josefa Cebrian filed a petition in which she alleged that she was and had been for more than forty years a resident of and domiciled in the city and county of San Francisco, state of California, and was a citizen thereof; that Maria C. de Laveaga, also called Maria Concepcion de Laveaga, also called M. C. de Laveaga, died on the 4th day of February, 1909, in the city of Madrid, Kingdom of Spain, Europe, while temporarily absent from the place of her residence and domicile; that said decedent was at the time and date of her death and for more than forty years immediately preceding said date had been, continuously, a resident of and domiciled in the aforesaid city and county of San Francisco, state of California; that said decedent left estate, consisting of both real and personal property, situate in said city of San Francisco, state of California, the probable value and character of which are as follows, to wit:

(a) Various parcels of land (ten or twelve or more parcels) situated in San Francisco, some improved and some unimproved, the details or particular descriptions thereof, your petitioner is unable to set forth at this time; (b) An undivided one-third interest in the Rancho "Quien Sabe," situate in San Benito county, said state; and (c) An undivided one-third interest in a town lot in Coronado, San Diego county, said state. Also (d) bonds, negotiable securities, shares of stocks of corporations, promissory notes and other personal properties, the details or more particular description of which your petitioner is unable to set forth at this time; that the probable aggregate value of the aforesaid real properties of said decedent in the said state of California is the sum of one million dollars and upward, or thereabouts; and that the probable aggregate value of the aforesaid personal properties of said decedent, in said state, as petitioner is informed, and therefore alleges, is the sum of one million dollars and upward, or thereabouts; and that the whole estate of said decedent, real and personal, in the state of California, is of the value of two million dollars and upward, or thereabouts; that there is also some real estate in the Republic of Mexico, belonging to said decedent, the description or prob-

able value of which your petitioner is unable to set forth at this time.

Petitioner further alleged that the decedent left a last will and testament, dated San Francisco, California, the fifteenth day of February, 1893, which the petitioner believed and therefore alleged to be the last will and testament of said deceased, and which she produced and presented and filed with the petition; that said will was by said decedent, in her lifetime delivered to, and left in the possession of petitioner, but that at the time of the death of said decedent, the petitioner was absent from her home and residence in San Francisco and was sojourning in the Kingdom of Spain, and continued absent from her home and said residence until the month of May, 1909, and therefore the petitioner was not able to search for said will until her return to her said home and residence in the month of May, 1909, whereupon, after the search therefor, the same was found by petitioner on May 23, 1909; that said will was olographic in form and is entirely written, dated and signed by the hand of testatrix herself; the said Maria C. de Laveaga, also called Maria Concepcion de Laveaga, also called M. C. de Laveaga, the said testatrix signing and subscribing the said will by her name and signature "Maria C. de Laveaga"; that at the time the said will was executed by said decedent, to wit: it was entirely written, dated and signed by hand of testatrix herself, and on the day it bears date, namely, the fifteenth day of February, eighteen hundred and ninety-three (1893) the said decedent and testatrix was over the age of eighteen (18) years and was of the age of thirty-two (32) years, and was of sound and disposing mind; that the said will is entirely written and dated in the Spanish language, the native language of the testatrix, and a true, correct photograph and photographic copy of said will so entirely written, dated and signed on a single page of paper is annexed to petition and made a part thereof; that a true, full and correct translation of said will, from the said Spanish language, in which it is written, into the English language, is annexed to the petition and made a part thereof; that the names, ages and residences of the

legatees and devisees of said decedent, under. said last will and testament are as follows, to wit:

(a) Miguel A. de Laveaga (also called M. A. de Laveaga), surviving brother of said decedent (testatrix), aged upwards of twenty-one years, residing in Contra Costa county, said state, (postoffice address R. F. D. No. 1, Box 61, Berkeley, in said county), designated and referred to in said will as "my brother Miguel" (translation);

(b) Maria Josefa Cebrian (wife of John C. Cebrian), surviving sister of said decedent, (testatrix), aged upward of twenty-one years, residing in said San Francisco, California, designated and referred to in said will as "my sister Pepa" (translation);

(c) The three children of Miguel A. de Laveaga, the surviving brother of said decedent and testatrix, namely: J. V. de Laveaga, aged upward of twenty-one years, residing at Menlo Park, San Mateo county, said state of California; Julia de Laveaga Welch (wife of Andrew Welch), aged upward of twenty-one years, residing at San Mateo, San Mateo county, said state of California; and Edward I. de Laveaga, aged upward of twenty-one years, residing in Contra Costa county, said state of California (postoffice address R. F. D. No. 1, Box 61, Berkeley). The said three last named persons being the children of "my brother Miguel" referred to in that certain language of the said will, to wit: "to my brother Miguel or to his children" (translation);

(d) The three children of Clemente Laveaga (a first cousin of testatrix) namely: Ignacia Laveaga, aged upward of twenty-one years, .residing in Mazatlan, Republic of Mexico; Maria Laveaga de Canobbio, aged upward of twenty-one years, residing at Mazatlan, aforesaid; and Guillermo Laveaga, aged upward of twenty-one years, residing at San Ignacio, state of Sinaloa, Republic of Mexico; the said three last named persons being designated and referred to in said will as "Clemente's children" (translation);

(e) Maria Cebrian de F. de Caleya (wife of F. de Caleya), a niece of said decedent (testatrix), of the age of majority, residing in Santander, Kingdom of Spain, being the person "Mimi" Cebrian, referred to in that certain language of the

said will, to wit: "my nieces Mimi and Pepita Cebrian" (translation);

(f) Josephine de L. Cebrian, a niece of said decedent (testatrix), of the age of majority, residing in said San Francisco, California, being the person "Pepita Cebrian," referred to in that certain language of the said will, to wit: "my nieces Mimi and Pepita Cebrian" (translation);

(g) The eight children of Maria Josefa Cebrian (aforesaid), the surviving sister of said decedent and testatrix, namely: Maria Cebrian de F. Caleya (wife of F. de Caleya), age and residence as hereinabove stated; Josephine de L. Cebrian, age and residence as hereinabove stated; Edward de L. Cebrian, aged 24 years, residing at said San Francisco, California; Louis de L. Cebrian, aged 22 years, residing at said San Francisco; Harry de L. Cebrian, aged 21 years, residing at said San Francisco; Raphael de L. Cebrian, aged 19 years, residing at said San Francisco (with his parents); Isabel Cebrian, aged 12 years, residing at said San Francisco (with her parents); and Beatrice Cebrian, aged 11 years, residing at said San Francisco (with her parents). The said eight last named persons being the children of "my sister Pepa," referred to in that certain language of the said will, to wit: "to my sister Pepa or to her children" (translation).

That the decedent testatrix was never married, and left her surviving neither father nor mother, nor any brother or sister, excepting the brother and sister referred to in the will and already named, nor any child or issue of any deceased brother or deceased sister, and that the next of kin of decedent testatrix who survived her, and who are her sole heirs at law, are the said brother and sister as already named. That the petitioner Maria Josefa Cebrian is named and nominated in said will as executrix thereof, and Miguel A. de Laveaga is nominated as executor thereof, they being the persons designated in the clause and language of the will reading as follows in the translation: "I nominate executor and executrix my brother Miguel and my sister Pepa without bonds." That the petitioner accepts the aforesaid nomination of her by said testatrix and consents to act as said execu-

trix of said will and hereby accepts the trust; that the petitioner is unable to state whether or not Miguel A. de Laveaga, aforesaid, who is nominated in said will as executor consents to act as such executor or renounces his right to letters testamentary, although inquiry in that behalf has been made by her, and he has had a copy of the will since or before May 24, 1909, a copy having been forwarded to him by her; and that he has not been and is not now absent from the state of California, but resides in an adjoining county within a short distance from said San Francisco.

Wherefore the petitioner Maria Josefa Cebrian prays the court that after proper proceeding as provided by law the said instrument be admitted to probate as the last will and testament of said decedent, and that the court find and determine what is the true, full and correct translation of said last will from the Spanish language, in which it is written, into the English language, and that upon the admission to probate of said will, she be appointed executrix thereof without bonds, and that letters testamentary be issued to her.

The original will in Spanish is as follows, the translation following:

"In the name of God, Amen.

"I, Maria C. de Laveaga, declare that this is my testament.

"I leave (bequeath) to my brother Miguel or to his children Eighty Thousand Dollars.

"I leave (bequeath) to my sister Pepa Five Thousand Dollars for alms, and One Thousand Dollars for masses, and Fifteen Thousand Dollars for Clemente's children.

"I leave (bequeath) to my nieces Mimi and Pepita Cebrian my wearing apparel, furniture and jewelry.

"I leave (bequeath) all the rest of what I possess to my sister Pepa or to her children, if she does not survive me.

"I nominate executor and executrix my brother Miguel and my sister Pepa, without bonds.

"And I sign it in San Francisco, California, the 15th day of February, 1893.

"MARIA C. DE LAVEAGA."

On July 12, 1909, Miguel A. de Laveaga filed a contest of and objections to this instrument in which are set forth, as grounds and objections to admission to probate of said instrument:

(1) That the said Maria C. de Laveaga left surviving her, her sister, Maria Josefa Cebrian, over the age of twenty-one years, and a resident of San Francisco, California, the petitioner in the petition filed herein on the 12th day of June, 1909, for the probate of the instrument filed herein on said day purporting to be the last will of the decedent, and her brother, Miguel A. de Laveaga, over the age of twenty-one years, and a resident of the county of Contra Costa, California, who is this contestant; that the decedent was never married, and left her surviving no issue, and neither father nor mother, nor any brother or sister, excepting as hereinbefore set forth, nor any child or issue of any deceased brother or sister, and the said Maria Josefa Cebrian and this contestant are the sole heirs at law of said decedent; that on the 15th day of February, 1893, the date of the purported will of said decedent, filed herein as aforesaid, and at the time the said Maria C. de Laveaga executed said purported will, if the same was ever executed by her in form or otherwise, she was not of sound mind and was not competent to make a last will.

(2) That on said 15th day of February, 1893, and at the time of the execution in form of said purported will, if the same was ever executed by Maria C. de Laveaga at all, she was not free from undue influence; that from her birth, in or about the year 1856, and continuously thereafter until said 15th day of February, 1893, and to the time of the alleged execution of said will, she was weak in mind and incompetent and incapable of taking care of herself, or of her property; that the execution in form of said purported will was procured by undue influence and the facts constituting said undue influence are as follows:

From the time of her birth, and continuously thereafter to the time of the execution in form of said purported will, if the same was executed by said decedent, said decedent was

weak in mind and unable to knowingly understand the ordinary affairs of life, or to understand or transact business, and, owing to the said condition of decedent's mind, during all of said time she was incapable of properly taking care of herself, and was in constant need of the care and attention of some other person to see that her wants were properly administered to, and during all of said period resided with and was taken care of by persons upon whom said decedent was entirely dependent for the care and attention of herself and her affairs; that persons, the names of whom are unknown to this contestant, well knowing the incompetent and weak state of the mind of said decedent, caused her, by influence, persuasion and machinations, to so execute said instrument, if the same was executed by her at all, for the fraudulent and wicked purpose of causing her to devise and bequeath the greater portion of her estate to her sister Maria Josefa Cebrian; that by reason of the said mental condition of said decedent, decedent yielded to the persuasion, influence and dictation of said persons, who caused decedent to write said purported will hereinbefore referred to, or part thereof, if decedent wrote the same at all, or any part thereof; that by reason of her condition of mind as aforesaid, on the 15th day of February, 1893, and at the time of the execution in form of said purported will, if the same was executed by said decedent at all, said decedent was completely dominated by said persons whose names are unknown to this contestant, and was unable to resist the said undue influence of said persons, and was unable to resist the dictation, persuasion and control of said persons, and solely by reason of said influence and of said dictation and control, the said decedent, as aforesaid, did in form make and execute said purported will, if the same was ever or at all made and executed by her; that if said decedent had been free from the influence, persuasion, dictation and control of said persons, she would not in form or otherwise have made or executed said purported will.

(3) That on the 15th day of February, 1893, and at the time of the execution in form of said purported will, if the same was executed by said Maria C. de Laveaga at all, she, the said Maria C. de Laveaga was not free from duress or

fraud; that from her birth, in or about the year 1856, and continuously thereafter to the time of the execution in form of said decedent, Maria C. de Laveaga, was weak in mind and incompetent and incapable of taking care of herself, or of her property; that the execution in form of said purported will, if the same was executed by the said Maria C. de Laveaga at all, was procured by duress and fraud, and the facts constituting such duress and fraud are as follows: From the time of her birth, and continuously thereafter to the time of such execution in form of said purported will, if the same was executed by said decedent, said decedent was weak in mind and unable to knowingly understand the ordinary affairs of life, or to understand or transact business, and, owing to the said condition of decedent's mind, was, during all of said time, incapable of properly taking care of herself, and was in constant need of the care and attention of some other person to see that her wants were properly administered to, and during all of said period resided with and was taken care of by persons upon whom said decedent was entirely dependent for the care and attention of herself and her affairs; that certain persons, the names of whom are unknown to this contestant, did at the time that said decedent did in form execute said purported will, if the same was executed by her at all, fraudulently and wickedly scheme and conspire to cause said decedent to bequeath and devise the greater portion of her estate to her sister, Maria Josefa Cebrian, and for that purpose did fraudulently entice and induce said decedent in form to make and execute said purported will, and did at said time, by duress, to wit: threat and by the exercise of pretended compulsion, which said decedent, owing to her said weak and incompetent state of mind, believed herself unable to resist, cause said decedent in form to execute said purported will, if the same was executed by her at all; that at the time said persons induced said decedent in form to execute said purported will, said persons well knew the mental condition of said decedent, and well knew that said decedent was incompetent and weak in mind, and, therefore, unable to make a will, and well knew that said decedent could not resist the duress exercised by said persons; that solely by reason of the

mental condition of said decedent, said decedent was easily induced by said persons in form to execute said purported will, if the same was executed by said decedent at all, and yielded to the fraud and duress of said persons in inducing and causing said decedent in form to execute said purported will, if she executed the same at all; that if said persons had not exercised said duress and fraud, said decedent would not have in form executed said purported will, if she executed the same at all.

Wherefore, the said contestant prayed that the said instrument be refused and denied probate.

### THE ISSUES SIMPLIFIED.

All of these grounds of opposition and contest were traversed by proponent and respondent in their several capacities, and the issues thus joined came to trial before the court, a jury having been waived, on October 27, 1909, being finally submitted for decision February 20, 1911.

Reduced to simple terms the issues are that the decedent was at the date of the will of unsound mind, incompetent to make a will, and by reason of her mental condition unable to understand the mechanical act by which in form she disposed of her property, and that said act was not hers in law but that of others who directed, dictated and dominated the manual performance.

It is charged, in support of the allegation of unsoundness of mind, that she never arrived at an age of mental maturity, not that she was a lunatic or dangerously insane, but that, in contemplation of law, she never reached the period of testamentary capacity.

Under our statute every person over the age of eighteen years may by last will dispose of all his estate. The age of eighteen years, therefore, is the initiation of the period of testamentary capacity in either sex. If one has not attained that age no will can be made. The testator must be over that age and of sound mind and free from undue influence, duress or fraud.

### TESTS OF TESTAMENTARY CAPACITY.

The tests of testamentary capacity are: (1) Understanding of what the testatrix is doing; (2) how she is doing it;

(3) knowledge of her property; (4) how she wishes to dispose of it; (5) who are entitled to her bounty.

She should have strength and clearness of mind and memory sufficient to know in general, without prompting, the nature and extent of the property of which she is about to dispose, the nature of the act which she is about to perform, and the names and identity of the persons who are the proper objects of her bounty, and her relation toward them.

In order to have a sound and disposing mind the testatrix must be able to undestand the nature of the act she is performing, she must be able to recall those who are the natural objects of her bounty, she must be able to remember the character and extent of her property, she must be able to understand the manner in which she wishes to distribute it, and she must understand the persons to whom she wishes to distribute it. It is not enough that she have a mind sufficient to comprehend one of these elements; her mind must be sufficiently clear and strong to perceive the relation of the various elements to one another, and she must have at least a general comprehension of the whole.

### CONTENTION OF CONTESTANT.

This is not a case of delusions or mental aberrations. Active insanity is not charged. It is not claimed that decedent was entirely destitute of understanding, but that she was deficient in testamentary capacity. This is the contention of the contestant, that the decedent had not arrived at that maturity of mind which qualified her to make a will; to that extent she was unsound in mind; and that was her mental condition on February 15, 1893, the date of the document in dispute.

The exact age of decedent was a matter of minor contention, the birth certificate indicated December 29, 1856, but this is of small concern, for it sufficiently appears that she became of legal age during the course of administration of her father's estate in 1874–75. There appears, however, to have been some doubt upon this point, as to her age, which, it is asserted, led to impressions among her acquaintances that she was very much younger than she really was, tending to

bear out the argument that she was not fully developed mentally, not that she was an idiot, or insane, or a maniac, but that she was a child all her life whose mentality had been in some way arrested at an early age; that she had never grown up intellectually; her condition was that of passive incompetency; never attaining intellectual adequacy to comprehend the circumstances essential to the making of a valid will as in the case of an adult.

### A PREVALENT LAY IMPRESSION CORRECTED.

It is a very prevalent lay impression on this point that the mind must be perfectly sound to make a will, but our supreme court has established the rule that such an exalted standard of intellect is not requisite; that a testatrix need not be expected to know the exact legal scope and bearing of her will, but that she should have sufficient faculty to understand generally her circumstances and natural obligations. The age of eighteen years in this state is fixed as the minimum limit at which that faculty is developed in a normal nature; in some other states and countries it is twenty-one, but here, other things being equal, one is supposed to be capable upon attaining the eighteenth year.

Having accomplished that period, if she be otherwise qualified, she may make her will. In the order of time, however, she may have arrived at majority without having emerged in mental growth from childhood; at eighteen in the sequence of years she may be only eight in the process of intellectual evolution. This does not import a disordered intellect or diseased mind; it is merely, perhaps, a mysterious dispensation of Providence in an individual or isolated instance, entirely consistent with the general fact, as is claimed here by proponent, that the family of the decedent was composed of persons of sound and strong mentality, and that her inherent traits were intellectually perfect, there being no suggestion of insanity in the blood. It is also consistent with the claim that the decedent was a woman in the full bloom of health; fully nourished bodily, with no serious corporal ailment, no indication of congenital incapacity; physically "a perfect woman nobly planned"; yet somewhat short on intel-

lect. The taint of insanity imputed to her aunt Trinidad may be unjustified, although Mrs. Cebrian testifies that Trinidad was delicate and dyspeptic, had partial paralysis and dwelt in a sort of semi-seclusion on account of her infirmities, had her meals in her room, and Mrs. Cebrian was the one that was most of the time with her; and it may be assumed that there is no showing of insanity in this family; yet this is not like the ordinary cases of unsoundness of mind; although it is not unusual that in families of average normality there may be deviations from the highest to the lowest type, from supreme efficiency to almost absolute deficiency. It is not uncommon in large families to find among the children very varying degrees of mental, moral and physical power, diverse dispositions and differing inclinations, sometimes as many differences in these respects as there are children; some alert, active, ambitious, diligent, energetic, intellectual, studious, industrious, thrifty; others inert, indolent, improvident, volatile, incapable of cultivation; indisposed to mental exertion; some high-strung, sensitive, sanguine, self-reliant and confident in their capacity to engage in enterprise, bright, daring and masterful; others lacking in these qualities and marked for meekness, diffidence, docility, timidity, susceptibility, dependence, humility, modesty, charity, piety and other amiable attributes and qualities. All varieties of these characteristics may be found grouped in a single family. Instances almost innumerable might be cited where the strength of the family was concentrated in some one member sometimes the eldest, again the youngest, or another; and others moderate in endowment, feeble or even imbecile in intellect. History is replete with examples and numerous local illustrations might be given without going beyond the records of this court.

The most contrary manifestations of character are exhibited by children reared under most favorable conditions. We find some consumed by cupidity, "metalized," avaricious, although possessed of wealth beyond the dreams of avarice, always thirsting for more; for, it is said, the love of pelf increases with the pelf, and poverty wants much, but avarice everything, and blinded by this vice its victims live only to increase their store. Others again benevolent, generous

prodigal, careless of the future.    Under the same roof, edu-
cated under the same auspices, with every advantage of domes-
tic and foreign culture, trained by the same parents, them-
selves examples of the cardinal virtues, we discover in their
offspring dissimilar traits, none of them necessarily vicious,
but still symptomatic of individual idiosyncrasies and oppos-
ing tendencies and temperamental tangents.    How to recon-
cile these incongruities is not the province of the court; to
note them suffices for the present.

### FAMILY HISTORY OF DECEDENT.

Decedent was born in 1856 and came from Mexico with
her parents to San Francisco in April, 1867.    There were six
children in the family at that time, three sons and three
daughters, two of the former, José Vicente, junior, and Miguel
A., were then in Europe for education, as José Maria had
been also for a time, returning in 1862 to Mazatlan, whence
he came with his sisters, Maria Ygnacia, Maria Josefa and
Maria Concepcion, and his parents, Don José Vincente de
Laveaga and Doña Dolores Aguirre de Laveaga.    The eldest
child, José Vicente, junior, was born August 10, 1844; he
died unmarried in California in August, 1894; the second,
José Maria, born in 1845, died unmarried in Denver, Colo-
rado, April, 1880; the third child, a daughter, Maria Ygnacia,
commonly called "Ignacia," "Nacha," or "Nachita," the di-
minutive for the full name, born in September, 1847, died in
Rome, Italy, February, 1888; the fourth child, Miguel A.,
the contestant here, was born in March, 1848; the fifth, Maria
Josefa, now Mrs. Cebrian, known in the family circle as
"Josefa" or "Pepa," the proponent here, born in October,
1855; the last in sequence of birth was Maria Concepcion, the
testatrix, born in December, 1856, who died unmarried in
Madrid, February 4, 1909.    The contestant Miguel and the
proponent Maria Josefa Cebrian are the only surviving
children.

The absent sons, José Vicente and Miguel, returned from
Europe, the former in 1868 and the latter in 1869, and there-
after remained with the family.    The respective ages of the
other children at the time of the arrival in San Francisco in

1867 were: José Maria, 22 years; Maria Ygnacia, 20; Maria Josefa, 12, and Maria Concepcion, 11 years. In the household there were two maiden sisters of the mother, Isabel and Trinidad Aguirre, who remained as members of the family until their death. In addition there were the necessary domestic servants and attendants. Upon his arrival here the senior Don José Vicente repaired to a house selected on Silver street, where he remained with his family until he moved to 512 Dupont street, near California, thence after a few months to 1115 Stockton street, near Pacific street, where he made his local habitation until he died in 1874. After his decease his widow purchased the dwelling-house 322 Geary street, near the present Hotel St. Francis. She lived there until her decease in 1882. This domicile she devised to the use of her daughters who should remain single in order that with its furniture it should serve as an abode for them, subject to the burden of taxation; in case of their marriage or death unmarried, the value of the property to be divided among the other heirs. In this residence these two daughters lived from 1882 to 1884, when they went to Europe, Ygnacia dying there in 1887.

### PRECATORY PROVISIONS OF MOTHER'S WILL IN REGARD TO FAMILY AFFAIRS AND SPECIAL CARE OF MARIA.

During this period Ignacia had the personal care and control of Maria, pursuant, it should seem to the terms of the mother's will, dated December 15, 1881, which set apart the fifth of her estate to charity, and the remaining four-fifths in equal shares to the children surviving, José Maria having died prior to that date. All the surviving children, save Maria Concepcion, who was then twenty-four years of age, were named as executors and executrices. The instrument was written in Spanish. In this document, after the dispository provisions, are these clauses as translated:

"Fifth. For the execution of all the dispositions contained in this, my testament, or any codicil in case I leave one, I name for my executors my four children, Maria Ignacia, Miguel Austacio, José Vicente and Maria Josefa; and in case the law prevents the last from being an executor, I name as the fourth

executor, in place of said Maria Josefa, her husband,. J. C.
Cebrian; and each of said executors jointly and severally I
release of all bonds or securities which are required by law.

"Sixth. I charge and implore my heirs and executors that
they shall do everything possible to avoid lawsuits and all
manner of judicial proceedings, because these are prejudicial
to the tranquillity of families and ruinous of their interest;
but in case of any unadjustable difference, they can submit it
to the decision of arbitrators or friendly adjusters who shall
name a person of probity, love and reliability. Further, I
charge, desire and ordain that in the divisions of my estate
none of my children shall seek any advantage over the others,
and that no account shall be made if some have spent more
than others while I was living, since this is my will, as is
everything which I ordain in this, my testament.

"Seventh. Most fervently I charge my said executors with
the care and protection of their younger sister, Maria Concep-
cion as long as she may live."

### THE FATHER'S WILL AND ITS ADMONITIONS AND REFERENCE TO A "MEMORIA."

The sixth clause is a repetition of the admonition con-
tained in the seventeenth paragraph of the senior Don José
Vicente's will to avoid all litigation. In the father's will exe-
cuted September 27, 1873, which, according to its final
statement, occupied in its composition, from commencement to
conclusion, five years, and was written slowly in the hand of
the testator, although regularly attested, he enumerates his
children, "the first four of legal age and the last two still
minors, since Maria Josefa will complete her seventeenth year
and Maria Concepcion her fifteenth year at the end of the
present year, 1872." In the seventeenth clause he admonishes
his heirs, their tutors, guardians and executors to avoid liti-
gation and in the eighteenth clause he names his executors:

"For the purpose of complying with and paying every-
thing contained in this, my will, and all of what may be con-
tained in the memoria, which, with a date previous to this,
may appear written in my hand, or a codicil, in the case of
leaving one or other or both, I name for my testamentary

executors, in the first place, my wife, Doña Dolores Aguirre; second, my daughter, Maria Ignacia; third, my son, José Vicente; and fourth, my son, Miguel Austacio, jointly, relieving them of the bond which the law requires. I confer upon them ample power to the end that immediately upon my death they may take possession of my property, comply with and pay out everything contained in this, my will, within the legal term or outside of it (with such additional time as may be necessary for its prorogation) (and if they need more time I now allow it to them.) ''

The twenty-first clause is as follows:

''And by means of the present I revoke and annul all testaments which previous to this I have formulated, which are many, and the last previous to this was in the year 1865, those which may have been made by word of mouth, or in any other form, to the end that no one of them may be of value or be effective in court of law or outside of it, except this testament and memoria or codcil which may appear at my death, but that the memoria must be written in my hand, although, as I have said, it may be dated previous to this testament, which I desire and command to be carried out in all its parts, as is my will, or by whatever means may be most secure and according to law.''

THE INCEPTION OF THE LITIGATION OF ANSELMO, NATURAL SON OF JOSÉ MARIA, RECOGNIZED IN HIS WILL AS SUCH.

He died on March 14, 1874, and the will came into course of probate and administration in that and the following year, during which time Maria Concepcion became of age. It is claimed here that the ''memoria'' alluded to in the father's will was a practical declaration and determination of the incompetency of Maria Concepcion. The executors named in the will were primarily, the widow; second, the daughter, Maria Ignacia; third, the son, José Vicente; fourth, the son, Miguel Austacio, all jointly. Certain obligations were cast upon them in the seventeenth clause as ''tutors, guardians and executors,'' and in this eighteenth clause they are named executors for the purpose of complying with and paying everything contained in the will, ''and all of what may be

contained in the memoria, which, with a date previous to this may appear written in my hand.''

No such written document as this memoria, nor any codicil, appears in evidence, but an attempt is made to supply its contents by other evidence.

It is claimed that the seventh clause of the mother's will is a virtual renewal of the memoria, tantamount to a new recognition of the mental incompetency of Maria Concepcion and an injunction for the fulfillment of the obligation thereby imposed. In the family all this was known and understood and respected.

José Maria died April 21, 1880. No proceedings were taken concerning his estate at that time. He left a will and by that will he gave his estate to a natural son, Anselmo. In October, 1895, an attorney filed a petition for its probate and it was admitted to probate in this court in that month without contest. On August 14, 1894, José Vicente, junior died, leaving a will admitted to probate in this court on the second day of October, 1894, the executors being Daniel Rogers, Thomas Magee and M. A. de Laveaga. The administration of his estate went on till, in the year 1895, an application was made to the court by Anselmo, the natural son of José Maria, for a legacy of $20,000 given him in the will. This application was made April 17, 1896. There was an appeal taken from this order upon the ground that the $20,000 was subjected to a reduction, it being limited with other bequests to a fund arising from certain property, and the supreme court so decided, and the balance was paid to Anselmo, after making this deduction. In the course of this application for the legacy, the question arose as to the legal status of Anselmo concerning the estate.

### DEPARTURE OF MRS. CEBRIAN FOR EUROPE WITH MARIA AND THE REASON THEREFOR.

Before this time, in June, 1896, Mrs. Cebrian, formerly Maria Josefa de Laveaga, with her husband, left the state for Europe, taking Maria Concepcion along with them. It is asserted that the cause of her departure was that proceedings might be instituted to have Maria Concepcion declared legally

incompetent, or other proceedings might be taken which might disclose her mental condition and her incompetency to transact her business affairs. Whatever the reason, Maria was taken from the jurisdiction of this court in June, 1896, and did not return pending the trial of the Anselmo case. In 1904 a settlement was effected with Anselmo by which he released any claim, of any kind whatsoever, which he might have upon her death, against her estate. For seven years she was kept beyond this jurisdiction for the purpose of avoiding an appearance in court in the litigation coming out of the estate of José Vicente, junior. Commission was issued early in that litigation to take the depositions of Mr. and Mrs. Cebrian and also of Maria. The depositions of the former were given, but Maria was never subjected to an examination. For one reason or another the attempts to take her depositions were ineffectual.

Maria Josefa had intermarried with John C. Cebrian on December 23, 1875, about a year after the death of her father.

On one pretext or another the taking of Maria's deposition was evaded or avoided, a doctor's certificate served at one time and other expedients were availed of at other times; but at all events it was never taken. The Cebrians remained away during this period, except for a short time in the year 1901, leaving Maria in Europe. They were all absent during the trial in this court of the Anselmo contest, which was instituted on January 27, 1897, by the filing of a petition of that person claiming a share of the estate of José Vicente as the natural son of José Maria, asserting that he had been legally adopted and was entitled to inherit the same as the other nephews and nieces. A demurrer was filed to this petition and overruled on December 3, 1897. A commission for taking the depositions of the Cebrians and Maria was issued in February, 1898; the trial began October 5, 1898, concluded on February 11, 1899, and the trial judge rendered his decision upholding Anselmo's claim on June 4, 1900. The bill of exceptions was settled on April 30, 1903, the appeal perfected May 7, 1903, and decided by the supreme court February 9, 1904. By this final decision the question under

section 1387 of the Civil Code was not determined, for it was held that according to the evidence Anselmo had not been legally adopted under section 230 of the same code.

THE COMPROMISE WITH ANSELMO AND ITS PRINCIPAL PURPOSE.

On March 25, 1904, a settlement was effected with Anselmo for the sum of ten thousand dollars, and the amount was paid; the purpose of this compromise being mainly to avoid a revival of a contest in the event of the death of Maria Concepcion. It is the theory and the claim of contestant that the sole reason for making this settlement was to avert such a contingency, it being assumed by everybody interested, throughout the litigation, that Maria Concepcion was incompetent to make a will, that she could not make a testamentary disposition of her estate, and that it would necessarily be administered under the statute of successions and that the only manner in which a renewal of Anselmo's assault could be prevented was to secure a release by which he relinquished any possible interest he might have in it. This object was accomplished through negotiations by the other members of the family interested in the estate of José Vicente and also heirs at law upon the death of Maria Concepcion; she personally had no part in it. During all this time Maria was in Europe, whither she had gone or been taken on account of this litigation. After the decision on the demurrer, the Cebrians, anxious to return to California, declaring themselves exiled on account of the necessity of keeping Maria away from the state, said in a letter to Miguel, who was representing the interests of all concerned, that if this decision should be upheld by the supreme court Maria could never return; and this was one of the strong inducements to Miguel to consent to the settlement with Anselmo, to enable them to return from their exile in Europe, which they did within a month after this compromise was consummated, bringing with them Maria. It is claimed that the reason she was kept so long in Europe was their fear of proceedings to declare her incompetent, and that that apprehension was not dispelled until there was no longer prospect of Anselmo's assailing Maria's estate. Meanwhile, they were continually complaining of the legal situation which compelled them to involuntary absence in Europe.

THE SOLE MOTIVE FOR KEEPING MARIA AWAY FROM SAN FRANCISCO.

The sole motive of their absence was to keep Maria out of the reach of the courts so as to prevent the disclosure of her incompetency to make a valid will and thus provide against intestacy and a new action by Anselmo. During this litigation an effort was made by the opponents of Anselmo's pretensions to change the Civil Code, section 1387, to counteract the effect of the trial court's decision in his favor. All this was made known to the Cebrians in Europe, as they were advised of everything that was going on, and they knew and approved of the measure to amend the statute so that an illegitimate child could not inherit the same as a legitimate and this amendment was adopted in 1901, but on account of a technical defect in the title of the general act it was declared invalid, much to the distress, apparently, of all concerned in its passage, and the Cebrians inveighed bitterly in correspondence against the futility of the endeavor to better the law in their behalf so as to guard Maria's estate from prospective danger; in the succeeding session of the legislature, 1903, another attempt was made on the same lines, but the attorney for Anselmo opposed its passage and it failed of enactment. In all of this scheming and counterscheming to influence legislation and efface the effect of judicial decisions there is a curious study in the undercurrents of this litigation as disclosed by the evidence, which, perhaps, it is not practical to pursue, however interesting philosophically. It is asserted, however, that the whole design of these devices and intrigues was in furtherance of the common family understanding, and the recognized fact in the domestic circle that Maria Concepcion was not mentally qualified to make a valid testament and that some provision should be made against the contingency of her dying intestate, so legislative aid was invoked in vain to that end.

MARIA'S FIRST TRIP TO EUROPE IN CARE OF YGNACIA.

It was in April, 1884, that Maria first went to Europe, under the care of Ygnacia to whose personal control she

seemed to have been committed by the other executors, all
of whom were very earnestly enjoined by their mother to
protect her as long as she should live. This personal trust
seems to have centered in Ygnacia on account of her own
peculiar fitness and the circumstance that she was singularly
situated to carry out its terms. Miguel had charge of the
properties, Maria Josefa was married and had her own cares,
José Vicente was otherwise occupied, and it necessarily de-
volved upon Ygnacia to execute the testamentary injunction
of their mother and assume control of the younger sister.

### MARIA REMAINS WITH YGNACIA UNTIL DEATH OF LATTER.

According to all accounts Ygnacia was the strongest char-
acter in this family; she seemed to have more individuality
and mentality than even the male members; she adminis-
tered the affairs of the house, even in the lifetime of her
mother; and she received, as she deserved, the respect of all;
and it was, therefore, natural that, in the circumstances, to
her should be intrusted the care of Maria. After the moth-
er's death, Maria and Ygnacia continued to reside in the
house devised to them until the trip to Europe, whither they
went together. The Cebrians were also abroad from 1884
to 1888, but they lived apart from Ygnacia and Maria. They
were in Paris off and on from 1884 to 1887, but they did not
live in the same house with Ygnacia and Maria, nor did they
constitute a family circle; they were not at all domestically
associated; they occupied separate apartments. Ygnacia
headed her own household, taking with her to Europe as
companions Juanita Laveaga and Celestina Halphen, and also,
as servants, Crescencia Martinez and Diega Hernandez, and
these remained with her and Maria Concepcion until her
own decease in Rome in 1888. She went with Maria and the
companions and servants to Rome from Paris about January
1, 1888, and a month subsequently she became seriously ill
and died on the 18th of February, 1888. The circumstances
of her illness and death are considered of importance in this
case and some reference to them seems to be pertinent at this
point.

ILLNESS AND DEATH OF YGNACIA——HER DEATH-BED MARRIAGE TO
JOSÉ CERVERA.

During these latter days of her life the Cebrians were in
Paris and were not aware of the condition of affairs in Rome
until near the end when word was sent by one of the servants,
whereupon Mr. Cebrian hastened to Rome, arriving a few
hours before the death of Ygnacia. She had become engaged
during the preceding year to one José Cervera and was mar-
ried to him shortly before her death, practically upon her
death-bed. When Cebrian arrived the husband, José Cervera,
was there and also, a brother, Cesar Cervera. Maria had
given no information to the Cebrians during this sickness for
the reason, as is asserted, that she was unable to do so and
the Cebrians were greatly perturbed and naturally distressed
that Ygnacia had been there in the hands merely of servants
during this critical period and that the man to whom she
had been engaged, José Cervera, had contrived the marriage
without any knowledge of or notice to her relatives. In ex-
plaining the fact that they arrived only at the last, the Cebri-
ans wrote to his brother-in-law in San Francisco that they
were not informed of the truth, stating that Maria, of
course, was a child and unable to acquaint them with the
facts, so it was left to a servant to communicate the intelli-
gence of Ygnacia's condition to them.

THE CONSPIRACY OF THE CERVERAS TO ABDUCT MARIA AND MARRY
HER TO CESAR CERVERA FOILED BY CEBRIAN.

One of the most remarkable features of this tragic episode
as related by Mr. Cebrian in his correspondence was the con-
spiracy concocted by José Cervera and his brother to abduct
Maria, upon the death of Ygnacia, take her to Spain and
marry her to Cesar. Fortunately Mr. Cebrian came upon the
ground just in time to foil the villains and in his communi-
cation recounting the incidents assumed the credit for having
baffled the conspirators. His narrative of the circumstances
and transactions connected with the last hours and the events
subsequent to the decease of Ygnacia is most illuminative to
show the nefarious character of the scheme by which, after
having consummated the death-bed marriage of José to Ygna-

cia, it was purposed to abduct and marry off Maria to Cesar, who is described as a semi-epileptic. The marriage of Ygnacia with José Cervera he described as monstrous, taking place after she had received the last sacrament, when she could no longer raise herself in the bed, "the merry wedding bells sounded for her with the solemn toll of the dead." Ygnacia had been ill for some time and an operation had been performed, but, owing to her debilitated state and blood impoverishment, the doctors expected a fatal result and the end was anticipated from the beginning; but those who surrounded her took good care to conceal the facts from Cebrian and his wife, because their interest was to keep her isolated in her last moments and even the poor Maria was herself kept out of the chamber and scarcely saw or spoke to Ygnacia during the last fifteen days. She was entirely defenseless in the hands of these schemers. Cebrian's censure was cast not only upon the husband of Ygnacia and the brother Cesar, but also upon the servants in attendance for neglecting to send word as to the true situation, and for being concerned in the conspiracy. No blame was attached to Maria, as she seemed to have been considered incapable of comprehending and communicating the circumstances and appears to have been treated as a negligible quantity all around, except so far as her name could be employed in carrying out the purposes of others. After the failure of the efforts of the Cerveras to abduct Maria, she went with the Cebrians and, thereafter, was identified with their family; her expenses were paid from her own income, but she was considered as under their care and protection, Mrs. Cebrian succeeding to the position of Ygnacia.

CONDUCT OF CEBRIAN IN THE CRISIS—HE SAVES MARIA FROM THE CONSPIRATORS.

It should be said to the credit of Mr. Cebrian that in the crisis which confronted him on his arrival in Rome he acted with courage combined with prudence and circumspection and contrived by his self-control and will power to outwit and overcome the conspirators. He was alone against them all, aided

as they appeared to be by the servants and by the supineness of Maria, who was not mentally adequate to assert herself. She was passive and plastic in the hands of the conspirators and appeared acquiescent in their plans, willing to go. with them and not return to Paris with Cebrian, until he by his finesse managed to rescue her from their toils. In his communication he gives a graphic account of the manner in which he achieved this result and of the pleasure it gave "poor little Maria," "the unfortunate," who wept and cast herself into his arms and did not want to leave him, after he had accomplished her salvation from the vampires who were seeking to entrap and abduct her. In these perplexing circumstances Mr. Cebrian acted with consummate adroitness and discretion and saved Maria from the fate prepared for her by the plot of the Cerveras.

### MARIA CONSIDERED "A NINA," INNOCENT AND IRRESPONSIBLE, NEEDING PROTECTION.

He had the satisfaction in his own conscience, as he said, of having saved Maria, "a niña," innocent and irresponsible, from the worst of tortures, and of having complied with the duties of a man and brother, and of a son (in law), for he said they all knew that the intentions and wishes of the father and mother were that more than any other of their children, Maria should be protected.

The marriage of Ygnacia with José Cervera was not without doubt as to its legal validity, but this was not contested, and, as husband, he laid claim to her entire estate and this matter was adjusted by paying him the sum of $150,000, the amount being raised by members of the family, Mrs. Cebrian, José Vicente, Miguel, Maria being made a party to the agreement of settlement, which was approved by Mrs. Cebrian, Miguel and José Vicente guaranteeing the share to be paid by Maria, the representatives of José Cervera not being willing to accept her signature or her undertaking. This was a family transaction and they contributed in proportion to their shares in the estate of Ygnacia and thus they rid themselves of the Cerveras.

MARIA NOT CONSULTED IN IMPORTANT MATTERS——HER PARTICIPA-
TION NOMINAL.

In all these matters, it is claimed by contestant, that Maria
was not consulted at all, that she was a nonentity and that
her participation in business was nominal and that the fam-
ily answered for her. Even in the important transaction
wherein Edward J. Le Breton was appointed receiver of the
California Safe Deposit and Trust Company, where she
signed as a surety on his bond it was all by arrangement with
the family, she not being consulted at all by the parties in
interest, Miguel guaranteeing on behalf of Maria, he not
wishing, for the reasons of his personal relations with Le
Breton to go on himself, to hold harmless Mrs. Cebrian for
her share. Maria signed the bond and Miguel made the guar-
anty. This, it is said, was the usual course of business.
Miguel handled the business affairs after the death of the
father, the senior Don José Vicente. All of the affairs trans-
acted in her name are sought to be explained in this way.
Illustrations of this practice are, for instance: in October,
1905, a lease was made by Mrs. Cebrian, Maria and Miguel
for a lot on the corner of Market street and Van Ness ave-
nue, for a monthly rental of $1,000, for twenty years, the
lessors negotiating to erect a building costing $75,000. The
lease was signed by Miguel, Mrs. Cebrian and Maria, but the
whole arrangement was made by Miguel, he simply consult-
ing with Mrs. Cebrian, and Maria signed as a matter of course,
without understanding the business or the transaction, and
because it was assented to by Mrs. Cebrian and her brother
Miguel; in July, 1906, that was after the fire, a piece of prop-
erty belonging exclusively to Maria, on the corner of Market
and Fell streets, was leased for twenty-five years at a monthly
rental of $800, and a building was to be erected thereon cost-
ing $100,000. This lease was signed by Maria, but she was
not in any way consulted; Miguel negotiated the lease without
having had any consultation with Maria about it, he simply
conferred with Mrs. Cebrian and with her consent Maria
signed the lease. In August, 1906, a lease was made on a lot
on Market street, one hundred and seventy-five feet west of
Sixth street, for twenty years at a rental of $300 per month

and a $12,000 building to be erected thereon; this belonging entirely to Maria, and the transaction was made in the same manner as the others. In October, 1903, a daughter of Mrs. Cebrian, Mamie, was married in Spain. No message was sent any member of the family here by Maria, who was with Mrs. Cebrian, and no word of any kind came from her. In November, 1903, Miss Julia de Leveaga, daughter of Miguel, and niece of Maria Concepcion, was married in this city, but no communication of any sort came from Maria. The comment made upon the omission of this courtesy was that Maria was not expected to render it, and that she was not sufficiently intelligent to know that it was socially incumbent upon her, and that, moreover, she was unable to compose a letter.

## ENDEAVORS OF FAMILY TO CONCEAL HER INCOMPETENCY IN THE ANSELMO LITIGATION.

During the litigation with Anselmo, when the question was mooted about her mental capacity, a form of letter was prepared here, sent to Mrs. Cebrian, and she had Maria copy it and sent it back to San Francisco, so that in the contingency it might be accepted as a letter from Maria, as against any claim of her incompetency, or inability to write a letter. It is asserted that Mrs. Cebrian participated in that act, and for that purpose, and as a part of the scheme in litigation to keep Maria from the jurisdiction of the court, and from being involved in any way which would expose her mental incompetency.

The contention of contestant is that she never arrived at an adult age in mind; she never mentally passed beyond childhood. At the age of fifteen her studies were like those of a child of seven or eight, never going beyond the rudimental degrees. She learned to write and she would talk upon simple subjects like a child, about the weather, about going to the theater or on the matter of dress, but in anything that required reason or thought she was elementally incapable, and so recognized and treated by all her family. She was alluded to by some of the acquaintances of the family as "tonta," "foolish," and "la tontita," "the little foolish one" (as the terms are translated), that is by the people not

in the immediate circle of the family, not by the members
of the family. She did not comprehend the reason why she
was taken to Europe, and knew nothing about the transaction
of her ordinary business affairs. She was a proper subject
to have been declared legally incompetent in a court of justice,
and had it been necessary at any time for her protection that
step would have been taken; but in order to avoid any such
proceeding during the Anselmo litigation, she was taken
abroad by the Cebrians, who were willing to banish them-
selves from the state for a long period of years rather than
to submit to a judicial inquiry into her mental condition.
It is finally asserted, most confidently, that the paper prof-
fered for probate was not her act, but that it was prepared
for her by some person who procured her to make a copy.
As to the identity of this person no positive charge is made,
but the circumstances point to the person, but the contestant
at the outset exonerated Mrs. Cebrian from having any par-
ticipation in the making of this instrument, inasmuch as she
disclaimed having aught to do with it, and asserted that she
endeavored to prevent it.

THE MAKING OF THE WILL—MRS. CEBRIAN'S STATEMENT AND
    DENIAL THAT SHE WAS CONNECTED WITH ITS EXECUTION.

Mrs. Cebrian denied having anything to do with the mak-
ing of this instrument. She testified that she first saw the
paper the day that Maria signed it and gave it to her, the
day of its date, February 15, 1893, in San Francisco, in her
room, 1801 Octavia street, in the Cebrian house, Mr. Cebrian
and herself being present, none others; Maria had called
Cebrian and herself to her room, after luncheon; it was all
written when they went into the room; she gave it to Cebrian
to read it for them; then Maria gave it to her and Mrs.
Cebrian wrapped it in a handkerchief and put it in her
drawer. Maria folded it herself and it remained in that
handkerchief. For some time it was in the drawer until when
she left San Francisco to travel she took it with all the papers
she had in that drawer and put them in a trunk and there
it was preserved all those years until June, 1909.

CUSTODY OF THE WILL—SIXTEEN YEARS IN AN UNOPENED TRUNK
—DESTRUCTION OF THE CONTENTS OF THE TRUNK.

The trunk was kept in the house in Octavia street, there were many other things in that trunk, among them letters and papers of no use to her which she destroyed when she unpacked the trunk looking for her sister's will. There were pictures and an album in the trunk which she kept. This trunk was packed by Mrs. Cebrian in 1893, before she went to the Chicago exposition and remained unpacked until June, 1909, never opened during that time, locked. She retained the key. In this trunk when opened after her return there were found many articles of apparel, letters from old friends and an album; the letters were destroyed, the album preserved; the only paper that was left that had been in the trunk was the will enveloped in the handkerchief. Mrs. Cebrian said that she did not remember anything of the will when Maria died, because she was so overcome with grief. The first time it occurred to her was when she answered her brother's letter by cablegram, when she remembered that he was named as administrator; she had not seen this will since 1893, and she did not remember what disposition Maria made of her estate until she opened and read the will; she knew that to a great extent she was a beneficiary; she had not spoken to anybody about the will from the time she put it in the trunk, except with Maria after the fire of 1906; she had not told Maria not to make a will at any time; the paper was not signed when Maria handed it to her; she signed it in her presence; none of her children knew of the existence of the will; the only person in Europe that knew was her husband; she never spoke to Miguel about the will. When she was in Paris in March, 1909, she remembered that the will was in a trunk in her house, but which particular trunk she could not recall, she had so many in the basement of her house; she did not remember about the pictures and the album, but she did remember that the will was locked up in a trunk there; it was the only trunk in which she kept valuable papers. She did not have a safe deposit box, but her husband had, some of her valuable papers were there, some in her trunk, or her drawer, or wherever it pleased her. The

first time Mrs. Cebrian knew that Maria had made a will was as narrated; she did not tell Maria then and there not to make it; it was made already, nor did she ask her not to sign it; but her brother José Vicente, had said very often to her, "You ought to make a will"; she could not produce the handkerchief in which the will was wrapped; she had not used the trunk in her travels, nor had she opened it for sixteen years; the pictures that were in the album were tokens of affection from friends. In the room where Maria was when she wrote the will there was no law book; Maria said to her, "You come here, Pepita and Cebrian, and see," sitting down at her writing desk and continuing, "See, I have signed, here is my testament and will"; they remained a few minutes, when Mrs. Cebrian went into her own room adjoining and left Cebrian with Maria; after a while Maria and Cebrian followed into this apartment and it was then and there that Maria handed the paper to her and told her to keep it; while Maria was there with them Mrs. Cebrian took the paper, wrapped in a handkerchief, and put it in the drawer, locking it up; after about five months she removed it to the trunk as stated. Mrs. Cebrian had no idea why she and her husband had been called in by Maria. No lawyer had visited the house to see Maria nor had Mrs. Cebrian known of her consulting any attorney before that time; she did not expect when Maria called her into the room that it was in connection with signing a paper; she had not importuned Vicente not to have Maria make a will; when Vicente spoke to Maria about making a will he thought it was necessary, it was good to do so, the father and mother had made wills and he advised a similar course to Maria and her sister. Mrs. Cebrian said that she did not importune Maria to make a will, she did not tell her not to make it.

MRS. CEBRIAN'S LETTER TO MIGUEL CONCERNING THE FINDING OF THE WILL.

Mrs. Cebrian recognized a letter dated Tuesday, May 25, and Wednesday, May 26, 1909, written by her to Miguel, in which she expressed herself as follows:

"Dear Miguel:

"I feel very badly that you did not care to speak to me when I arrived at my house anxious to see you and to weep with you and to console ourselves together after the death of my dear Maria and to give you this will and to explain to you how it came to be made.

"Vicente was the one who importuned her many times to make it and finally she gave in (cedio) and when she told me about it I told her not to make it, but she made it. She gave it to me to keep and I did not remember that that document existed and I did not see it again until today. Since my poor little (thing) died Cebrian and I have never spoken of the will nor the estate until we received in Paris your letter full of fear and anxiety on account of the estate which was entirely new to us and owing to my long sickness which I did not think sufficiently and with great tenderness (love) for you and with the best of desires to eliminate your anxieties I telegraphed you. Too bad that I was mistaken in doing it for never would I have believed that you could have condemned me on account of appearances and I was very tranquil because I could not believe it until I saw that you would not answer to my telephone. What a horrible shock. What a terrible shame that you have insulted me by writing and before your children without any motive. But I forgive you and in the name of our sainted Mother hope that you will think and will reconsider and that we will be able to talk it over.

"Finally on Sunday I found the will and I send you a copy of it and I do not know yet whether you desire to present it jointly with me which is our duty. If you do not care to do it I will have to present it personally together with my petition of which I also send you a copy.

"Reflect it well Miguel and if we do not present it jointly you fill in the lines in paragraph 12 of the petition that which in your conscience you believe just before I will sign it.

"It is clear that if we present it together there is not the slightest necessity that the Court should know anything about it, if it is agreeable to you to arrange it between ourselves privately, which we can do by writing before a notary. All this

I would have told you with more explanations on the 17th if you had consented in seeing us and talking the matter over, not as strangers, but as brother and sister, all would have been arranged to your satisfaction in an instant.

"Wednesday.

"Yesterday I could not finish this on account of a strong pain in my head and in place of Tuesday I put Monday on the letter. This is all I can tell you by letter. I confide in God that you will consider the matter well.

"As ever, your sister,

"PEPA."

MRS. CEBRIAN'S EXPLANATION OF THIS LETTER AND HER PROPOSED PETITION TO THE COURT PREPARED BY HER HUSBAND, WITHOUT LEGAL ADVICE.

Mrs. Cebrian explained that she meant by the expression in this letter that she never would have believed that he would have condemned her on account of appearances, that Miguel got "mad" because Maria had made a will and she had not told him about it; that is what he had said, that he was very angry that she had concealed the secret of Maria's will for sixteen years, and that she had copied that will without telling him; when he was very angry he claimed that she was incompetent.

Enclosed with this letter from Mrs. Cebrian to Miguel was the copy of the proposed petition, which she said was prepared by her husband, and which reads:

"Maria Josefa C——, wife of J. C. ——, a resident of S. F., and for over twenty years at 1801 Octavia St., deposes and says:

"(1) Maria C. de L——, her younger sister, a feme sole, a resident of S. F., and also for over twenty years at the above said address, died, while traveling in Europe, at the city of Madrid, Spain, on the 4th day of Feb., 1909, a victim of pneumonia;

"(2) That said decedent was then traveling with deponent and her family;

"(3) That said decedent lived uninterruptedly with deponent, at their parents' home, or at school ever since her

birth until deponent's marriage in Dec. ——, 1876; and thereafter again, said decedent lived continuously since Feb., 1888, until her death, with deponent and her family, but at decedent's own expense;

"(4) That between Dec., 1876, and Feb., 1888, said decedent and deponent had their meals together, an average of 25 days every month, whether at said decedent's residence, or at the deponent's residence; and also in that interval of time they on several occasions lived under the same roof for weeks at a time;

"(5) That in the month of Feb., 1893, said decedent called deponent to her room, signed in her presence a paper and handed it to said deponent saying: 'Here is my will and testament; please keep it for me, or rather for yourself'; and deponent kept it in one of the closets at her above said residence; in Octavia St.;

"(6) That before and after said decedent's death deponent kept a correspondence, by mail and telegraph, with her brother, Miguel A. de L——, of S. F., and of Bien Venida, Contra Costa Co., Cal., until the 27th of April, 1909, when deponent wired him her safe arrival in New York City;

"(7) That deponent was taken ill in Madrid, after her sister's death, and again in Paris, and could not return to S. F. until the evening of the 12th day of May, 1909;

"(8) That since the 14th day of May, knowing her brother Miguel has an interest in last will and is also named therein as executor, deponent has tried to meet him and talk to him, even by telephone, but without success;

"(9) That since her arrival in S. F. deponent has not been in good health, but has been looking for said will in her above said residence, and found it on the 23d May, and now deponent files said last will and testament in this court, declaring it is the same will handed to her by said decedent in Feb., 1893; and that deponent is the person mentioned in said will by her pet name 'Pepa';

"(10) That deponent declares she never mentioned the matter of a will to said decedent, nor ever insinuated to her the making of a will; that it was very unexpectedly that she received from said decedent the said will in Feb., 1893; that

deponent never mentioned the existence of said will to any of her children, until the said 27th day of Apr., 1909, when she met her third child in New York;

"(11) That considering that said decedent spent over 38 years of her 50 years of life in the company of deponent, or deponent's family, in perfect communion of spirit, without ever the shadow of any disagreement, deponent thinks it perfectly natural and thoroughly just that if said decedent should write her last will, it would be favoring in some way deponent's family, as decedent had publicly and repeatedly declared in the presence of many friends;

"(12) That notwithstanding the justness of the foregoing, deponent submits to this Hon. Court her wish to alter the last provision of this will, provided the law permits, in the following manner, to wit:

"To suppress the paragraph 'Dejo todo lo que me quede a mi hermana Pepa o a sus hijos, si ella no me sobrevive' (lines 12 and 13 of will) and to substitute instead the following words:

"I bequeath .......................................
.................................................
.................................................

"(13) That deponent hereby prays this Hon. Court to issue letters of administration for the estate of said decedent to her, jointly with said M. A. de L——.

"And your deponent will ever pray, etc., etc., etc."

#### THE CONSEQUENT CORRESPONDENCE.

Mrs. Cebrian testified that this paper was prepared without the advice of a lawyer; she did not intend to present that paper to the court; she wanted to bring her brother to reason by all the means she could; a message of love, not intended for the court. The statement in the fifth paragraph of this paper that she kept the will in one of the closets at her residence in Octavia street was not correct, the rest was true, "more or less"; her husband wrote the paper for her; she never mentioned the matter of a will to Maria, nor ever insinuated to her the making of a will and she had not anticipated the action of Maria. It was true, as stated

in that paper, that Maria had repeatedly and publicly declared in the presence of friends that her intention was to leave everything to Mrs. Cebrian and her children; she said it to several, after Ignacia's death, before she made this will, in Paris she said it to Mr. Cazet, she said it to Mr. and Mrs. Guerrero, in San Francisco, so many persons were present she could not remember.

To the letter containing this proposed petition Miguel replied as follows:

"Dear Pepa:

"Being in the City to-day, I was handed your letter of Tuesday with a copy of a curious document which pretends to be Maria's testament. I hasten to answer to show you there is not the least hesitation in the course I propose to follow in this matter. You know as well as I, that Maria was incompetent to make a will. As you know, our father left a memoria naming Nacha and myself guardians of Maria because she was incompetent. I obeyed that request religiously. I gave Maria my services for over 30 years free of charge, increasing her fortune considerably. I believe that in justice and in law I am entitled to one-half of her fortune, and on this point I am confirmed and positive. I do not think it will be difficult for me to show that Maria was not competent to make a will. That monstrosity speaks for itself. I believe I can easily prove it without going very far, with your own letters written before and after the date of said paper. My private correspondence was not burned and I believe your affidavit will suffer when it is compared with the contents of your letters. I am ready to make an arrangement, as I said before, half and half to each one. In case this does not meet your approval, you may file that paper in court, and I will take steps to protect my rights. As for the legacies, it is unnecessary to say I would respect these, because it is a good deed. Yours,

"MIGUEL."

In answer Mrs. Cebrian wrote:

"Wednesday, Bien Venida.

"I received your letter, and see that you think that paper has no value. According to your opinion, I am mistaken,

and one who is mistaken had better say nothing more. Therefore, send back to me the papers which I sent you today with my letter, because they are mine, and I want them, and they have no value for you or anybody else. Send them back to me. I suppose that the court will give us the property, as you desire, half and half. There is no necessity to write insulting letters, or letters insulting the memory of the dead.

"As ever, your sister,

"PEPA."

"That paper having no value for you, there is no necessity to present it, and in this way the court will distribute the property according to law, and in this way the matter will be most simple."

In reply Miguel wrote:

"Bien Venida, Cal., May 28, 1909.

"Dear Pepa:

"I received last night after 8 o'clock your letter of Wednesday. I see your acquiescence that the property of Maria be distributed by the court according to law. Now, the question is, how to present ourselves to the court. You have informed me that a document is in existence which purports to be the will of Maria, but which I do not recognize as such. If I ask for general letters of administration (what I have now, or special letters) I have to swear that I do not know of any will; no matter that in my judgment it has no value. We must be very circumspect on account of Anselmo, who, I have not the slightest doubt, will try to cause difficulties. (According to Vin., this also the opinion of his uncle) he will try to see that what he can get out of us under the pretext of new evidence, and who knows what other allegations.

"Yours,

"MIGUEL."

Then ensued the following correspondence:

"San Francisco, May 31st, 1909.

"Dear Miguel:

"Your letter of the 28th came to me on Saturday, the 29th, night. I understand that you do not want to present to the Court a document which you do not recognize. I do

know that that document is the truth pure.  I am ready to present it, but if you think to dispute it I will not present it, because I never wanted lawsuits, nor fights, nor lawsuits 'with any of my brothers (not even for injury inflicted by them)' and it will not be I who will give you leeway to insult before the Court the memory of our parents and sisters as you threaten to do.

"Now if you have reconsidered and you promise me by writing not to dispute that document, I will present it, any day asking for general letters of administration for you and me.

"I have not as yet a lawyer.  Until now my lawyer has been God, who sees my conscience.

"Your sister,

"PEPA."

"M. A. de Laveaga, R. F. D., No. 1,
    "Berkeley, Cal.

"Bien Venida, California, June 1st, 1909.

"Dear Pepa:

"Received tonight your letter of May 31st, frankly I do not understand it.  As I already wrote to you in my letter dated May 25 (it ought to have been May 26th) my position is simply this: I consider that before God, Justice and the Law I am entitled to one-half of what Maria left in fortune, this I will defend before the court or courts with all means in my reach.

"In your letter of Wednesday last you consent that the property be divided half by half between us two.  If we arrange this satisfactorily between us two I don't see any necessity why I should promise in writing not to dispute that paper.                    Yours,

"MIGUEL."

"Wednesday, June 2, 1909.

"Dear Miguel:

"You tell me you don't understand my letter, and I see you have also not understood my former one. Read them with calmness.  I have not consented that the property shall be divided half and half.  I have said that the Court should divide it according to the law of the State, be that what it

may. Remember how I have acted all my life, and think how you have treated me lately. Read again my last letter. I now confirm it.     Your sister,

"PEPA."

"Bien Venida, Cal., June 2nd, 1909.
"Dear Pepa:

"Your letter of today received. All I can say is that you know my position and my determination. Now, do whatever you want.     Yours,

"MIGUEL."

"Dear Miguel:

"Today I have consulted with a person very respected in California (who is not a lawyer) and with great sorrow of my heart he has convinced me that the law obliges me to present the will. I am' sorry, for I did not want to present it if you have to attack it then I was ready to let the law follow its course without the will.

"As soon as the papers are ready, my lawyer will advise you. Your conscience will dictate you what you do. No matter what the results are my parents and my brothers and sisters will know the same as God that I never attacked them. They will know that the step I take is against my will, compelled by law. No matter what the end will be I will never cease to wish you the best.

"As ever, your sister,

"PEPA."

"Don't forget to send me the papers that I asked you for in my other letter."

"Bien Venida, Cal., June 3, 1909.
"Dear Pepa:

"I acknowledge receipt of your letter of today. You say 'I was ready to let the law follow its course without will.' In your letter of Wednesday, May 27th, you say 'that paper not having any value for you, it is not necessary to present it, and in this way the Court will distribute all the property in accordance with law, and in this way it would be more simple.' To this last I answered to you in substance the same which that person so highly respected in California tells you, telling you that a will, or an alleged will having been men-

tioned general letters of administration could not be asked for without mentioning the will. You being ready to concede. me one-half of the property, what I ask and insist upon, we can make between us two satisfactory arrangements on this point. There will be no necessity for me to dispute that paper when it is presented into Court. Yours,

"MIGUEL."

"Read your letter of Monday Tuesday, you make me a similar proposition."

"Bien Venida, June 10th, 1909.

"Dear Pepa:

"I see there is going to be war between us two. Of this I was convinced from the moment I received the dispatch which said there was a will (made behind my back and guarded· as a great secret) and prepared myself for it, but that it may not be said that the blame is on me, but only to protect my rights (Duty I owe my children) I want to call your attention to the following:

"In your letter June 2, 1909, you say: 'Remember how I have behaved towards you'? To this I answer, what has been done speaks for itself; now how have I behaved towards my sisters: I have been executor of my father, mother, Nacha and of Vicente. I have managed all where we had mutual interest, never have I charged a cent, yet I have spent out of my pocket for the mutual interest.

"In the Estate of Vicente, you went to Europe and left me alone to fight the suit of Anselmo. I worked hard, and had a compliment from McE and even D. in open court said Mr. de Laveaga makes a big fight. I received my share of the commission in the estate, and what did I do; notwithstanding of having done all the work, I divided it up to the last cent, giving you and Maria, to each one-third. This has been my conduct to you all since the death of our father. This in itself seems to me would be sufficient to break the will of a person more rational than our poor Maria. For thirty years of faithful service what does she leave me of an immense fortune that which a cheap miserable clerk—without any responsibility would have earned; without entering into

calculation I think it reaches to one hundred dollars per month; calculating interest on interest at 5% for thirty years.

"Besides this it seems you forget that after the death of Nacha there was a great deal of correspondence about Maria in relation to Doña Celestina Juanita and Cervera. Without doubt, Cebrian will recollect what he wrote about this last regarding Maria he (Cebrian) thought I did not understand his insinuations and afterwards used the most vulgar word. Of this on my word of honor not one of my children knows and will not know it unless it is forced in protecting my rights.

"Besides there have been enough letters in regard to Maria during the many years that you were in Europe and during the suit of Anselmo when Dwyer threatened to have Maria put under the guardianship of the Court.

"I swear to you, as disagreeable as it may be to me, that I will use all the legal means in my reach to guard my rights and as I tell you I let you know beforehand that later you cannot complain.

"Up to now I have not consulted any lawyer, besides Vin, as soon as Mr. Lyons puts on file the pretended will I will see one of the first lawyers of the city and will present him my whole case and you will have my answer in court.

"Now, good bye.

"MIGUEL."

"San Francisco, Friday, June 11, 1909.

"Dear Miguel:

"I can answer each point of your letter with advantage to myself but it would be very long I not being at your side to explain to you some words that you would not understand. That is why I desired to talk with you. You refused me and forced me to present the will. Now, I am in the hands of the law and God's will be done.      Your sister,

"PEPA."

THE CONNECTION OF CEBRIAN WITH THE TESTAMENTARY TRANSACTION.

As to the connection of Mr. Cebrian with this transaction it is claimed that he was the mainspring and he was the only

person who could have managed the matter; he was the man through whose machinations the plot was contrived and executed; the complaint of contest does not mention him, but recites that decedent was influenced by parties unknown, for at that time the contestant could not know the circumstances of the fabrication of the instrument, which is asserted to have been copied from a form prepared for Maria. It was not until the examination of Mrs. and Mr. Cebrian developed the incidents that inferences could be drawn irresistibly implicating Cebrian as the author of the document and the procurer of the paper propounded as her will. Mr. Cebrian denied that he had anything to do with the paper or ever saw it anterior to the occasion when Maria called him and his wife into her room; he knew naught of its contents prior to that time; after she signed it he read the whole of it; Mrs. Cebrian left the room before he finished reading it aloud, and he subsequently communicated to her its contents on the same day; after Mrs. Cebrian left the room he and Maria had a conversation for perhaps twenty-five minutes and then he went into his wife's room with Maria and the latter handed the paper to Mrs. Cebrian; he had no knowledge of the making of that paper before he was called in by Maria and from the time Maria left the room until May, 1909, he never saw the paper again. During that entire period he never spoke to anyone except his wife about the will. He had seen Maria before she made the will on the same day. He had spoken to her about a will some months before that time in his own house; but he had never procured a form of any will for her nor did he know of any form having been furnished her, nor of any law book containing forms being given to her, nor of any translation of any will being shown to her; so far as this paper was concerned it was a surprise to him when he was called in by her; when Maria spoke to him five or six months before this time she said, ''Vicente thinks we ought to make our wills, Pepa and I,'' and she remarked that it would be a good thing for all of them to make their wills and she asked him if he had made his will; she did not tell him of her intention to make a will, but she did state what she proposed to put in her will, that everything she had was for

"Pepa," that is his wife; she said this several times; sometimes there were present the children, sometimes Pepa, and at other times he alone with Maria; one time Clemente de Laveaga was present, the father of the children who were left $15,000 in the will; Cebrian knew that Vicente had talked to Maria about making a will, not this particular paper, not "importuned," but he had said several times that it was expedient for everybody to leave a will. The letter of May 25 and 26, 1909, was written by his wife, he saw it after it was written and read it and prepared the paper that was attached to it, the form of petition, he and his wife prepared it together and he made the copy of the will annexed to it, and he knew that the matters stated in that letter were correct. Mr. Cebrian knew approximately the value and the character of her property.

CEBRIAN'S ACCOUNT OF WHAT OCCURRED AT THE TIME—HIS CONVERSATION WITH MARIA.

Mr. Cebrian testified that after Mrs. Cebrian went out of the room, on the occasion of his reading the will made by Maria, he remained and talked with the latter and she said to him, "Well, Vicente has explained, as you know, very often about making the will. I told him I don't like to make the will because I don't want to make it public. I don't want to have the notary know it, as in the case of Ignacia, I don't want to have friends as witness as in the case of my mother," and then Vicente told her that there was no need of any notary or any witnesses: "You may just write your will on a piece of paper, and that is all, only be careful that the piece of paper has no initials, no printed matter, and you write it all by your own hand; there is no need to call in a witness"; and she said to Cebrian, "Well, as soon as I saw that it was so easy I made it"; Cebrian then said to her, "Well, how is it that you don't leave anything to Vicente?" and she replied, "Well, Vicente told me that he had already made his will, and he left nothing to her, nor to Pepa, nor to Miguel; that he knew that all of them were rich enough to get along and he left all to charity, so if she in making her will left him nothing he would not complain"; that was why she did

not mention him in her will; then Cebrian said to her, "Well, Maria, I thank you, I know that you love my children, but I see that this will will bring them trouble"; she asked why; and he answered, "because you leave so little to Miguel," and she replied, "Never mind about that; that is my wish, and if I had twice or ten times what I have, I would not leave him any more; he is just as rich or richer than I am; his children will inherit all his riches; his children have a rich uncle besides, and then, as you know, everything I have in this world is for Pepa. Pepa is the person I love most in this world, and such is my will." In this conversation she said that when she found out how easy it was to make a will in writing she sat down and wrote this will; that was her statement to him; so he understood that she was just learning from her brother Vicente that she could make a will in her own handwriting, she just sat down and made this will of her own motion and without any help from anybody. Maria also said to Cebrian, "At the beginning I was going to leave less to Miguel, but afterward I thought to leave him that much," he remembered this remark perfectly, although he forgot it for the moment in his first statement of a conversation that lasted twenty minutes or more on that occasion. So far as he knew Maria made this will without the aid of any one.

#### CEBRIAN'S KNOWLEDGE OF LEGAL FORMS.

Mr. Cebrian had with him in Europe during the eight years of the Anselmo litigation a copy of the Civil Code of California presented to him by Mr. Jarboe, the lawyer, many years prior in 1884; he did not have it in 1896–1904 in Europe, but he did have it from 1884 to 1896; in preparing the form of petition attached to Mrs. Cebrian's letter to Miguel of May 25–26, 1909, he did not consult any form; composed it entirely without recourse to any form book; he had known prior to the date of the will of Maria, February 15, 1893, that the intrusion of printed matter in a will otherwise holographic would invalidate the instrument. In reference to the letter of May 25–26, 1909, Mr. Cebrian said that although he drafted the petition inclosed with it, Mrs. Cebrian wrote the letter of her own volition. He said: "I did

not dictate to her; I am not a tyrant"; but it does appear that the petition, in conformity with the contents of the letter, was his handiwork.

As to what occurred in and about the making of this will we have no testimony except out of the mouths of Mr. and Mrs. Cebrian in their oral evidence and what is stated in the correspondence and form of petition hereinabove reproduced. Nobody but these two testify as to how this instrument came into existence; and in all their communications with Miguel, prior to their arrival in San Francisco, neither disclosed to him nor to anyone else the contents of that document. From February, 1893, to May, 1909, although the paper was in their possession, no word was uttered to him of its existence. Their correspondence was continuous and copious, but not a suggestion in it all that Maria had executed this instrument until after Maria's death, when she cabled to Miguel, March 23, 1909, that there was a will in which he was appointed administrator. Mrs. Cebrian said that the first time she thought of this will after Maria's death was when she received in Paris a letter from Miguel to which she answered by cable as follows:

"Paris, March 23, 1909," addressed "Laveaga, 1228 Geary, San Francisco." "Maria's testament appointing you as administrator is kept at my home. Pepa." The next day she received the following from him: "March 24. Cebrian, care Hottinger Co. Paris, France. Cable explicit directions exact location Maria's Will. Important, Miguel," to which she answered: "Paris, March 25, 1909, Laveaga, 1228 Geary, San Francisco. Can't remember. Will soon be there. Pepa."

Neither she nor Cebrian made a direct statement about this paper in all these years and the question is asked, why did they go along in this covert manner and then finally submit in the form of a petition to Miguel the proposition as to how much of the estate he chaimed? Before the examination of Mrs. Cebrian was concluded she left the stand and on account of illness she did not reappear and when her husband was asked if he aided in the letter she wrote accompanying the proposed petition he said he did not, he made no sug-

gestion, adding, "I am not a tyrant." He admitted that he had written the petition, at the suggestion of his wife, but the letter itself was of her own volition; he did not dictate to her.

### MRS. CEBRIAN'S RELUCTANCE TO PROPOUND THE WILL.

Near the close of the correspondence consequent upon the proposal to settle on a half and half basis the negotiations were terminated, after she had consulted with a person very respected in California, although not a lawyer, and to the great sorrow of her heart he had convinced her that the law obliged her to present the will. She was sorry for this, as she did not want to present it, but as she had been advised as to her duty, and her obligation to the law and to conscience she would present the instrument to court against her own wish and will.

### MRS. CEBRIAN'S WILLINGNESS TO DIVIDE THE ESTATE EQUALLY WITH MIGUEL.

Up to this time Mrs. Cebrian had consulted no lawyer; she was apparently dealing directly in a fraternal spirit, imbued by sisterly affection, with her only brother, whom she dearly loved, and with whom she was extremely anxious to avoid misunderstanding or conflict, doubtless mindful of the solemn testamentary adjuration of her mother to avoid lawsuits and all manner of judicial proceedings as prejudicial to the tranquillity of families and ruinous of their interests and not to seek advantage one over the other in the divisions of their patrimonies; so, notwithstanding the will, she broached the proposition to Miguel to make an equal partition of the properties; she preferred not to present the paper for probate if her brother should undertake to dispute it, and let the court divide the property half and half, as he desired; in this way, she wrote, there would be no necessity to present the will, and the court would make distribution, "according to law," which would be most simple.

### HER CHANGE OF POSITION.

Of course, if this plan were agreed upon the will would be suppressed and the estate would devolve upon the two

equally by the statutes of succession. To this plan an impediment was interposed that allusion to a will could not be avoided as general letters of administration could not be obtained without inquiry into the fact of the existence of such an instrument. In this Miguel told his sister the same in substance as the highly respected adviser whom she had consulted on the subject. It is insinuated that the intervention of this adviser was brought about by the subtlety of Cebrian, who designed to divert his wife from her desire to amicably adjust their differences without recourse to law. When she returned to California she intended to settle the matter without litigation and equalize the division of the property with her brother, thus complying with the charge, desire and ordination of their mother that the children should abstain from any attempt to seek advantage over each other, and above all things keep out of the courts and compose their controversies or "unadjustable differences" by submission to arbitrators or friendly adjusters who should name a person of probity, love and reliability to decide between them.

#### MRS. CEBRIAN IS ADVISED TO PRESENT THE WILL.

There is no doubt that when Mrs. Cebrian came back to California her disposition was to respect religiously this request so piously inculcated by the terms of the testaments of the parents from whom they all derived their fortune. In her letter of May 25–26, 1909, she pleaded in the name of their sainted mother that they should come together and consult as brother and sister, so that all would have been arranged to his satisfaction in an instant. At that time she was ready to settle without advice or interference from the outside, but, afterward, through some influence, she was induced to consult with an adviser who convinced her that it was her duty to present the will to court. This adviser was the Reverend Antonio M. Santandreu, whose advice was sought as a business matter, a friend of the family, their spiritual director and pastor of the church which the family attended; and here is where the truce ended and the fight began.

Father Antonio was apparently reluctant to testify as to this advice until he was instructed by the court that he was not under the statute privileged to refuse, when he repeated the conversation he had with Mrs. Cebrian about the will, he had her permission to tell it, otherwise he would decline; it was not under the seal of the confessional, but he considered it the same as if he were a lawyer, a confidential and privileged communication, but being released of any obligation of confidence by her, he stated that she told him that she had nothing to do with making the testament, but that Miguel was going to contest unless he got half; Father Antonio advised her against conceding a compromise, as considering her children she had no right in conscience to surrender their interests; that if she were alone in the world she might do so, but not otherwise; and she accepted and acted upon this advice, which was to go ahead and assert the rights of her children and fight to the end and get what she could for them.

FATHER ANTONIO SANTANDREU'S ADVICE ACCEPTED AND ACTED UPON.

As Father Antonio enters so importantly into this contest as the adviser upon whom proponent relied for her change of base and assumption of an attitude of resistance towards her brother, it may be well here to consider briefly his testimony concerning his relations with and knowledge of this family:

Father Antonio M. Santandreu was the pastor of the Church of Nuestra Señora de Guadalupe, the Spanish Church; he was educated for the priesthood in All Hallows College, Dublin, and spent three years there as a seminarian; he was a native of Barcelona, Spain, and was sent to Ireland to learn English; in order to come to California, whither he came in 1876, having been ordained in Ireland in the month of June of that year, and in a few days thereafter he started for America, and reaching San Francisco he was assigned to St. Patrick's Church; afterward to Guadalupe, as assistant pastor, where he served till the month of May, 1877; thence to Mission San José until 1879; after to Calaveras county, where he was pastor until May, 1880; then he was appointed

to Half Moon Bay, San Mateo county, where he continued to labor until November,.1886, at which time he resigned that pastorate and went to Europe on a vacation of six months. Returning in 1887 he went to Guadalupe again as assistant, and in 1889 became pastor and has been there ever since in that capacity; his native tongue was Spanish, although he spoke also English, Italian, Portuguese and to some extent German and French; he knew decedent for many years; he became acquainted with her in the house of Mr. and Mrs. Cebrian when he became pastor of the church, in 1889, at which time he also became acquainted with Mr. and Mrs. Cebrian and the members of their family; they had front pews in his church. Maria frequently visited the church, as a rule on all great occasions and festivals. He did not remember the first time he met here there; he saw her once alone and at other times, always with some member of the Cebrian family; she was coming as a regular Catholic to the church to pray; he was generally perhaps twenty-five feet away from her while observing her; he saw her at a special devotion, Portiuncula, which begins at 2 o'clock on August 1st and ends at 7 in the evening of August 2d; she was alone at that time; he did not remember the year. Father Antonio knew the family only by reputation prior to 1889; he knew that they made a trip to Europe in 1896; he visited Maria the day before in Octavia street, in the house of the Cebrian family, to bid them good-by; he talked with all the family, Maria included, at that time; he could not state approximately how often he called upon them during the seven years from 1889 to 1896; Maria made many donations to the church; when he visited the family he never saw her alone, there were always others present. When she returned from Europe he met her and had conversations with her about her travels; she liked Europe better and he tried to argue her out of that notion, insisting that this country was preferable, but she persisted in her views; she greeted him in a very nice, agreeable manner; she talked generally about churches and the general attendance there and the like; he did not visit her directly, but visited the whole family; pastoral visits.

FATHER ANTONIO'S ACQUAINTANCE WITH THE FAMILY—HIS
OPINION OF MARIA'S COMPETENCY.

Father Antonio knew the daughter of Mrs. Cebrian who
was married over in Spain; he had a conversation with Maria
about the marriage after her return; she spoke of it as a
grand ceremony, the greatest event they had during their
sojourn in Europe; all the people of the town turned out to
celebrate. This conversation was in 1903. He would go to
the Cebrian house possibly about once a month, and then pos-
sibly not for two months or three months, and then sometimes
more than once a month, according to what he thought his
duty. The Spanish Church was almost totally destroyed at
the time of the earthquake and fire, but a temporary struc-
ture was built over what remained of the foundation. Maria
visited the church subsequently to that time, but he remem-
bered only the occasion referred to of the Portiuncula, when
she was making a time of special devotion, when she was mak-
ing visits and went to confession there; he believed she came
to him.

After the fire he continued to call from time to time at the
home of the Cebrians, until they made another trip to Europe
in 1908; he was there the day before their departure for about
half an hour and had conversation about the trip, wished
them a good voyage and a safe return, the sooner the better;
he saw them on the day they started, went across the bay
with them to the train; Maria said she was most delighted in
making the trip; as they went away they said good-by, which
is their "adios" in Spanish, which was the language in which
they always conversed; always spoke in Spanish.

Maria was godmother to some of the children of Mrs.
Cebrian; Father Antonio was the officiating priest at the bap-
tismal services three or four times; the usual formula of the
baptismal ceremony was complied with; Maria made appro-
priate responses, reciting the Lord's Prayer, the Apostles'
Creed, audibly, after the manner prescribed by the priest;
her conduct and demeanor on these occasions were rational;
she gave him on one occasion forty dollars, two twenty-dollar
pieces, she always gave him something; she stood for at least
three children; the names of the children are preserved on

the baptismal registers. Maria received Holy Communion at his church more than once; she made confession to him at the church; but he was not her regular confessor.

Father Antonio procured a transcript made by himself from the records of his church, which certified as to the baptisms at which Maria was godmother, reading as follows: "Edward Francis Antonio Simon was born of the above parents, September 26, 1882, and was baptized October 28, 1882, by Rev. A. Garriga, and were sponsors Eusebio Molera and Maria de Leveaga"; then also the item: "José Vincente Alejandro Ricardo was born of the above parents December 16, 1890, and was baptized by Rev. A. M. Santandreu, February 5, 1891, and were sponsors Vincente de Laveaga and Maria de Laveaga"; and then the item: "Julio Rafael Ignacio Angelo was born of the above parents July 16, 1889, and was baptized by Rev. A. M. Santandreu July 31, 1889, and were sponsors Ricardo Cervera and Maria de Laveaga"; and then also this item: "Isabel Sophia Luisa was born of the above parents June 21, 1895, and was baptized by Rev. A. M. Santandreu July 5, 1895, and were sponsors José Vicente de Laveaga and Maria de Laveaga"; and then this item: "Ramon, 1905, born of R. T. de Caleya and of Maria Cebrian, sponsors Edward Cebrian and Maria de Laveaga."

By the parents above named in this statement, reference was made to Mr. and Mrs. Cebrian, except the last one; the parents were Mr. and Mrs. Caleya; the last baptism took place in 1905.

All the acts of Maria when he saw her in church were rational; this was true of every occasion; her acts, conduct and demeanor were those of a rational person; on one occasion years before the fire she gave him $200 for the poor; on another occasion after the fire she gave him $500 for the church.

#### CONVERSATIONS WITH EDWARD J. LE BRETON.

Father Antonio knew the late Edward J. Le Breton, had conversations with him, met him in 1898 to consult him about a loan to be made to a parishioner; he said, "Father, don't touch it"; on another occasion he consulted him about a deposit in his bank, "The French Bank," on California street,

between Kearny and Montgomery streets; the statement made by Le Breton as to the conversation in the Catholic book store on Taylor street, in 1898, Father Antonio declared to be incorrect; it was about a matter connected with the estate of one Aurrecochea, in which there was some discussion between them as to reimbursement of a certain sum which the priest had laid out for church services, masses and money to the poor; Le Breton objected to paying him until the court passed upon it, but the priest tried to prove to him that his claim was as just as it could be. They argued upon the point and Father Antonio remembered that he gave to Le Breton this simile: If a member of a well-to-do family bought a rich shroud for the corpse of one of that family the judge would never object to it, so, the priest said, neither would the judge object to the payment for those masses and the gift to the poor, it being in compliance with what the priest thought was the wish of the deceased; but Le Breton did not accept the simile, saying he did not admit the comparison and that finished the discussion as to that matter at that time.

The conversation that occurred at the priest's house in June, 1907, was not accurately related in full by Mr. Le Breton; he said that if the will was broken he was sure that Miguel would give the $5,000 left "to the poor" to "the church," meaning the Church of Guadalupe, of which Father Antonio was pastor; Le Breton said that it was intended for "the poor" and the church was poor enough. He told Le Breton in answer to his assertion that she was incompetent, that Maria was competent and then the subject dropped. At that time Le Breton gave the priest a check in the Aurrecochea matter in settlement of the dispute about the masses, and that ended that incident; he said that as he had laid out the money that he should be repaid. He spoke about the guardianship of the boy, José Aurrecochea. The conversation in the priest's house took a half hour or three-quarters of an hour.

### CONTRADICTS LE BRETON.

Father Antonio did not say to Le Breton that Doña Pepa would take care of that, meaning the $5,000 to the poor, or

that Maria did not know how much she had; the priest had not the remotest recollection of saying what Le Breton attributed to him.    Father Antonio told Le Breton that when he heard she made a will he was glad because she would sure remember their church, Guadalupe; afterward he was sorry she did not leave any, but when he was told the dates, he understood how that occurred, as it was so long before; Father Antonio had an opinion as to Maria's soundness of mind; she was of sound mind, rational in all her acts, devout, sensible, no crankiness; no queerness in her conduct, so far as he saw; if she had acted odd he would have seen it, as she was near the altar; that embraces the whole subject; all her acts formed the basis of his reason and opinion.    In his cross-examination Father Antonio said that when Maria gave him the $500 after the fire it was a check in an envelope; handed him by her, signed by her; Edward Cebrian's name was on the back, Father Antonio indorsed it also and thought that he deposited it in the French Bank; he thought it was drawn on the London and Paris or the Anglo-Californian, he did not remember whether he collected it himself or deposited; she gave him the check in the temporary church edifice.    The $200 she gave him in her own house, in money, before the fire.

### WHY FATHER ANTONIO WAS CHOSEN AS ADVISER.

The reasons why he was chosen as an adviser, although not a lawyer, by Mrs. Cebrian may be gleaned from this epitome of his evidence.    He had had some misunderstanding with Edward Le Breton concerning a benefaction in an estate of which Le Breton had executorial charge and he seemed to connect the latter's long deferred settlement of the dispute with a desire to secure an opinion that Maria was incompetent to make a will; but Father Antonio was not to be convinced by any such method.    He believed to the contrary for the reasons stated by him.

### FATHER ANDREW GARRIGA'S ACQUAINTANCE WITH THE FAMILY— HIS OPINION OF MARIA'S COMPETENCY OPPOSED TO THAT OF FATHER ANTONIO.

Father Andrew Garriga, the predecessor in the pastorate of the Spanish Church of Father Santandreu, was of an op-

posite opinion as to the mental competency of Maria.    He arrived in San Francisco in November, 1868; shortly after his arrival he made the acquaintance of the De Laveaga family, they used to frequent the church at which he was stationed and he knew them from the very beginning; he visited their house sometimes and he would have lunch or dinner there during a period of twenty-one years; he knew the father and the mother and the two aunts and the children; from 1868 to 1891 he knew the family; knew Maria very well, she was rather simple-minded, "short of intelligence"; there was no change in her as long as he knew her; her intelligence did not develop with her age; she was constantly accompanied by somebody, a member of the family or a chaperon who always spoke for her; she was not extraordinarily bright; he observed no change in her mental condition from the time he first saw her; she was not an idiot, nor insane, nor anything of the kind, but a sort of grown child; made some progress in her catechism, not much; she was short-minded.    This is, according to this testimony, the full measure of her mental condition from 1868 to 1891, from her twelfth to over her thirtieth year, within two years of the date of the will, February 15, 1893.

It is to be noted that Father Garriga's acquaintance antedated and was of longer duration than that of any of the other gentlemen of his profession who testified in this case. For twenty years prior to the time at which Father Antonio first met her, Father Garriga was familiar with the growth of her mind, with her religious instruction and the progress that she made therein.    He was certainly an intimate acquaintance, as well as a religious adviser.

FATHER GARRIGA'S REASONS FOR HIS OPINION AND HIS OPPORTUNITIES FOR OBSERVATION.

Father Garriga gave it as his opinion that Maria was not of sound mind, "not like an idiot or insane, but like an undeveloped mind, rather short of intelligence," and his reasons were that her actions were like those of a child, and the way that he saw that the family took such great care of her, and

that she was regarded as a child, and the way she answered when he spoke to her, which was very rarely, she would answer a short word and kind of shut her eyes and turn the face a little one side and she would seem to be troubled with modesty or shyness; he did not consider her capable of carrying on a conversation; that was what he believed; she was not of complete mind. Father Garriga's opportunities of observation were more extended than that of any of the other clergymen who testified on this point, taking in twenty-three years, from the time she was 12 until she was 35; and he is not contradicted in any material point as to the facts which he observed during that period. In addition, it may be said, in connection with his testimony, that Mrs. Cebrian refers to Father Garriga in a letter to the contestant dated April 29, 1898, as an intimate friend of the family; as one entirely familiar with the family.

It appears, then, that Father Garriga is approved as one who during the twenty odd years of his pastoral relations to this family had exceptional opportunity of considering the mental condition of the decedent and he gave his opinion and his reasons and the details of his observations.

### FATHER VALENTINI'S CORROBORATION OF FATHER GARRIGA.

Father Valentini corroborated Father Garriga. Father Valentini was a native of Italy, came to San Francisco on October 20, 1868, and the event was indelibly impressed on his mind, as it was the eve of the great earthquake of that era, and he thought it was a remarkable reception, and resided here continuously until the first Sunday of October, 1872, he was stationed at Saint Francis Church on Vallejo street; he was not pastor of the Spaniards, Father Garriga was at the same church and had that charge, but on account of his own knowledge of languages he ministered to the Portuguese, Spaniards and others, chiefly to the Italians to whom he devoted his more particular attention, but being proficient in Spanish he aided Father Garriga in his ministrations to those people; he became well acquainted with the family of the elder José Vicente de Laveaga within a few months after his arrival, in the beginning of 1869, and

saw the family almost every Sunday; he visited their house
sometimes while they were on Stockton street; he was absent
in Half Moon Bay—Spanishtown—when the family lived
on Geary street; from there he came up regularly twice
a month, and on some of those occasions, not always, occa-
sionally in the company of Father Garriga he visited the
Geary street house and remained to luncheon and dined
there several times; he was six years and a half at Half
Moon Bay, until April, 1879; during those visits he saw
Maria almost every time; after he left Half Moon Bay he
went to San Pablo for two years and then to Stockton for
less than a year, then back to St. Francis for two or three
years, then to St. Vincent's in Marin county for a year and
a half, and finally to Sausalito, where he has been ever
since. During his visits to the de Laveaga family he had
observed Maria, but he had had no conversation with her;
some sign of recognition was all he could get out of her, but
no talk; he never remembered her having any conversation
with others when he was present; he had a most decided
opinion as to her soundness of mind; from his acquaintance
with and observation of her she was not sound in mind; he
saw no change in her in the last three or four years that he
knew Maria.

### FATHER ANTONIO CORRECTS A MISTAKE.

In reference to the check for $500, Father Antonio tes-
tified that he received from Maria, he made some mistakes
which he subsequently undertook to correct on redirect ex-
amination; he first testified that she handed him the check
signed by her on one of the two banks named; when the
check was shown to him on redirect he said that that was the
check he received in an envelope from Maria; Edward Ceb-
rian was with her when she handed him the envelope; when
he opened it he found the check which he identified on the
witness stand, and which he afterwards deposited in the
French Bank. The check reads:

"San Francisco, Cal. Aug. 17, 1907, No. 71.
Up town Branch
       California Safe Deposit and Trust Company
   Pay to the Order of M. C. de Laveaga            $500.00
   Five Hundred 100/100.......................Dollars.
Clearing House No. 14        LOUIS de L. CEBRIAN
(Endorsed)
   Pay to the order of
       REV. ANT. M. SANTANDREU.
           M. C. DE LAVEAGA.''

### MARIA'S LACK OF KNOWLEDGE OF HER AFFAIRS.

The check itself did not tally with the first testimony of
Father Antonio and it is argued that he was confused in
memory as to two transactions, as evidenced by the check
book stub and the check itself No. 71, and that when Maria
handed Father Antonio the envelope, it was sealed and she
did not know its contents; she was not cognizant of the fact;
it was the act of Cebrian, senior, who made the entry in the
stub book; and this was true as a rule, that she had no actual
knowledge of what was done with her own moneys; others were
her almoners; and this is shown by the testimony of Petron-
ila Velasco. Mrs. Velasco came to California in 1889 and
first met the decedent and the Cebrian family within the
twelve months thereafter in the house 1801 Octavia street;
she was a seamstress at that time, was introduced by a friend
not for the purpose of engaging to sew, but just as friends;
she came to know Maria very intimately and saw her fre-
quently, often called there as a visitor, was a guest at the
breakfast, luncheon and dinner table, slept over night there
and made all Maria's dresses, and also for all the Cebrian
family and sometimes for Mrs. Welch that used to be Julia
de Laveaga, Miguel's daughter; she went with Maria to-
gether to church festivities and to see some poor at times,
shopping, for a walk in the park and many places, and dif-
ferent times to the theater. Mrs. Velasco lived in San Fran-
cisco until the fire, April 18, 1906; she was at the Cebrian
house at that time; they all went to the Presidio together
and slept there that night; they went shopping together be-
fore and after the fire. Maria would ask her to go and select

the material as she wanted the goods for Mrs. Velasco's taste; and she would say, "select a good piece and take yards enough to make a coat," and the like; she had no care for fashion; she was not a society girl, wanted what was plain and comfortable; she had her ideas about such matters; she asked Mrs. Velasco to give money for the poor and for masses; when they were alone in her room Maria spoke to Mrs. Velasco very intimately about her trouble—about her ideas—she was a saint, not like society people; they cannot be saints; but she was devout, prayed every day a novena, read religious books, no novels; gave the Cebrian children religious instruction; she sewed beautifully; read newspapers in English, French and Spanish; talked in English and Spanish every day; spoke some French and some English with the children; she went out with them for exercise; she liked traveling very much and spoke about her travels, fond of Paris, talked about all the places she visited; had a good memory, sound mind, "always normal like anybody."

MARIA DID NOT KNOW THE EXTENT OF HER PROPERTY, MRS.
VELASCO'S OPINION.

Mrs. Velasco was surprised when she learned after Maria's death that she left so large an estate and so little for charity; she did not think Maria knew how much property she possessed. Le Breton had visited Mrs. Velasco after Maria's death and tried to impress on her mind the idea of incompetency, but she did not agree with him. Maria did not dispense her charities directly, but through others, she did not want to be known in these matters, did not want her name mentioned; so when she gave alms to Mrs. Velasco for the poor or for masses she requested that nothing be said of the donor.

After the deposition of Mrs. Velasco was read on September 14, 1910, she appeared on October 25th, and was recalled by proponent and testified that during the month of September she was absent in Mexico, leaving San Francisco about July 1st; she had been in court on various days before she went to Mexico; she told Mrs. Cebrian before she went that she was going. Mrs. Velasco said finally that as to

any and all conversations she had had with Maria that the latter was very rational; her conduct and acts all rational; she was of sound mind; very religious without ostentation; she had good sense; her conversation showed a good mind; many of her acts indicated that she was rational.

Of the persons taken to Europe by Ignacia to accompany herself and Maria, one was Juanita Laveaga, whom Mrs. Cebrian in her testimony described as a distant relative. Her deposition used in this trial was taken at Durango, Mexico, where she has lived for thirteen years. She was married in 1889 to one Juvenal Valdespino and at the date of the deposition answered to the name of Juana de Laveaga de Valdespino. From her birth until 1880 she lived in San Dimas, Mexico, and in May of that year went to San Francisco and in July went to school in St. Rose's Convent, where she remained until December, and leaving there she went to the house of Mrs. de Laveaga, that is the Señora Doña Dolores Aguirre de Laveaga, the mother of Maria Concepcion, at 322 Geary street; she knew Ignacia and Maria, who went to meet her on the ship when Juanita arrived in San Francisco. From that time until she became an inmate of the household on Geary street in December until April, 1884, saw Maria every day, except for a short period when they went to the country for about two weeks one year after she began to live in the house; besides Maria there lived in that house in the year 1880 Doña Dolores, the mother; Doña Ysabel, an aunt; Ignacia and Vicente. In April, 1884, Ignacia and Maria left for Europe, taking with them Juanita and Celestine and two servants, Crescencia Martinez and Diega Hernandez.

JUANITA LAVEAGA, COMPANION OF YGNACIA, AND IN EUROPE WITH HER AND MARIA—HER CONSTANT OBSERVATION OF MARIA AND OPINION.

Juanita was with them all the time in Europe until Ignacia died, and after that they returned to San Francisco with the Cebrian family and Maria, and lived with them until November, 1888, when she departed for Mazatlan; the position Juanita occupied in the de Laveaga household was that of a relative, she did no household work, but acted always as a

companion to Ignacia, "Nacha"; nursed her when she was sick; she spoke frequently to Maria, observed her constantly, noticed what she did, when she arose, ate at the same table; she described with great detail her observations and stated that in her opinion

MARIA DID NOT ENJOY HER COMPLETE MENTAL FACULTIES;

she was not sound; her reasons were she could not be allowed to go alone in the street because she would have been lost; she played with the children the same as they; her opinion was never taken in the house with regard to any matter; she did not know how to chose her clothes nor her hats, never expressed any desire; did what she was told; everything about her revealed the intelligence of a child of young age; she never saw Maria doing needlework or crocheting, hemstitching or anything apart from a little "tatting" now and then; she required assistance in reading and writing letters. Juanita and Maria were schoolmates; one of their teachers, Miss Callahan, testified that she taught the two jointly; Maria made very little progress, practically none.

TESTIMONY OF TEACHERS AS TO MARIA'S PROGRESS IN STUDIES.

Mrs. Macomber, who was her first teacher, said that she taught Maria for a year at her home, tried to teach her English and music; Maria made no progress in either; she could speak English; taught her in the primer but with scant success; could not understand as quickly as another child; could not impress her or make her remember nor do anything with her; had more difficulty with her than with any pupil she ever began with; never could get her to learn her notes from the book that children of five or six years of age used, a book for primary pupils; Maria never got as far as the scales in music; this was in October, 1875, and from that month until June, 1876, at that time Maria was 15 or 16 years of age; Mrs. Macomber said she could not see any improvement in her; she thought her intellect was feeble, that she did not understand well; she could not read a word in English. Mrs. Jenny, then Miss Kate Golden, who was a sister of Mrs. Macomber, taught her afterward when Juanita was also her pupil; she said Juanita was a noisy little girl

of six years when she was teaching Maria; in fact she was 14 years old at the time; Mrs. Jenny said that Maria read English newspapers every day, read Louise Alcott, the Lives of the Saints and other books. Miss Callahan who followed Mrs. Jenny as teacher for four months said she understood English, but could not converse; she could get her to nothing higher than the primer, could not.get her through the primer, it was like teaching a child of 6 or 7 years, while teaching Juanita was as if she were instructing a mature person; at the end of four months Juanita went into grammar and literature, but Maria remained behind; did not seem to make any headway in her studies. Juanita was much younger than Maria in years, but in mind much more advanced. The testimony given by Juanita, Mrs. Valdespino, in her deposition, is corroborated upon the points indicated in these particulars by Mrs. Macomber and Miss Callahan, although it does not agree with Mrs. Jenny; it leads to the inference that the latter was mistaken in her high estimate of Maria's intelligence, as she certainly was in her statement that Juanita was a little girl of 6 years of age when she first met her, whereas she was really 14.

### IMPRESSIONS OF WITNESSES AS TO AGE OF MARIA.

Now as to this impression of witnesses as to the age of Maria; Miss Ainsa knew Maria in 1884, intimately she said, and yet she believed her to be a child of 12 or 14 when she in fact was 28. She said that she had never met and spoken to Miss Maria before the latter went to Europe with Ignacia; she had been acquainted with Ignacia and visited her on Geary street; at that time Maria was going to school and she did not come into society because she was very young, she was like a child, not yet entering into society. Miss Ainsa visited Ignacia about once a month up to the time they went to Europe; she saw Maria when she went to the house but the latter would go in and out like a child and Miss Maria never spoke to her; and yet Maria was at that time 28 years of age. The mother died in 1882 when Ignacia took formal charge of Maria, although she appears to have had actual charge of her prior to that time. Miss Callahan testi-

fied that when she went to teach Maria in 1880 Ignacia engaged her. Maria was then over 20 years of age and it is argued that she might have engaged her own private tutor in English.

Mrs. Aguirre said that when she knew her she never saw her exercise a will of her own; Maria appeared like a little child, not capable of governing herself; members of the family or servants were always around and they would ask her if she wanted this or that; did not seem capable of conversation when talked to. Once Mrs. Aguirre asked Maria how old she was and Maria turned to Ignacia who said "she is 21."

CELESTINE WALKER, FORMERLY HALPHEN, ONE OF THE GROUP THAT WENT TO EUROPE WITH YGNACIA AND MARIA.

Mrs. Celestine J. Walker, formerly Celestine Halphen, who was one of the group that went to Europe with Ignacia and Maria, in 1884, first made the acquaintance of the family about 1870, and she was a single woman, keeping a store, dressmaking and fancy goods, on Third street, between Howard and Mission. She did some dressmaking for them, beginning about 1870. She was acquainted with all the family, including Maria; she could not tell how old Maria was at that time; she continued to work for the family, sometimes on Stockton street, not every day, but three or four times a month, for the mother and the daughters and the aunt, Isabel; after the death of the father they had her buy everything for the mourning of the family for themselves and the servants; from that time on she continued in the same way with them, visited their house, took many meals there, generally saw Maria there; she was around the house; did not seem to do much; it was Ignacia who sent for her to go to the house and she continued doing so until they all went to Europe in 1884. She never saw Maria doing anything, only sometimes crocheting; she used to call it "tatting," some kind of needlework (narrow edging like crochetwork, but it is not crochet work; but some kind of work the same style; a little kind of edge for anything one wants, like handerchiefs, collars or something of that sort). She never saw her doing anything else. When they reached Europe they first went to

Paris; she lived with Ignacia in Europe for about four years until Ignacia died. They lived in hotels for some time and then went to keeping house; the household consisted of Ignacia and Maria, Juanita, Celestine and two servant girls,

### CELESTINE'S POSITION IN THE HOUSEHOLD OF WHICH YGNACIA WAS THE HEAD.

Crescencia and Diega. Celestine's position was to be always at Ignacia's orders, and to be with her all the time, go out and get anything she wanted, go and change her drafts when her brother sent them to her and also to Maria and bring the money to Ignacia. Celestine paid the most of the bills for which Ignacia gave her the money. When they went out they usually went together, that is, Ignacia and Maria, Juanita and Celestine; she went shopping, to church, to the theater, they did not work very much, driving or riding nearly all of the time. Maria never said much; she passed her time looking around, seemed to enjoy what she saw, enjoyed the outdoors a great deal; Maria never bought anything for herself, Ignacia usually selected what she purchased, and it was the same about that in San Francisco; she talked very little; if one would say to her, "Do you think your dress is nice?" she would say, "Yes, it is nice"; she would like to go to the theater; Celestine always went with her in Europe; she never knew any plot, but she liked the singing, the ladies, the dresses and the music and what was going on, but she never thought anything about the plot. She went to church in Europe, the four went together and sometimes Celestine went alone with her, and sometimes Maria went with some of the servants. Maria never went out doors alone. While in Europe they went to Italy, Spain, Portugal, Holland and Norway. When they were traveling Maria would never have anything to say as to what she wanted to see or where she wanted to go; Ignacia head of all; Maria spoke English and Spanish; she never heard her speak any other language; Celestine herself was French by birth; Maria liked to hear music, but she never saw her playing; she never saw her write anything but her name and Ignacia assisted her on that occasion; in the matter of spending her money she was di-

rected by Ignacia; Celestine was married twice; her maiden name was Pandello; she was first married in San Francisco to one Halphen and she was a widow when she went to Europe with the de Laveagas; at the time of giving her deposition she was married to a man by the name of Walker, living in Los Angeles. Juanita's position in the household in Europe was to room with Ignacia; she was constantly with her, night and day; she did not do the work of a maid; she was a friend and companion. Maria never suggested anything as to what was to be done, but she was pleased when anybody else would make a suggestion; she never had her own plans.

### WHATEVER IGNACIA SAID WAS LAW.

Maria never had anything to do with regard to the accounts; never saw her counting money or counting up bills or anything of that sort. Maria never gave any orders to anyone for anything. In Rome, when Ignacia was taken ill, they were staying at a hotel, and Celestine gave the directions as to what was to be done at the instance of Ignacia; they had connecting rooms, four in all; the hotel people took care of the rooms, but Celestine looked after the people to make known the wants for their accommodation. Maria never gave any instructions or directions about the care of the rooms or anything pertaining to their stay in the hotel or the management of affairs. At the beginning of Ignacia's illness she requested Celestine to take Maria out; she did not want Maria to be about, as she was afraid that she might herself become ill if she remained in the house, so she desired Celestine to take Maria out and to go and have some amusement, music or anything that was to be seen, to keep her out of the house.

### MARIA DID NOTHING IN THE HOUSE

during the illness of Ignacia; did not write any letters that she knew of. Maria never requested her during the illness of Ignacia to send any word to Mrs. Cebrian. Mrs. Cebrian herself wrote to Celestine to let her know how her sister was, the way she got along and she wrote and said she was not exactly very well, she was ill and that if it came to the

worst she would let her know and she did, and she telegraphed to her and Mr. Cebrian came. Maria did nothing about notifying Mrs. Cebrian, only she saw Mr. Cebrian's letter and Celestine told her "there is a letter from Pepa,". and Maria went inside to tell the others. Maria never said anything about the illness of Ignacia, she looked at her and that is all; there were doctors and attendants, but Maria never consulted with them; there were operations upon Ignacia, but Maria never said or did anything about them. During the period that Celestine lived with Ignacia in Europe she never received any compensation from either her or Maria; there was no talk of salary, it was all friendship. Juanita was a constant companion of Ignacia's, always with her, sleeping in the same room and doing everything that she wanted; next room was occupied by Maria; the door between the two rooms usually opened; but she was never called upon to do anything for Ignacia.

CELESTINE'S OPINION: MARIA NOT OF SOUND MIND—BASIS FOR
THIS OPINION.

From her acquaintance with Maria, Celestine was of opinion that she was not of sound mind; she was childish, like a child 10 years old, and she would play and act like children do, having no harm in her and always pleased with anything. Celestine related many incidents as a basis for her opinion. The last time that Celestine saw Maria was in Paris, after Ignacia's death, about April, 1888, when having been dismissed by Mr. Cebrian, she returned to the United States. She never saw Maria reading much; she saw Ignacia read constantly, but not Maria. Celestine spoke Spanish when she came to this country, which language was acquired at her home, which is not very far from Spain. She had said that she received no compensation for her services during the whole period in which she was in Europe. She attended to the purchases for the ladies and acted as an interpreter and general assistant to them, and she had been paid nothing; but after her dismissal she presented a claim which was subsequently settled and she accepted something over 12,000

francs from Mr. Cebrian, in full of all demands against Maria and the estate of Ignacia.

THE SERVANTS IN THE HOUSE—CRESCENCIA AND DIEGA, THE REMAINING MEMBERS OF THE GROUP WITH IGNACIA AND MARIA. CRESCENCIA'S NARRATIVE AND OPINION.

Crescencia Martinez was one of the two servants that went in 1884 to Europe with Ignacia and Maria, Diega Hernandez being the other servant; she had worked in the family in Geary street in San Francisco beginning in 1877, as chambermaid; Diega was the cook; they traveled in various places in Europe and stopped at different hotels, and for a time in Paris had a house or flat with seven or eight rooms in it. Ignacia and Maria occupied the two front rooms; Juanita occupied the room with Ignacia and there was a room separately for Diega and Crescencia; after they left Paris they went to Rome and stopped at a hotel; in that city for a time they had a German girl named Elise Sitter; it was there that Ignacia became ill; Maria was there during the illness; Crescencia saw Maria always in that room where Ignacia was ill; she talked with her several times; Maria would say to her, "Crescencia, what shall we do? 'Nacha' continues sick; if Pepa was here (or Señora Cebrian, as she called her sometimes) we would try and see how we could be better pleased or more comfortable, or arrange matters better." Crescencia heard a conversation between Maria and Ignacia when the latter said to Maria that she had received letters from Mrs. Cebrian and at other times she told her to write to Mrs. Cebrian, and sometimes she would say to her, "Juana is writing to Mrs. Cebrian," and then Ignacia would say, "I am sick, Maria, so it is about time for you to comfort yourself," meaning to resign herself to the situation, which is a customary expression used when a person is dangerously ill or apprehending death; Ignacia used to tell all of them to resign themselves, or conform to the anticipated event. Ignacia was about eight days in bed; when the doctor would come Maria would ask him as he left the room, how the sick one was; he did not remain long; used to talk a little to Maria and some to Juanita who was with "Nachita," as they always called

Ignacia. Maria used to say to Crescencia that the doctor was not very good because "Nachita" did not get better. All they talked about was that Ignacia was very ill and that she did not seem to get better and what would they do if she died. An operation was performed on Ignacia and afterward Maria and Crescencia had a talk in which Maria seemed to lament the fact that the operation had been performed and she did not think it would bring about any good results. Before Ignacia became ill they all traveled a good deal about the city; went to mass at St. Peter's and at other churches and to other places of interest, such as the Vatican and Maria spoke of the many things that were seen, explaining to Crescencia what they signified; they visited ruins and picture and art galleries and palaces; when there was an audience they entered to see the Pope on several occasions; were at a ceremony of the canonization of the saints; Maria said that the ceremonies had been very pretty, very nice; she liked them so much, she was so happy that she gave thanks to God that she had been in Rome; Crescencia had several conversations with Maria about what she had seen in other cities. Maria would read from papers in French, Spanish and English; she read the French paper in Paris, France; she spoke French just as well as she spoke English; Crescencia, herself, did not speak either French or English, Spanish for her. Maria was very devout; she went to the different churches; in Rome, for instance, she saw her kneeling down for the devotions, like all the "niñas," the "girls," do, and act like other worshipers; in Rome they kneel on the floor in the churches, they have no pews nor any seats. They visited Lourdes, all the family together, and Maria spoke about the great miracles that the Virgin had performed. Maria made Crescencia a present of several books, one a mass book and a book of devotions to the Sacred Heart; this was in San Francisco; these books were burned in the fire; in the two books Maria wrote Crescencia's name and the number of the street and house on Geary street, and a verse about "If this book should be lost, I beg the one that finds it—" she forgot the remainder of the little verse of poetry; she made her other presents of money, Christmas gifts, when she had a baptism, or on Christ-

mas eve sometimes, once a hat, another time a cloak, a dress, rosary, scapulars, which Maria had blessed for her by a priest at St. Ignatius, where Maria took her for that purpose. Crescencia frequently saw Miguel and Maria talking together at the house on Geary street; in all of the conversations she had with Maria the latter appeared to her as a rational person, one who is in accord or in straight mind, Maria's acts were those of a rational person. Crescencia's reasons were that she never saw Maria do anything but that it was from a person of sound mind. When she saw the Pope it was at a devotion of the Pilgrims when he went around and bestowed his blessing and gave medals and offered his ring to be kissed; saw him up in the chapel, also at the ceremony of canonization "Nachita" died on the 18th of February, 1888; Crescencia did not recall the date of the month she left Rome for Paris; Ignacia died on Saturday, funeral services were on Sunday; her body was placed in a vault; Crescencia went to Paris with the Cebrian family; "la niña Maria," Juanita, Diega and herself; they went to the house on "Rue Cimarosa"; Maria and all went there; she was a chambermaid in the house, she was not present in the parlor when the visitors were entertained. Crescencia said she was 68 or 69 years of age at the time of the taking of her testimony.

### DIEGA'S STATEMENT THAT MARIA ALWAYS ACTED LIKE A CHILD; DEFICIENT IN CAPACITY.

Diega Hernandez, who was a fellow-servant in the house with Crescencia, testified in her deposition that she was 53 years of age and first went to San Francisco in the year 1883; she did not remember perfectly the length of her stay, but it was about eight months, arriving about the month of July, 1883, and leaving about the month of March, 1884; she became acquainted with Maria Concepcion de Laveaga about the month of September, 1883. In the month of March, 1884, after entering the service of Ignacia, she went to Europe with her and with Maria and others who were attached to the household. They left San Francisco for France and were constantly traveling out of France, Paris being the principal place of their residence; they went to Germany, Austria, the

Tyrol, Denmark, Sweden, Italy and other points which she did not remember perfectly, until the year 1889, which was about the date of their return to San Francisco; Diega was constantly living with Maria until the year 1901, with the exception of three years of this interval, she did not remember just then which years those were; she did not know either the father or the mother of Maria; Ignacia and Maria were living together; Ignacia took a house in Paris where she lived with Maria, Diega being with them; they always traveled together, never separating from them, until the death of Ignacia in Rome; after that in 1888 Diega remained with Maria, returning to Paris in company with Mr. Cebrian who had attended the obsequies. Diega resided subsequently in the household of Mrs. Cebrian and came back to San Francisco with them and remained there until she came to Mazatlan. During all the time that Diega lived in the house of Ignacia, Maria lived there and afterward with Mrs. Cebrian, and Diega lived in the same house with her and was constantly at her side in the family, speaking to her and observing her nearby in regard to everything.

Maria's actions and acts were those of a person of few years, like a child; she was meek, charitable, good, of good heart and very simple in her speech; during all the time that she knew her, simple in her acts; she did not have much capacity for her acts, during all the time Diega knew her. From the acquaintance Diega had with Maria her mental condition was such that, according to her observations she had to be assisted in her actions, inasmuch as she performed them as those of a person of a young age; and on occasions, for example, when they went to the store to make purchases with Ignacia the latter told her she should purchase this or that object which she needed, and in her turn she did so; as also it was always necessary to assist her in dressing, and in other acts, according to whether or not she was in the humor for doing it personally, which was sometimes; her mental condition remained always the same; she did nothing without the direction of the family and without consulting them. In her cross-examination Diega said she was not able to read or speak

the English language, she had never been in any school, never had any education only from her parents; she entered the service of Ignacia as an ironing woman, but in reality she was employed generally in doing all of the chores in the house, as general servant, from 1883 to 1888. After the death of Ignacia in the month of February, 1888, she immediately entered the service of Mrs. Cebrian and was employed by her as a nurse for her children, and for no other purpose, and she continued to remain in that capacity as general servant and nurse for children until she left for Mazatlan.

## NORBERTA MARTINEZ IN INTIMATE CONTACT WITH MARIA FOR YEARS.

Norberta Martinez, at the time of testifying by deposition, was seventy-eight years of age, and was then living in Mazatlan, Mexico; she had lived in San Francisco from 1878 to 1906 continuously; during that period she knew Doña Dolorez Aguirre de Laveaga, the widow of the senior José Vicente de Laveaga; she did not live with her but daily went to her house to sew until 1882, in which year Doña Dolorez died in San Jose, and afterward at the request of Ignacia she went to live with them at 322 Geary street, San Francisco, that is, with Maria Concepcion and Maria Ignacia, until they made their trip to Europe in 1884; from 1882 to 1884 she lived at that house where Maria lived with Ignacia; during the time she lived with Doña Dolores she was there in the capacity of seamstress; after her death she was in the service of Ignacia from whom she received her monthly pay until Ignacia made her trip to Europe; the two sisters lived constantly together; Norberta was in intimate contact with Maria during all this time, except when Maria was away from the city traveling, spoke to her and saw her daily, talked with her and observed her constantly; accompanied her sometimes to the Park and very frequently to church; during the years when Norberta knew Maria the latter was very simple; she was continually praying and going out to walk with the children and with more frequency she went to church where Norberta accompanied her until the trip to Europe.

MARIA'S MENTAL CONDITION AS DESCRIBED BY NORBERTA.

With respect to the mental condition of Maria she was very simple, like a child, without malice, without decision, short of understanding, entirely without thought for scarcity of understanding; she had malice toward no one, "malice of nothing." During the years that Norberta knew Maria the latter remained the same in her mental condition. As to Maria's writing she did not write anything more than her name without direction. She depended for direction upon her sisters in everything. As to Maria's ability to write, one of the counsel for proponent contends that while she was not a practiced writer and inclined to be indolent in that respect, yet she could write and did write without aid; he claims that it is not established that her letters were copied from patterns prepared by others; that she was not a correct penwoman does not argue intellectual incapacity; many persons of scholastic and even university training are indifferent in their chirography and orthography; the signatures of Maria C. de Laveaga are examples of really beautiful handwriting; the very numerous signatures of Maria show excellence of a superior kind; the centention that she could not write more than her name is not borne out by the many specimens of her proficiency in this case; the exhibits prove her power with the pen sufficiently to manifest that she had the ability to write more than her name.

COUNSEL'S COMMENTS ON HANDWRITING.

This counsel also compared the handwriting of Maria with that of Ignacia saying that the former could actually write so that her writing could not be distinguished from Ignacia, a small but pregnant proof of competency; and the other counsel for proponent compares the manuscript of the will in question with Abraham Lincoln's chirography in the composition of the Gettysburg address, a facsimile of which he introduced where there was a failure to dot an "i," a common error; another letter of Lincoln's was referred to to show that his "i" was not usually dotted and sometimes the "t" not crossed. Horace Greeley and his peculiar handwriting and Shakespeare also were brought to show that mistakes in

writing and speech and departures from grammatical accuracy and corrections, errors in orthography, accentuation, interlineations, erasures, capitalizations, substituted words were not significant, and to clinch this argument proponent introduced a compilation of the mistakes of contestant in his letters. Concerning the mistakes made by Miguel in his letters to the decedent, Maria, 867 errors in omission of accent marks, in misspellings, interlineations, corrected words, crossed out, written over, figures, letters. In his correspondence with Mrs. Cebrian, Mr. Cebrian and to both jointly, 133 letters in all to them, there were 12,606 mistakes, misspellings, grammatical errors, accents omitted, interlineations, substituted words or letters, capitalizing errors, erasures; grand total, 13,473. Contrast this great number of mistakes with the errors claimed to have been made in her writings by Maria. From this comparison it is argued that the proposition that her handwriting indicated imbecility or unsoundness of intellect is shown to be without substance.

Counsel adverted to other letters of educated persons as replete with errors such as are criticised in this case, and said if such mistakes be a standard of unsoundness of mind then these letter writers cannot be said to be sane, yet this is the standard set up by contestant. If such errors be indicative of insanity, counsel asks, What shall we say of contestant with his multitudinous mistakes?

### DISTINCTION BETWEEN ERRORS OF EDUCATED PERSONS AND MISTAKES OF ILLITERATES OR IMMATURE INTELLECTS.

There is a distinction, however, between errors of educated persons, such as are pointed out by proponent's counsel and the mistakes of ignorance or illiteracy, or those arising from the undeveloped intelligence of children, or those in the early processes of primary culture in correspondence, from which, it is claimed, Maria never emerged. In the revisions of manuscripts, the correction of proofs, the preference of one word for another, the selection of synonyms, the exact expression of an idea in appropriate phrase, every writer and every lawyer knows that before the final form is printed it is difficult to decide the precise mode in which the thought is to be con-

veyed; this comes from study, reflection, desire to be clear, many considerations which influence the author in his composition. It is not every writer that is gifted, as Shakespeare is said to have been, with such a facility and felicity of art as never to have made a blot or a blemish in his work, nor as, according to Pope, "the copious Dryden who wanted, or forgot, the last and greatest art, the art to blot." It is an idle boast that one never makes a mistake in manuscript, as proofreaders and typewriters can testify, for Shakespeares and Drydens are uncommon, and Sheridans remark still holds good, that your easy writing is curst hard reading.

MARIA'S ABILITY TO WRITE CONSIDERED—NOT A LINE FROM MARIA DURING LIFETIME OF YGNACIA—MIGUEL'S LETTERS TO MARIA AFTER DEATH OF YGNACIA—NO RESPONSE FROM MARIA.

Except for the signatures to various formal documents there is no writing of moment from Maria for over thirty years of her life, no scrap of writing, indeed, until the postscript to Mrs. Cebrian's letter to Miguel from Paris, May 15, 1888, which was:

"Muchos besos de
tu hermana que te quiere
mucho Maria."

This first specimen of Maria's handwriting hereinabove copied as nearly as may be, comports with the testimony of Norberta Martinez, that Maria's writing was like that of a child, commencing high up and ending low down, letters large and very much separated. She could only write her name without direction. The postcript speaks for itself in the original exhibit. She was then 32 years of age.

During the lifetime of Ignacia, Miguel had no communication in writing from Maria, none whatever. Ignacia conducted all the correspondence; while the sisters were in Europe from 1884 until Ignacia died in 1888, Maria made no requests of him, and after that none whatever, either written or oral, from her return to San Francisco until she went again to Europe; all the subsequent transactions were through Mrs. Cebrian. Prior to Maria's going to Europe with Ignacia in 1884, Miguel had never seen her write more than her

name. While Ignacia was in Europe before her death he received no word from Maria about the former's illness; she wrote nothing about Cervera's marriage to Ignacia, nor anything else from 1884 to 1888, nor thereafter during that period; not a line came from Maria while Ignacia lived; but subsequently a series of letters was started from Miguel to Maria, which, it is claimed by proponent, constitutes an estoppel on his part to question her competency. He wrote to her, for instance, on March 28, 1888, ''I am now going to molest you with business matters''; this is a letter of great significance, showing that he treated her as a person of intelligence who understood her business affairs; it proves his appreciation of her interest in and desire to know about her property and its management and so he communicated to her a concise statement of its condition; this was not such a letter as one might write to a child, but to an adult of mature mind quite capable of comprehending her surroundings, the nature and value of her estate and her relations to it.

He wrote about forty more letters, but there appears no response in the record, and it is said that all these letters make answer to contestant's claim that she was mentally incompetent, and if anything could estop anybody these letters should estop him from making this contest. Wherefore should he thus write to a person destitute of intellect and incapable of apprehending an idea, in fact of infantile mind? In one of these letters dated September 10, 1903, there is a reference to a letter received from Maria in which he says: ''Con mucho gusto recibi tu cartita de Agosto 10, felicitandome por el pronto casamiento de Julia''; and in this letter reference is made to her request for $10,000, in reply to which be sent $5,000. Maria's letter is said to have been lost. Otherwise the correspondence on her part is sparse and meager after the death of Ignacia, and before that there is none at all. Contestant's counsel explains this correspondence by saying it was all in pursuance of a purpose, Miguel never expected an answer from Maria, and she did not answer. Mrs. Cebrian answered him every time; the whole letter-writing to her was upon agreement to show in case of inquiry as to her competency; it was a device to mislead anyone who

might challenge her capacity; it was a family understanding. It may not be very creditable to anyone concerned, but there is reason to believe that this was a concocted correspondence.

### CEBRIAN'S EVIDENCE AS TO MARIA'S ABILITY TO WRITE AND SPELL, SELF-CONTRADICTORY.

In Mr. Cebrian's testimony he says that Maria knew how to write and how to spell; that she wrote with facility, she wrote more readily than her mother, and less readily than her sister, as readily as people generally do; she was as good as the average in writing and spelling; he never assisted her to write a letter; and he did not remember that his wife ever sat down with her and made her write a letter, but he admitted that he had written a letter to Miguel from Paris, April 10, 1888, in which there was a sentence which in the contestant's translation was as follows:

"Maria has not written to you—you know how much work it costs her to spell. Pepa continues with her persistent cold and cough, therefore she has not been in the humor to sit down with Maria and make her write."

Mr. Cebrian said this was not a correct translation, because colloquial phrases are very difficult to translate; he said it should be, "you know how she dislikes to write and spell." The original is, "Tu sabes cuanto trabajo le cuesta deletrear." Mr. Cebrian explained that Maria was disinclined to write and that on account of his wife's cold and cough she was not able to induce her to write to Miguel.

### MRS. CEBRRIAN'S STATEMENT ON THIS SUBJECT—HER LETTER THAT MARIA DOES NOT KNOW HOW TO WRITE.

Contestant's counsel, in directing Mrs. Cebrian's attention to the circumstance of the death of Ignacia, asked these questions:

"Q. Maria was with her, was she not? A. Yes, sir. Q. Did Maria give you any information about the sickness of Ignacia? A. Yes, sir, wrote once that she was sick. She was writing all the time."

This was Mrs. Cebrian's statement on that subject and about Maria's ability to write. It may be remembered in this connection that Crescencia Martinez said that Maria was writing from three or four letters, and that she saw her writing and took them to the postoffice, so that she knew that they were sent. But in a letter written April 19, 1888, identified by Mrs. Cebrian, as her own writing, occurs the following:

"Dear Miguel:

"Do not take it badly that poor Maria does not write you, the unhappy one. You well know that she does not know how to do it. If she had known how to write, they would not have concealed from me the state of sickness of Nacha, nor would they have written a letter in her name to a serving man they had in the Rue Cimarosa, the day on which Nacha died; a letter of which Maria knew nothing, nothing, and she had not given any idea of whom may have written it."

After this letter was brought to the attention of Mrs. Cebrian, she admitted that she had not received any letter from Maria during that sickness and also that the lines, "if she had known how to write they would not have concealed from me the sickness of Nacha," were underscored by her in the original.

### COMPARISON OF HANDWRITING OF YGNACIA AND MARIA.

The conclusion from the comparison of one of the counsel for proponent of the handwriting of Maria with that of Ignacia is not fully established, if we take as standards the postscript written by Maria to Mrs. Cebrian's letter of May 15, 1888, and Ignacia's letter of June 4, 1885, in which she acknowledges a receipt of a draft for Maria; nor the letter from Maria to Miguel dated at San German, May 2, 1898, which reads:

"San German

Mayo 2 de 1898

Mi querido hermano Miguelito Desde
que es toy a qui en San German
es toy Yo mucho mejor. Mamie y
Yo estamos muy contentas con

estos Sr. y Sra., son los dos
muy buenos y muy obsequi-
osos.   Su casa es muy bonita,
tenemos cuartos buenisimos
Dales muchos besos a
los ninos; tengo muchos·
deseos de be verlos
              tu hermana que
te quiere mucho

MARIA."

This letter is translated as follows:

"San German, May 2d, 1898.
"My dear brother Miguelito:

"Since I am here in San German I am much better. Mamie and I are very content with this Sr. and Sra.   The two are  very good and very courteous.   Their house is very pretty.   We have very good rooms.   Give many kisses to the children.   I have many desires to see them.   Your sister who loves you much.

"MARIA."

This counsel says that Maria could actually write so that her writing could not be distinguished from that of Ignacia and that this is a pregnant proof of competency.   With these two samples before the court, it is hard to agree with counsel that no difference is discernible between the two scripts. Ignacia's writing is fluent, regular, correct in composition and in form, such as might be expected from a person of her years and education, treating of many matters of mutual interest, altogether the product of an adult intellect, while Maria's letter in structural form and substance might be written by a child; it answers to the description given of the manner of her writing already quoted from the testimony of Norberta Martinez.

NO SIMILARITY BETWEEN THESE WRITINGS.

Certainly so far as these specimens are concerned, there is no similarity between the writings of these two women. Maria was forty-two years old when she wrote this letter.

On the same day that this letter was dated at San German, May 2, 1898, Mrs. Cebrian wrote from Cannes to Miguel that Maria had written to her and told her that she had written to him and said, "Miguelito will have a great surprise with my letter"; "is it no so? Maria wrote to the consul and sent him a certificate signed by the doctor that she could not come because of a nervous prostration. I hope that this will do and that there will be no other commissions to answer because these have me half dead." Maria and Mrs. Cebrian were twenty-four hours apart at this time, as the latter herself said, "She was in Los Angeles, for instance, and I was here; I could not know that she had written."

### MARIA'S MOST ELABORATE EPISTOLARY EFFORT.

Perhaps the most elaborate effusion attributed to Maria is the letter dated at Paris, December 12, 1899, less than three pages of small note paper, in which she conveyed to Miguel her desire that the first day of the last year of the nineteenth century should not pass without his having her felicitation. She sends wishes for his good health and desires that he come over in the coming year with his children, for the exposition, because they would have much pleasure, and she very much desired to see him, for it was now three and a half years that she had not seen him; the works of the exposition were far advanced, some buildings almost finished; it was very pretty; she wanted him to give each one of the children money in her name the same as the year before, so that they might have a remembrance from her as she was not there to buy it herself. She concluded with an embrace from herself, his sister who loved him much, and desired that he should come to see her. Although this letter is dated December 12, 1899, three days thereafter, on the 15th, Mrs. Cebrian writes to Miguel: "At last Maria has now decided to write and she wants to begin with you. When you are in the humor send her four words urging her to write you." It seems strange that if this letter were already in existence, Mrs. Cebrian should not have known it, and not refer to what had been done as something still only in contemplation.

THEORY OF THE PREPARATION OF LETTER.

The theory is that this letter was a long time in process of preparation and that it was necessary to have Maria write something to exhibit as coming from her in case Maria's competency should be called into question; Miguel testified that he called for letters from Maria that he might show them and that these two letters were prepared for that purpose. Mrs. Cebrian in her correspondence with him, seems to admit that a duty had been imposed upon her to have Maria write something. On November 24, 1899, she writes: "Receive a thousand loving regards from Maria, who for a week says that she is going to write you." On the 30th of November, 1899, she says, "Maria salutes you and thanks you for the draft which she has received. She was going to the theater with P. and Cebrian. It is days since she says she is going to write you." And then two weeks later this letter is produced. In all the letters written by Mr. and Mrs. Cebrian prior to taking the deposition at Cannes there is no reference to Maria's writing, nor any excuse made for her not writing; but after that, Miguel testifies that he called for a letter from Maria which he might show, and subsequently came these excuses from Mrs. Cebrian in numerous letters, in which she spoke of Maria as promising to write to him, or that there was a letter being written, or that she would write to him soon, and so on for years. It is argued that prior to the deposition at Cannes, there was no necessity and he thought of having Maria write, but at that time, and after that time, Miguel was very anxious that she should do so and thus these letters came into existence; up to 1898 there is no letter from her nor any reference to any writing made by her; on September 6, 1901, Mrs. Cebrian wrote: "Maria always with the good intention of writing, with the laziness on the one hand, and the outings on the other, never finishes the letters commenced. She sends you a thousand remembrances, and also to your children and receive the same from all of us, and especially from your sister who loves you much." On November 15, 1901, Mrs. Cebrian says, "she will soon write to you but she has taken an incredible laziness to the pen and paper."

A GREAT LABOR FOR MARIA TO WRITE AT ALL.

Certainly these letters purporting to have come from her, short as they are, show that it must have been a matter of great labor in her to write at all, and although one of the reasons for writing to her direct was that she liked to receive letters, she certainly showed no liking to answer them, whether it was from her incredible laziness, or her inability to write. Miguel testified that during the flying trip of the Cebrians to California, this subject was discussed with Mrs. Cebrian and it was then agreed that there should be letters written. Mrs. Cebrian told him that Maria liked to receive letters, and so after that visit these letters were sent to her and also the drafts month by month, but the responses and acknowledgments came from the Cebrians, except in two or three cases. It is claimed that all of these letters ostensibly addressed to Maria were intended for the Cebrians and the fact that the answers came from them and not from her seems to sustain this claim. There is no reply on record from Maria to any one of the series of letters from Miguel, while the Cebrians were in Europe, but during their so-called flying visit to California in 1901, contestant wrote three letters to Maria who remained in Paris and sent five drafts, to which the only response came on a postal card, not postmarked, which acknowledged the receipt of three drafts. This postal is an evidently labored effort, six or seven lines in length, and bears some aspect of aid in its composition or writing. Maria was forty-five years old when that was written. As to the other writings and postals ascribed to Maria, considering her age, they are not beyond the capacity of a child, leaving aside the suggestion that she was assisted in their composition.

MARIA WAS ALWAYS ASSISTED IN WRITING.

That she was assisted, even in the writing of a postal card, is quite plain upon inspection, for example, a card with the picture on one side of "Oradour-sut Vayres—Chateau Callandreau," and on the other side under printed "Correspondence,"

"Mi querido Miguel
me acuerdo mucho
de ti; Enesta casa
todos te saludan
con cariño.          Maria.

Adresse (in print):
Mr. Miguel
    de Laveaga
        Geary St.
            San Francisco
U. S. A.            California."

The address was in the handwriting of Isabel. This postal was not postmarked, but sent under cover of somebody else's letter. Attention is directed to two letters, one dated Paris, March 5, 1901, and the other San Francisco, August 1, 1906, and comparison made to show that she was aided even in these simple writings. The difference between the capital F in the word "Felicitas" in the Paris letter from the F in "Francisco" in the other is certainly very striking. There are other marks on the surface that tend to show that she was materially assisted in the letter of March 5, 1901, sent to her sister Pepita in California, while Maria was in Paris in the house with Josephine Cebrian. The San Francisco letter of August 1, 1906, is very different in construction and if she were aided in that writing it was by another person than the one who was present in Paris five years before.

These writings constitute about all the contributions of Maria to the correspondence in this case. Many letters and postals were sent to her, but her responses have not been preserved, if ever made, except as herein put in evidence. She certainly was not at any time of her life a facile, fluent or frequent writer, although Mr. Cebrian says she wrote with facility and that she knew how to spell as well as the average, and Mrs. Cebrian testified that when Maria wanted to write she knew how to write pretty well and of course she knew how to spell, she spelled readily and easily; when Maria was 22 or 23 years of age she could spell and write as well as she could at any time of her life; but there is no writing here to support that statement. Outside of the few letters and postals here introduced she wrote nothing in the way of correspondence.

EVERYTHING WAS DONE FOR HER BY THOSE ABOUT HER.

It should seem that so far as Maria's ability to write ordinarily the subject was exhausted. The claim that she was a ready writer or a correct speller may be left to an inspection of the original documents; it is impracticable to reproduce them here in facsimile, but it is enough to say that they do not bear out the assertion that she was at any time equal to the average in either respect of those who had ordinary opportunities of education. In all there are only four writings of any length, besides the will, and six postal cards, attributed to Maria. Counsel for proponent says that Maria's letters evince memory, reflection, power of thought, interest in affairs, affectionate consideration for her nieces and are normal and intelligent, and quotes the letters just cited to prove this thesis, especially the letter from Paris, March 5, 1901, to "Pepa," Mrs. Cebrian, then in San Francisco, a well-composed and sensible epistle; thoughtful and kindly; as to this letter and its character sufficient comment and comparison have been made.

MARIA'S GENEROSITY TOWARD HER SISTER'S CHILDREN CONTRASTED WITH HER TREATMENT OF MIGUEL AND HIS FAMILY.

The same counsel alludes to the generosity of Maria, she gave $5,000 for her niece's child, then recently born, Isabelita, in 1904; "she was giving all her life, constantly bestowing benefactions on friends, relatives, dependents and others in need; the decedent was sound enough to make gifts of great value in her life and they were accepted with avidity by the donees." There is no doubt about this; there is not an instance in the record where anyone declined a gift from Maria; all of them were avid enough in acceptance, if not assiduous in cultivating their opportunities of obtainment. Why, it is asked, if she were competent thus to donate personal property inter vivos, could she not do so by will? One of the donations was a watch which her nephew Harry Cebrian testified that he received, said to have been purchased by Maria in Europe as a present for him and sent through his parents to him, and proved by the deposition of the salesman that it was bought by his father in Tiffany's, New York, three

months after her death. This counsel speaks of the trust and confidence reposed by Maria in her brother Miguel and her generosity to him and his ingratitude in return for all her kindness, now claiming that she was deficient in intellect and incapable of apprehending an idea of business, in fact infantile in mind.

MIGUEL'S CARE FOR HER PROPERTY WITHOUT COMPENSATION.

As to Maria's generosity to her brother Miguel, it appears that for thirty years he had received no compensation for attending to her affairs and that he had even relinquished his share of executor's commissions in the family estates; and the associated counsel for proponent contrasts the fact that she favored her sister's children in whom her affections were centered, giving them more liberal presents than to the children of "the metalized Miguelito," a most significant expression, an epithet said to have been used by her; all that came to Miguel's children were $20 apiece at Christmas, while the others in closer touch with her received munificent presents. Miguelito may have been metalized but certain it is that he bestowed great care without a penny of pay for himself upon this property. He was minute in his accounts and careful in his record of transactions to an extent that causes criticism of his exactitude in minor matters. He does not seem to have sought anything from her as a reward or otherwise for himself or his children; but she was in the habit of presenting them with these remembrances at Christmas. As an instance or illustration in this regard of the manner in which Miguel managed her affairs, there is a letter from Mrs. Cebrian of December 5, 1902, to Miguel: "Receive many remembrances from Maria who with much formality says that she is going to write you to tell you that you buy a remembrance to your three children in her name"; but no letter came and on December 24, 1902, Christmas eve, Mrs. Cebrian writes: "Maria gives me a thousand messages. She hopes that you have purchased them some little present in her name, for although she has the letter commenced for you, I fear this may have the fate of many others never to be concluded." Miguel answers this January 8, 1903: ·

"My very dear Pepa:

"As I was waiting the letter from Maria in which she would tell me to give a present to my children, I did not give them anything in her name on Christmas eve. I confess they were disappointed, but now with your letter, which says she wishes to give them a present, I gave each one of them twenty dollars as I have been giving them the past few years according to her request."

Certainly there is a contrast in the relative value of gifts, but no occasion to charge Miguel with ingratitude for Maria's generosity to him. The cause for gratitude might seem, in the circumstances of his attention to her interests, to be on the other side.

MRS. CEBRIAN RELIED UPON TO ANSWER FOR MARIA.

The letter of January 8, 1903, is urged to show that Miguel expected Maria to write and it may be that he did expect some note in her name, but the customary mode was, as has been repeated, that Mrs. Cebrian should act for her, and that for reasons already stated he desired the personal signature of Maria. Miguel wrote to Mrs. Cebrian on October 9, 1906:

"To-day I am sending Maria draft for 3780 francs which I had not sent her before because from day to day I was expecting she would advise me of the arrival of the one which I sent her in September, and that Cebrian would tell me if it would be better to send drafts in pounds. I am writing Maria under separate cover. I believe that it pleases her to receive letters, and am sending her a draft. Advise me if she receives it."

So on a previous occasion he wrote: "I send Maria under separate cover a draft; as long as she does not write, please tell me if she receives." Here it is patent that he was not relying upon Maria to answer his letters, but that Mrs. Cebrian was attending to the matter. That this is so appears from another letter, from Mrs. Cebrian to Miguel:

"Maria charges me to say that she received your little letter and she thanks you and gives you thanks for the two drafts which came with it. When she receives the other I will advise you."

THE ACCEPTED WAY OF DOING BUSINESS—MRS. CEBRIAN MADE
ALL ARRANGEMENTS FOR MARIA.

It may be asked, why did not Maria herself advise. Miguel
of the receipt; the answer is that this was the accepted way
of doing this business; she was not called upon nor expected
to do anything of importance. Maria was constantly receiv-
ing letters and answering none, occasionally, perhaps, a mis-
sive to Mamie or a postal, but nothing of consequence to any-
body else. Many letters and postals are here from others to
which she made no response, no writings to those outside of
her family, none to strangers. Some of her correspondents
seemed to have a mania for multiplying manuscripts and
wrote to her with great frequency without evoking any an-
swer; but the sum of it all is that her necessary correspond-
ence was in the hands of Mrs. Cebrian. The arrangements
for her maintenance abroad were made with Mrs. Cebrian.
Miguel was asked whether or not he had made any arrange-
ments with Maria before she went to Europe as to how much
money he should give her monthly; he said that he had not;
and he wrote on July 29, 1906, after they had left for
Europe, "I inclose for Maria, draft on London for £204–14–2,
here $1000. If she tells me what she needs each month more
or less I will forward her a monthly remittance"; but she
did not tell him; it was reserved for Mrs. Cebrian to answer,
and she wrote on August 15, 1896: "With reference to what
you say as to how much Maria gets per month, for the time
being I send her $750 on the first and if she has any over I
will let you know, and if she needs more I also will advise
you." Was Maria consulted as to this arrangement? What
had she to do with the provision for her own necessities?
The whole matter was managed between Miguel and Mrs.
Cebrian, and Maria was only a name, she was only a pawn
in the game that was going on between these people. Their
common mode of transacting business was to leave Maria out
of consideration, except to obtain her necessary signature,
upon which Miguel insisted because he wanted her actual
receipts. Cebrian desired that Miguel should deposit moneys
here to his credit and he would pay Maria in Europe, but
Miguel was wise to this suggestion, because he said he wanted

a voucher for everything he sent Maria and he answered Cebrian that "as to not remitting to Maria but placing it to your credit in the bank, I will tell you frankly that I prefer to send her the money, because the second of exchange is a receipt that remains with me, and you will know why." Cebrian answered that he understood why this was desired by Miguel. If Maria was competent, why all this roundabout business Why could not she attend to it herself? During the time they were in Europe, from 1896 to 1904, Mrs. Cebrian testified that she did not receive Maria's money; she did not receive any money from Miguel for the care and support of Maria; but in the letter from her to Miguel dated Paris, August 15, 1896, she acknowledged the receipt of money for that purpose. In another letter, March 23, 1898, she writes:

"Maria received the double draft which you sent her and I am very glad that it was so. Send her another in April and don't send her any in May. As I think of going in May I will leave her money on hand."

If Maria could attend to her own affairs, why not send to her in May, when Mrs. Cebrian thought of being away?

If the remittances were to be received by Maria why was there to be any change during the absence of Mrs. Cebrian? Could she not be trusted with the control of her own money and the cashing of her own drafts?

During the lifetime of Ignacia it has been proved that the latter attended to such matters, and for the four years from 1896 to 1900 Miguel advised her that Cebrian would tell her how to cash a check; and during the flying visit in 1901 Josephine testifies that "Father told us to go to the bank and collect them and I went with her when she collected the drafts in Europe during the flying visit, all of them"; so, it seems, that after all her experience of eight years in receiving drafts, during the short episode of the elder Cebrians in San Francisco, Maria had to be instructed as to how a draft should be cashed and after that she needed the aid and company of her neice in order to collect the money. Maria was then 45 years of age, and it might be presumed that she could cash her own checks without assistance.

MARIA ALWAYS ACTED UNDER GUIDANCE AND DIRECTION OF
OTHERS.

It is claimed by proponent's counsel that Maria's signatures to these drafts and other important papers establish her competency, but it is shown that in such transactions she was always accompanied by others and acted under their guidance, and that seldom, if ever, did she exhibit any cognition of the contents of the important instruments she signed or formally executed. There is no evidence that she ever drew or read one of those papers, or discussed them, or even had explained to her their contents; and, indeed, it is too much to expect that as to the legal verbiage she should have understood them, much less have drawn them, but as to the substance and purport she might have obtained aid to her understanding from those who were acting for her and she had the right to rely upon their advice and act upon their counsel, as betokened by their superior judgment in matters not of common ken. One of these matters was the bond in the Safe Deposit receivership in which she signed as surety and which, it is said, was done by agreement in the family, arranged among them, and everybody acquiesced in the justice of it, and was strictly in accordance with what had previously been the custom and supervised by her sister and her brother. Joseph Vincent de Laveaga, attorney for the receiver, testified that he consented and took part in the giving of the bond because his father and aunt, Mrs. Cebrian, consented to it, and it was the way Maria's business had been transacted, because she had not been adjudged incompetent and his father and aunt were the only persons interested and they were all agreed. Joseph Vincent de Laveaga is denounced for his conduct in this transaction, in view of his opinion that she was incompetent, as deceiving the court, and his action is described as moral·turpitude of the most depraved degree and type. While Joseph Vincent's action in this matter is censurable, it is of a piece with that of all concerned; they were all in the same case. He was striving to further his own interests, and they were all at that time in sympathy. Whatever blame attaches to one, the others are measurably blamable, he more, because, as an officer of the court, it was his duty to act with the utmost frank-

ness and candor, and to the extent that he did not do so, he is deserving of severe reproach; but that does not affect the fact that Maria was incompetent, it simply shows the common family purpose to keep her condition concealed.

### THE COMMON FAMILY PURPOSE.

Everyone of these people was equally endeavoring at that time to prevent courts and public from knowing the family secrets, and, perhaps it may be going too far to blame them for desiring to maintain their own privacy and in affairs of business to carry out what they considered formalities, without exposing to strangers the infirmity of one of their own members. Whatever may have been their motive, what we are to look for is the fact of Maria's competency. Vincent said he acted in this way as in all her other business, and it was done in the best of faith and he thought it was a good bond. He may have been mistaken in his legal judgment, even ignorant of the law, without moral turpitude; all of the parties to the bond, including the principal, being financially responsible, he thought he was justified in his action.

In all transactions in the family Maria was treated as inferior in intelligence; this was recognized in their correspondence; it was a family secret, they did not desire it publicly known or made a matter of record; Ignacia wrote to Miguel in January, 1889, that if she had to draw on him for Maria, it would be better always to send the money in her (Ignacia's) name, "for you know her and to go or sign at the bank or before a clerk, the poor thing suffers"; but Miguel for his own security in disbursing funds wanted an actual signature, so he declined Ignacia's suggestion to dispense with it, a precaution justified by the future events; so he required a formal voucher signed by her; and Ignacia wrote in reply "you can send the money in her name, because if she signs once she can do so other times; the observation I made was to save her who is short the pain of doing it before people."

### MARIA'S SHORTNESS OF INTELLECT ACKNOWLEDGED.

Here was a distinct acknowledgment of that shortness of intellect ascribed to Maria in the family circle. This is the

explanation of the caution exercised by the members of the family to guard from public view Maria's infirmity or deficiency. Mrs. Cebrian's letters written after the death of Ignacia are inconsistent with any theory of Maria's competency. She declared she wrote those letters to an intimate loving brother who knew Maria and she never thought of their coming out in court. So all of them closely guarded the secret and permitted Maria to perform perfunctorily acts and to sign mechanically documents of which she had no comprehension. All the legal documents, leases, contracts, powers of attorney, bonds and the like are accounted for upon this ground, that she did as directed by those in charge of her affairs, and others assumed that it was all right because no one interested raised any question in any particular matters. It was all in the family. She did nothing of her own initiative, originated nothing, always at suggestion or under direction of others, acquiescent.

MARIA HAD NO WILL OF HER OWN—NO VOLITIONAL POWER.

After Ignacia's death in Rome she was willing to go with the conspirators who plotted to abduct her, said she would not go with Cebrian; but after he had by his cleverness released her from their control, she flew to his arms, embraced him and went with him. She was thus the creature of her environments, no will of her own, no volitional power. Cebrian characterized Juanita and Celestine as the accomplices of José Cervera in his plot to carry her off and marry her to his brother Cesar. Maria was helpless in the circumstances and would have been their victim except for the coolness and strategy of Cebrian who circumvented their maneuvers. He was too skillful for the schemers and rescued Maria from their toils. That Mr. Cebrian was an accomplished strategist and a man of resources and fertile in expedients, and quite conscious of his gifts in these respects, is shown by his own account of his conduct in the affair of the attempted abduction; as, also, on another occasion in connection with the taking of the depositions of Mrs. Cebrian and himself in Europe in the Anselmo case in May, 1898, when he wrote from Paris to Miguel that he had finally sent to Lyons, the attorney, answers to the cross-questions

and in a separate envelope some explanations and observa-. tions regarding the same; he much desired to know how Miguel found their testimony for it was hard work, having no lawyer near to guide them. Within a week he said he would have another copy to send to Miguel or McEnerney, "The consul will send another copy to the attorney of Anselmo, who asked him for it. I employed a stratagem in order that the copy for the attorney for Anselmo might leave here a week later than that for Lyons. I think that I did this without the consul suspecting anything."

### SHREWDNESS AND STRATEGY OF CEBRIAN.

In this he evinced his characteristic shrewdness in dealing with the difficulties that confronted him from time to time in connection with this vexatious litigation. In the preparation of Mrs. Cebrian's deposition and his own he was engaged for eleven days, morning, afternoon and sometimes evenings; and, having no stenographer, he "did a terrible amount of work in those eleven days; Mrs. Cebrian herself said that he 'worked divinely.'" After this it appears that the consul held him up for services in executing the commission in the sum of 2,500 francs or $500, at which Cebrian was astounded and feared the effect of this extortion upon his own lawyer, who might be deceived in regard to his fee, seeing the exorbitant charge of the consul for really clerical service. Although he was dumb with surprise and with the consequent anger for three weeks, first for the extortion or robbery by the consul; second, because he attributed it to a letter written by Anselmo's attorney to that official insinuating that as the amount at stake was large the consular fee might correspond; and, third, by the effect the charge would have on his own attorney, "for if this little work of the consul is worth $500, how much would that of our lawyers be worth?" But notwithstanding his indignation he mastered his emotions and concealed his chagrin.

### CEBRIAN'S SELF–CONTROL, AS DESCRIBED BY HIMSELF, IN THE ROMAN INCIDENT.

Mr. Cebrian's ability to control himself is shown in his recital of the Roman incident after the death of Ignacia when

the Cerveras "not content with having killed Nacha and having robbed her in life and in death, they also sought to seize Maria." When Cervera was abusive Cebrian remained impassive, for although Cervera showered ·him with abuse, Celestine supporting him, Cebrian saw the snare that was laid and did not propose to allow himself to be taken by it, nor to abandon Maria; so he contented himself with curtly denying the imputations, making Cervera furious at his tranquility, and the two left the room where Cebrian was dining, and he had the will power to remain there eating everything brought and even repeating in order to extend the meal, thus dissembling his anxiety while mentally working out a plan whereby if he could not protect the body of Maria he would shield her soul, even if it was only for an hour; for if he had left at once the two accomplices of José Cervera, Celestine and Juanita, would immediately have worked upon the imagination of "our beloved Maria" to fix her in the idea of not going to Paris, so he remained in the room after the Cerveras had left that he might talk with Maria and· he endeavored to frame words which would "recapacitate" or change her mind which had been infected first by José Cervera and secondly by Celestina, who had been working on her while Cebrian had been occupied with the interment and other important matters, and during the interval of this preoccupation they had utilized their opportunity of perfecting their plan to capture her and carry her off to marry Cesar and had succeeded in persuading her to not go back to Paris; but Cebrian undertook to efface the effect of their efforts and to convince her that they were uttering falsehoods; he had a hard time, however, as Celestina would not cease to plead for "Pepe" (that is, José Cervera), and was talking to Maria in the same strain as Cervera before the latter had left the room, and urging her that she should not go to Paris with Cebrian, who was in vain trying to counteract the influence of Celestina. After a long siege, two hours, Cebrian quit, unable to consummate his purpose and overcome the power that the Cerveras and their accomplice Celestina exerted over the mind of Maria.

### A SCENE NEVER TO BE EFFACED FROM MEMORY.

The scene of that night would never be effaced from his memory. At 10 o'clock Cebrian withdrew from the apartment, leaving Maria with Celestina, and went to his hotel, where he spent a sleepless night thinking over the situation, so perilous to the peace and happiness and fortune of Maria. On the following morning he went to consult the American consul to find if that official could aid him to save Maria in preventing her from being captured and carried off by the Cerveras and to induce her to go to Paris with him. The American consul said it was impossible. Cebrian then sought the Spanish consul to advise with him about the matter, and that gentleman, who seemed to understand the situation in Rome and to have appreciated it prior to Cebrian's arrival, was glad to greet him and declared that he had heard of certain rumors before he had the pleasure of meeting him; the consul said that these rumors came from a lady who accompanied the señorita and who spoke Spanish as if she were a foreigner. When the consul consented to aid Cebrian, Cervera, who knew that the consul doubted him, having no remedy, submitted, because otherwise he would have increased the doubt of the consul upon whom depended the decision, so he yielded and asked pardon of Cebrian for what he said the night before, held out his hand and with all Cebrian's repugnance he took it, for he had no idea in his mind of vengeance or punishment; he only thought of the salvation of Maria; and she was saved, through the aid of the Spanish consul from the conspirators; and their conspiracy to carry her off and marry her to Cesar proved a failure, and she went to Paris with Cebrian.

### CEBRIAN'S DOMINANT IDEA NOT TO LOSE MARIA.

At the time when he went to the Spanish consul to advise with him, Providence willed that Cebrian should there meet José Cervera, Cesar and their friend, and after the conversation narrated, having no notion of vengeance in his mind, so happy was he at the outcome, that he was, therefore silent; returning to his hotel, to his great joy, he found, "poor little Maria," who cast herself into his arms weeping,

kissed him and did not want to leave him, "unfortunate, for twelve hours she had seen herself isolated, although erroneously, and then she found the love of which she had never doubted." Cebrian's dominant idea was not to lose Maria, so he put up with an intolerable amount of effrontery from the conspirators; after the mass for the dead he even breakfasted and dined with them and endured with equanimity their irreverent behavior and coarse conduct rather than to give them an opportunity in which they could have carried him off as they might have done on the preceding night, if he had not contained himself; but he preserved his poise and thus kept them at bay; had it been otherwise and "if Maria could have been in a safe place" he would have showered them with abuse and would have left that sacrilegious place"; as it was, prudence dictated forbearance for the sake of Maria, and he parted with them, the company Laveaga for Paris and the company Cervera in the direction of Naples.

PRESERVED HIS POISE AND KEPT THE ENEMY AT BAY—A DESPER-
ATE SITUATION—RESCUES MARIA AND TAKES HER TO HIS
OWN HOME.

In all these circumstances Cebrian showed a mastery of mind; he acquitted himself creditably where a man less mentally endowed might have failed utterly. He found Maria, after the death of Ignacia, upon his arrival at Rome, in the power of persons whom he described as conspirators and spoliators, with accomplices who should have guarded her, but who participated in a plot to seize her and carry her off clandestinely to be married to an adventurer. Maria was there at the mercy of this coterie of complotters, utterly helpless, until Cebrian came and if it had not been for his advent she would have been captured and conveyed to Barcelona or elsewhere and married to Cesar. In their hands she was powerless. The servants seemed to have been suborned. The situation was, indeed, desperate, with these heartless rogues intent only upon the success of their own wicked purposes. Cebrian found himself in the presence of all these people with no one to advise or assist him and noth-

ing but his own superiority of intellect and resourceful mentality to enable Maria to escape from their clutches, and she was yielding to them and willing to go with them, whithersoever they willed, with a mind as plastic as that of a child, although she was then over thirty years of age, and was "a woman of dominant personality." On this supreme occasion when she was in peril of her liberty and when her fortune and future were at hazard from the harpies who had pounced upon her and were ready to capture her, how did this "dominant personality" assert itself? While she was with them she was submissive, docile and entirely subject to their wishes, had apparently no will of her own; she was as a child, simple and irresponsible, and the plotters were taking advantage of her condition until she was liberated through Cebrian's procurement of the Spanish consul's assistance, when she was as ready to go with him as she had been the night before to go with the Cerveras to her doom. Thenceforward until her decease she was a member of the Cebrian household; never leaving for even a day or a night the family circle; constantly in their company; if not under their surveillance, she was under their protection; they succeeded to the place and trust made vacant by the death of Ignacia.

### CEBRIAN'S CHARACTER AND CAPACITY.

The head of that household naturally was Mr. Cebrian; no one questioned his authority, all bowed implicitly to his will; he was a devoted husband and father, and, while not a tyrant, it is quite clear that he maintained a judicious discipline and that all looked up to him for directions and were subject to his control. He was ever mindful of their interests, present and future, saw that they were properly educated and taught to depend upon their own exertions. His paramount idea was the conservation of the Cebrian family fortunes. A man of capacity and culture and worldly experience, apt at business, somewhat conversant with the law and its forms; he carried with him in his travels not only a copy of the Civil Code but also Cowdery's book of forms, a useful publication containing models of legal documents which he had received from Mr. Jarboe, the lawyer who had

drawn the will of Maria's mother, in the drafting of which he had participated; he wrote letters from Europe concerning the amendments to section 1387 of the Civil Code; he was thoroughly familiar with all the details of the Anselmo litigation.; a vigilant observer from afar of all the proceedings, a close student of the arguments and briefs of counsel on both sides, a keen critic of his own lawyer's work and a shrewd analyst of the methods of their opponents; he has said of himself that he did not belong to "the literary clan" and was not a lawyer, but although not of the literary clan, as he called it, Cebrian was certainly a man of letters, as his correspondence shows, and although not a lawyer he was a student of the statutes of wills and successions.

ALTHOUGH NOT A LAWYER, VERSED IN THE STATUTES OF WILLS
AND SUCCESSIONS.

He was very much vexed with the decision of the supreme court which nullified the commissioners' amendment on account of what he termed a clerical error in the code amendatory act, the bad news of "the scandalous fiasco" had not surprised him, because, unfortunately, he already knew that that grand country which, notwithstanding its riches, was still semi-civilized, and the laws, as well in California, as in the other states, had not yet come out of chaos. The action of the supreme court had disgusted him extremely, but he was still hopeful that the law might be amended so as to be more favorable to their case. This was in November, 1901. Mrs. Cebrian herself was anxious about that law; how did it stand; if it did not pass they would be as before, and the return to San Francisco would not be easy; they did not lose hope, however, that before spring perhaps it would be all arranged. Cebrian always advised with his wife and read to her what he sent to Miguel and the attorneys and she was in accord with him and they were prepared to do as directed. He was very anxious about the question of the codes and inquired if some step was not about to be taken, such as an extraordinary session of the legislature or something else, and he wanted to be informed about this by newspaper clippings or other means of knowledge. On this subject he was

extremely solicitous, for we find him inquiring in March, 1903, as to the question of the legislature about the new code, as to section 1387 of the Civil Code. He was thinking about asking by cable about this point, because the mail would take a month, and in April they were awaiting letters from Miguel as to what was the decision of the legislature. It may be regretted that the legislature had done nothing, for this left another question pending for some time. While he disclaimed being a lawyer, he yet perceived the faults of the law, as construed by the courts, and noted with discernment the conduct of the case by the attorneys; he was quick to see how Anselmo's lawyer had "given away" his design in a certain instance and his own attorney in his brief had also been guilty of a similar indiscretion exposing his hand to his adversary. He criticised leases and other documents concerning Maria's property and assumed the position of man of affairs in Europe as to her business; he acted practically as financier, received her money, indorsed checks, collected and deposited in his own bank account, as occasion required, and kept such accounts or memoranda as he pleased of these transactions; there was a direct relation of confidence between him and Maria from the death of Ignacia in 1888 to the end of Maria's life, covering the period of the date of the will of February, 1893.

ALIVE TO THE EXIGENCIES OF THE LEGAL SITUATION—HIS SUG-
GESTION OF AN AFFIDAVIT TO BE COPIED BY MARIA IN LIEU
OF A DEPOSITION.

Although not a lawyer he was alive to the exigencies of the legal situation in the Anselmo case and very desirous that Maria should not be subjected to the ordeal of examination in court or before a commissioner, so he proposed that an affidavit be prepared, to be copied by her, to answer the purpose of a deposition. He was keen to the method of examination, for he wrote to Miguel from Cannes, April 12, 1898, that the manner of Anselmo's questions was less complicated than that of their own attorney (but of course he would not tell the latter so) ; to him, Cebrian, it would be all the same, but he would say it for Maria, for whom it

would be easier to answer short questions. "She has a cough and is troubled with her teeth, and very nervous, and I fear some difficulty with her answers, above all if cross-questions come from Anselmo. For this reason we to-day are cabling you 'If sister refuses to answer, will we lose our suit or not? She will make affidavit instead. Consult our attorneys.' It occurs to us if she makes an affidavit in her own handwriting that before December 24th she never heard mentioned of Anselmo under any of the names which they give him, nor yet of Basilia, all the interrogatories for her will be answered, and she will sign it before the consul and it would be carried to him to send it on, naturally giving as a pretext her want of health to endure so long an interrogatory. Let our attorney at the same time know that she was less than nine years old when she arrived in San Francisco; that she at once went to Benicia; and it is as clear as day that she cannot know the innumerable questions they put to her. But as there are so many technicalities in the law, I ask you this, or cable expecting that your answer after you have asked Lyons and McEnerney will arrive here before the 23d. If as a last step we see that she can answer, we will certainly take her, but if it seems dangerous to us and your answer approves the affidavit suggestion, we will do it that way." He cabled the same day to Miguel: "If sister refuses to testify, will we lose the suit or no, . She will make affidavit instead. Consult lawyers."

A LOAD LIFTED FROM THE CEBRIANS WHEN MARIA ESCAPED EXAMINATION—SHE GOES TO ST. GERMAIN.

Mrs. Cebrian wrote April 15, 1898, to Miguel that she had received his telegram and a load was lifted from them in seeing that Maria would escape so horrible a torture as the protocol of questions "that soulless creature" sent them. "Maria is very nervous and oppressed with this matter, of which she had never heard mention, but now she will get over it quickly. The doctor will give us a certificate that she is suffering, and I think that everything will go well from this time on. The only thing is it will be long, as it will have to be written by hand." April 22, 1898, Mrs. Cebrian

notified Miguel that the doctor had already seen Maria and recommended her much tranquility and repose, therefore she went to St. Germain, on the outskirts of Paris, and he could go out any hour, if necessary. Maria was very well in St. Germain; the friends with whom she was staying were not aware of anything; they did not even know that the "testamentaria" of José Vincente continued; "they are very prudent and never ask anything, fortunately." Mrs. Cebrian had heard from Miguel that their attorney had been satisfied with the depositions of herself and Cebrian; they had been much exercised about this, and were relieved to know that the result was satisfactory, for she could assure him that they were "sudamos la gota gorta," which meant they had perspired profusely on account of their concern in the matter; Cebrian had labored divinely and the consul had complimented him greatly. "The escape of Maria was magnificent. The journey to St. Germain was a true inspiration"; and they had a debt of friendship with their friends who would not accept compensation, but they would see what presents could be made to them.

THE ESCAPE OF MARIA MAGNIFICENT—A TRUE INSPIRATION.

It appeared that it was "a true inspiration" that Maria should have gone to St. Germain, for she became much better. They were troubled about the commission to take their testimony, Cebrian had not ceased thinking about it for one moment. Maria would not be able to go to Cannes to testify, she did not care to do so, thus it was written to the consul; she would not testify, and a certificate came from the doctor who did not want her to pass through an interview so long and tiresome and she remained in St. Germain with "Mimi" who was a good sick nurse and the nervous illness was not dangerous. Maria wrote to the consul and sent him a certificate signed by the doctor that she could not come because of a nervous prostration.

MARIA'S LETTER TO THE CONSUL AT CANNES—INTRINSICALLY IM-
PROBABLE THAT SHE WAS ITS AUTHOR.

If we were to accept this letter as the genuine composition of Maria she should be considered a capable correspond-

ent, notwithstanding her physical condition; but it is intrinsically improbable that she was its author; indeed there can be no pretense that she composed the letter; it was written for her and copied by her and sent to the consul to support the doctor's certificate that she was unable to give her deposition. Cebrian had thought that an affidavit prepared for her would do in lieu of a deposition, but he was advised that if she had nervous prostration an affidavit would not be necessary, and that a doctor's certificate would suffice, which certificate was accordingly obtained and with it went the letter to the consul at Cannes, ostensibly composed by Maria. It is dated at St. Germain, 27th April, 1898:

"The Hon. P. J. Riddett,

"Vice Consul of the United States, Cannes.

"Sir: I have received your notification of the 23d inst.

"I am unable to be present at your office, as you request, on account of my bad health as you will see by the enclosed certificate of my physician. I wish to add that I declare under oath that before January 1895 (that is three years ago) I never knew nor I ever heard of any son or child of my late brother José Maria de Laveaga, nor I ever knew nor I ever heard of any person or persons, bearing the names of Anselmo José Maria de Laveaga, or J. M. Laveaga, or Joseph Laveaga or Joseph Dohrmann, or J. M. Dohrmann, or Joe Dohrmann, or William J. Dohrmann, or Anselmo Sanchez, or Anselmo José Sanchez or the boy Dohrmann, or the child of Basilia Sanchez, or Basilia Sanchez, or Basilia Sanchez or Basilia or Manzano, or any person or persons, bearing all those names or some of those names, or any combination of those names.

"And also I declare under oath that I do not know any person or persons bearing all the said names or some of said names, or any combination of said names.

"I wish you would send this letter with my Doctor's certificate to the Superior Court of San Francisco, Cal.

"I am sir, very respectfully yours,

"MARIA CONCEPCION de LAVEAGA."

It is a short but a highly artificial letter; could not easily have originated in the mind of a person unacquainted with the facts of the Anselmo controversy, concerning which Mr.

and Mrs. Cebrian repeatedly testified Maria knew nothing. Mr. Cebrian swore that he did not know by whom this state-ment had been prepared, that he had nothing to do with it, although it had been suggested by their lawyers that she should write a letter or affidavit or some sort of a paper saying, "I never heard of this Basilia." It had been testi-fied that the names of Anselmo had never been mentioned in the house, yet in this letter she gives all of the different names attributed to him which could not have been done without acquaintance with the record.

### CEBRIAN'S EXPLANATION OF THIS LETTER UNSATISFACTORY.

Mr. Cebrian in undertaking to explain this letter, denying that he had anything to do with its preparation, said that Maria had knowledge that Anselmo claimed part of the inheritance of her brother Vicente, although she was not familiar with the record in the case; but she became convers-ant with all the names by which the claimant was known because prior to April 12, 1898, they had talked over the question of remaining in Cannes and they had mentioned the different names, and it was a matter of jest in their house; Mrs. Cebrian's letter of April 15, 1898, merely meant that Maria was not familiar with the details of the matter; before Maria went to Europe and for two years while there she had heard all these names mentioned. This was his explanation of her knowledge of the names given in this letter which the court is asked to believe was composed by her; and yet it is in evidence from members of his own fam-ily that the name of Anselmo was never mentioned in the household. One of the children said she had a wonderful memory, and counsel for proponent comments on this ex-traordinary memory, strong and powerful, a splendid and retentive recollection, and he said that every witness bore testimony to the marvelous development of this faculty. Certainly this tribute is true, if she was the real author of this letter, and recalled without aid and prepared without assistance the component parts of this intricate epistle to the consul at Cannes. Mrs. Cebrian hoped that this would do and that there would be no other commissions to answer be-cause these had her half dead.

THE ARTIFICE OF AN AFFIDAVIT TO AVERT INQUIRY—CEBRIAN TO
PREPARE IT FOR MARIA TO COPY.

All through this we perceive the dread that Maria should be placed upon the stand to be interrogated in the ordinary mode, so the artifice of an affidavit prepared for and copied by her was suggested by Cebrian to avert the apprehended danger of a deposition. This suggestion was in his letter of April 12, 1898, to Miguel, and his explanation of it was that, as he did not know anything about law and had no lawyer to consult with, it occurred to him that it would be much shorter to write an affidavit, as he said in the letter; that was an idea that passed through his mind; so he contemplated preparing the affidavit for her and then have her copy it in her own handwriting and then send it on to San Francisco to be used instead of a deposition. The idea was that Cebrian would prepare an affidavit giving the substance of the questions, and one single statement would cover all the answers. The pretext for the affidavit would be her want of health to endure so long an interrogatory. If this could not be accomplished, the deposition would be taken as a last step, but if this should seem dangerous and the affidavit suggestion should be approved it would be done that way. In all these tribulations about the testimony of Maria, she appears never to have been consulted about anything; it was all to be done for her; the affidavit containing the substance of the questions and the answers formulated by Cebrian, copied by her, and sent to the court as her composition, coming from her head and hand, as it were, to be presented to a judicial tribunal as the emanation of her mind to influence its decision. The affidavit suggestion was not accepted, the deposition was not taken, and Maria escaped the ordeal of examination, which was their great object and the real occasion for their trip to Europe and their lengthened sojourn on the continent.

CEBRIAN ALWAYS ON THORNS—EXILED IN EUROPE.

It was not a journey of pleasure nor for educational purposes; if either of these elements entered into it was incidental and casual. All through his correspondence Cebrian

laments the necessity for their enforced absence from California; he was always on thorns, as he said; after the decision of the lower court in the Anselmo suit the supreme court would take its own time to decide and then the return of Maria could not be determined for a long period; the excessive prolongation of his stay in Europe kept him in continuous anxiety and took away the pleasure of everything; they suffered, but those who felt the consequence most were their children. When the matter was submitted in the trial court Mrs. Cebrian's desire to go to California was renewed, because they believed that she would not be bothered to go to the courts, but it would not be prudent that Maria should leave until they had the security of the supreme court; after the appeal she saw the impossibility of Maria returning until they had a favorable decision, which might not come for two years from that date, December, 1899. Mr. Cebrian would like to be in San Francisco, but his wife could not make up her mind to let him go. He was still kept away in September, 1900, when he wrote to Miguel that the wretched suit had disturbed his life completely, as well as that of his wife and had changed the course of their children, only God knew that it would not have gone worse had they remained in San Francisco; and he, who thought to be absent only a year, had now been more than four years with the prospect of an indefinite longer absence; he was destined to remain away years longer, for the case was proceeding at a turtle's pace, as Mrs. Cebrian said in November, 1902. In May, 1903, they were inclined to return to San Francisco because the children did not want to unamericanize themselves and they believed that America would suit them better than Europe. In August, 1903, Mr. Cebrian was impatient, anxious and regretful at not being in San Francisco. All his life in Europe had been a waste on account of this miserable case, and they longed to return except for the fear of the attorney of Anselmo and the court.

THE REASON FOR THE EXILE TO AVOID THE QUESTION AS TO
MARIA'S INCOMPETENCY.

The reason for the trip to Europe was to avoid the question as to Maria's incompetency. So Cebrian testified. He

feared that if she came back to San Francisco the attorney for Anselmo would claim that she was incompetent and expose her to the ignominy of inquiry; this made the trip to and the stay in Europe indispensable; it had cost him more than anyone could imagine, not only in money but in suffering in body and soul; it was really providential that Anselmo's attorney had disclosed to his opponent the plans which he harbored to attack Maria on the score of her incompetency; but this providential advantage was counterbalanced by what was inserted in the brief of the opposing attorney who had made a similar slip in revealing his own plans; but now it could not be remedied. Evidently, although Cebrian was not a lawyer, he thought he knew more than the two opposing attorneys.

### CEBRIAN'S NATURAL SAGACITY.

His natural sagacity was shown by his suggestions to Miguel in a communication, January 25, 1897:

"With regard to Costa and the compromise; you, Pepa and I are exactly of the same opinion, and what is worse, I think that we are not mistaken. Costa has so little diplomacy that in the moment in which he speaks to D., or that D. speaks to him and he answers him, D. would think that he came with our instructions. It appears to be more probable that Le B. himself would be able to make D. foolish over this point rather than Costa. The person most suitable for this would be McEnerney. McEnerney would like for there to be a settlement, because he would save work and would collect more quickly, that it would be plausible to D. that McE. should interest himself in the matter. But to this I see two great difficulties.

"1st. If you should propose this to McE., the latter might believe that we were afraid; that we believed the case lost; and then he himself would lose faith in it and lose his ardor in the fight. This would not do. If on the contrary D. speaks to McE. in this strain, making it appear that it is contrary to our opinion, and that Le B. thinks it more expeditions and more practical, McE. himself might suspect the

game, and then we are as bad or worse off than if you spoke to him directly.

"2d difficulty. Supposing that McE. should take this step without our intervention, it is very possible that D. would think that McE. as a lawyer saw that the case was in bad shape; and then either D. would persist in the suit or he would make this demand excessive.

"In summing up accounts I see nothing but to wait until D. proposes a compromise, either through those that we know, or through some other person that we do not know, in which case it would be received with diplomacy. The fact that D. has not spoken of a compromise does not mean to say that he is not looking for it. Perhaps he is endeavoring to pump him, to feel his way with McE. in order to see how to open up the question. His delays can be explained in many ways, of course, but also it may be that he is using them simply for 'sparring,' in order to see if through pure weariness we may not cry out 'compromise' before he does."

### DIPLOMATIC TACT AND TALENT.

In a subsequent letter to Miguel, dated Paris, February 14, 1897, he writes:

"With regard to the compromise the best time for Costa was in December, because it was then plausible that in view of his trip it should occur to him to mix in this matter without our authorization, but now, after having seen us here, by no means. Even though Costa were more diplomatic than he is, D. would always think that he was sent by us. It would be different if D. should speak first. Costa and I spoke of D. and of the compromise very little and very lightly; because I believe we have always said that it is well that one of us be favorable to the compromise and the other not. He asked me if I wanted him to speak to D. and I answered him what I have said above that, by no means would it be well at this time, and I added that if by chance, D. should speak to him; that he leave it in suspense; that he consult you and take it from you as if your words were mine, and that he answer you as he would answer me, that is to say, that I approve everything that you decide. I still think that D. desires and

trusts in a compromise, but that he does not know how to bring it to the point. Who knows?''

It has been claimed by counsel for proponent that there is no evidence that the attorney for Anselmo asserted the incompetency of Maria, but this is answered by Cebrian's admission that what Anselmo's attorney stated of Maria was one of the reasons for the trip to Europe, to take her out of California, ''thanks to his talking we came to Europe and delivered Maria from his claws.'' On the witness-stand Cebrian had said that he had not heard of the claim of her incompetency until he was in Europe; his recollection was that he did not hear of it until the year 1898; but when confronted by this letter he admitted that his attorney might have told him something about it before that time. The letter was dated January 12, 1897. So it seems that his recollection was at fault. His oral evidence was not in exact conformity with his written statement; and this illustrates, for an example, how this correspondence came into the record; it was not introduced until after he had denied the facts admitted therein; and this remark applies to all the testimony of this character, concerning which the counsel for proponent said that it was not conceivable that it was admissible, but, even if it were, it bore no such interpretation as contestant placed upon it. This might be a matter of argument if Cebrian's own construction had not precluded disputation, at least as to what he thought about it. In his testimony he said he was always opposed to a compromise in the Anselmo case, but in the letter above quoted, Paris, February 14, 1897, he shows his concern in the matter. Costa was intended as an intermediary but he lacked diplomacy so far that the attorney for Anselmo would easily see through him and perceive ''that he was sent by us.'' The game was to draw Anselmo's attorney out, for Cebrian thought that Dwyer desired and trusted in a compromise, but that he did not know how to bring it to the point, and Costa was equally inexpert. ''Who knows?''

### MASTER OF THE ART OF DIPLOMACY.

It is quite plain that there was but one man in this whole business that was master of the art of diplomacy and who

understood how to impart instruction to the novices. He knew and he indicated in this letter the manner in which his knowledge should be applied to the solution of the problem. He was dexterous in design and deft in execution and the final settlement was, no doubt, the consummation of the conception of his brain, always active and ingenious. Mr. Cebrian kept daily notes of everything said or done in which he was interested. In a letter to Miguel from Paris, May 20, 1899, he denies having made a certain promise imputed to him, saying:

"Let us drop times and go to the subject. I don't remember ever having made the promise, I do not believe I made it; if I should have made it I would have told you and Pepa, and in addition I would have put it down in my diary, which I have just gone over from '94 to '96, and in it I have put down all of those painful details which I regret having read now."

### CEBRIAN'S DIARIES AND THEIR DESTRUCTION BY HIM DURING HIS EXAMINATION.

Prior to the introduction of this letter in evidence Mr. Cebrian had testified that at times he had kept diaries after his marriage, but he could not remember at what times or for what years; he said he might have in his house some diaries; he was asked by counsel for contestant to investigate during noon recess and inform the court what years he kept diaries from 1890 to 1900; the request was made, but the court did not make any specific order; afterward he was asked if he had completed the search for the diaries; it was objected that the court had made no order that he make a search, it was simply a request of counsel to which the witness had assented; the request was that he should either bring his diaries into court or give the dates or the years in which he kept them; he said he could not remember 1890, 1891, 1892, 1893, 1894; he had previously testified that he thought he kept them in 1889 and 1894; he had found two diaries of those years, but he did not have them to produce in court because in the interval of intermission he had burned them in the range in his own house; they were

burned the very moment he saw them; he went into the kitchen and put them into the fire, because when he saw that a man could produce in court a stolen letter, he thought that the law might also allow such a man to read his diaries, "and my diaries are not your property." He burned other diaries, but he asserted that he could not remember the dates, whether they were of the years 1891 to 1895, but thought they were 1889 and 1894; he "burned quite a lot, a bunch," how many he could not tell. He burned them when he went home from the courtroom; he was under a misapprehension; he thought the court had ordered him to make the search; he did not know it was only the request of the counsel; he went to his house, and searched places where he knew he had several diaries, and took them to his kitchen, and before taking his luncheon, put them into the range; in his kitchen there was a big range, that could burn quite a lot, not a stove; he did not put them in the oven; they were consumed on the live coals; right into the coals he put them, cremating every diary he had in the house; he burned all that he had found. This act was accomplished at a noon recess of court after he had been requested to produce the diaries, his wife being the only person who knew what he had done; no one suggested to him to burn them; he did it of his own accord. He justified himself in this act because of the technical reason that the court had not ordered him to produce the diaries, it was only a request of counsel for contestant which he felt he was not bound to obey. The attorney for proponent had not advised him that he need not produce these documents, certainly not that he should destroy them; but he acted upon his own motion and so committed them to the flames and they became an irreducible minimum as evidence, if they should have been ever admissible.

### EXPLANATION OF HIS DESTRUCTION OF THE DIARIES—TECHNICAL EXCUSE FOR HIS ACT.

These diaries might or might not have been admissible; that was a question for the court, after inspection; it was not a point to be decided by a witness or by a party in interest; it might have been a matter for contention of

counsel; it was possible evidence to be considered and resolved. by the court, of vital value to the issue, and yet the witness took upon himself, after he was asked to produce these diaries, to destroy them upon the theory that he was not judicially ordered to produce them in court. The serious character of his act did not seem to impress the witness. He kept the court awaiting for several sessions the result of his search for those diaries and then came in on the last day and said that he had burned them all at the noon recess of the first day of investigation after he had been requested to. look for them. The court was under the impression that it was agreed to by the parties that he should produce those diaries. Cebrian himself so thought, for he said in his explanation of his conduct, that he labored under a misapprehension when he left the courtroom that it was the court that had ordered him to bring them, not the counsel for contestant; and yet he destroyed the documents notwithstanding that he believed he was ordered by the court to produce them; and he came back to court, said nothing about the destruction, leaving it to be understood that he was still making search whereas he had at the noon of the first day, before taking his lunch, burned every diary he had in the house; "he burned the whole bunch the first morning," although at first he believed he was under order of court to produce, but when he realized it was only the counsel's request he did not feel bound to obey him; that was his explanation: "Of course. that is the explanation; any intelligent man will see that this is the explanation."

### WHY SHOULD HE DESTROY THOSE DIARIES? EVIDENCE WILL-FULLY SUPPRESSED.

If the court had made an actual order in the premises the witness might have found himself in a serious situation and he seemed to realize this, for he sought shelter under the plea that there was no judicial command, but only a request of counsel to which he was not compelled to conform. The destruction of these diaries in the circumstances related is a matter of pregnant import; it is not to be ignored; if they contained nothing contradictory of Cebrian's oral statements,

nothing relevant to the subject matter, he could not be harmed by their production; if there were nothing to implicate him in connection with the issues involved, it would be to his advantage to keep his implied promise to produce them; but he chose to suppress and destroy them after he had led counsel and court to believe that he would expose them to judicial examination subject to proper protection as to privacy of matters not pertinent to the case; and he concealed, while a witness on the stand, the fact of this suppression and destruction for several days. It is denied, however, that these diaries have anything to do with the case, but the answer is that their existence was not admitted until when the witness had been examined about them and professed that he did not remember the dates of the years in which he had kept them, his constant answer as to particular years was "I don't remember" and "I don't know," and their connection with the matter is arguable from the correspondence referring to them and to their contents. Why should he destroy those diaries in such hot haste before taking his luncheon, in the interval of court recess, after the request to produce, if there was nothing inculpatory in them? It is certainly suggestive that they contained matter of moment prejudicial to proponent's case and there was that motive to prevent judicial inquiry. It is claimed, and with force, in connection with the destruction of these diaries at such a time and in such circumstances that they contained matter prejudicial to proponent and favorable to contestant; for, under the code, it is a satisfactory presumption that evidence willfully suppressed would be adverse if produced, and this evidence was willfully suppressed and destroyed by proponent, or by her husband who acted for her.

### THE "MEMORIA"—EXISTENCE AND OBJECT ESTABLISHED.

In regard to the so-called "Memoria," Miguel testified that after the death of his father there was a meeting of the members of the family at which the will was read and also a paper, a "Memoria." Maria was present at the reading. Their mother had charge of this paper during her life and after that Ignacia held it and took it with her to Europe

and Miguel never saw it again. Mrs. Cebrian admitted in her examination that on this occasion there was some paper read besides the will and in that paper mention was made of Maria. "It was a private letter addressed to my mother from my father." Mrs. Cebrian was then asked and answered as follows:

"Q. That was what was called a Memoria? A. Well, I don't know if you would call it a Memoria. It was a private letter from father to my mother.

"Q. Did your father call it a Memoria? A. My father—no, I think not. My mother always called it a letter from my father to her. My father never spoke to me of the letter.

"Q. You heard the letter read? A. Yes, sir.

"Q. Was this Memoria referred to in the will? A. Not that I can remember. I remember of the letter very well.

"Q. Did not the will recite that some other matters had been left in the form of a Memoria, because your father did not desire to have them expressed in his will?"

To this question an objection was sustained upon the ground that the will was the best evidence.

"Q. Did you see the Memoria or letter? A. Yes, sir; my brother José Maria was reading; he read it for us, for all of us; he was crying it was all against him.

"Q. Do you know where that letter is now? A. No. I last saw it the day José Maria read it for us. So far as I know it was left with my mother. I never saw it afterwards. Maria was mentioned in the letter and myself and Miguel and all the children.

"Q. Was there anything in particular about Maria Concepcion?"

An objection was made and sustained to this question upon the ground that the letter was the best evidence.

"A. I do not recall that sometime afterward my mother took the letter out from among her papers and spoke of it to the children. Miguel never spoke to me about it; he had nothing to say after it was read; it was read before the whole family."

When the court ruled that inquiry as to the contents of the Memoria could not be made until its loss was established,

Mrs. Cebrian was not further questioned along that line; her illness intervening, she was never recalled; but Albert J. Le Breton, who had been attorney in the estate of the senior José Vicente de Laveaga, was called as a witness, the loss of the instrument having been proved, and he testified to its contents, and to the fact that it was read at a family council after the death of the elder Don José Vicente, Maria being present, and that by its terms Maria was committed to the care of her brother and sister. That there was such a paper as this "Memoria" is incontestable, and that it referred to Maria as its special object cannot be controverted in the face of the wills of the father and mother of Maria, and of the other evidence. It is unnecessary to revert to the clauses of those instruments, especially that of the mother in which she most fervently charged her executors with the care and protection of their younger sister, Maria Concepcion, "as long as she may live." At the date of that will, Maria was nearly 25 years of age. This was carrying out the spirit of the Memoria, or "letter," as Mrs. Cebrian chooses to call it, which she says was addressed to her mother. There is no other document to which that description applies and whatever became of it, it is undeniable that it once existed, and that it referred to Maria.

Mr. Cebrian testified that he heard about that Memoria, but he never saw it.

The last known of the Memoria it was in the possession of Ignacia, who took it to Europe, and when she died the record shows what became of her effects. The care of Maria's person devolved upon Ignacia and of her estate upon Miguel. Ignacia performed her part until her death, and Miguel continued his trust until Maria's decease, and is still in official function. No complaint is made that Ignacia was derelict in duty, nor is it charged that Miguel was unfaithful to his trust in the management of Maria's temporal affairs.

The testimony of Albert Le Breton is severely attacked by counsel for proponent and the court is asked to discredit his evidence because of his inaccuracies of recollection as to the details of a transaction thirty-six years old; but counsel says that so much stress is laid upon this incident that it

must be treated seriously, and assuming the "Memoria" as if it ever had been in existence, of what value is it evidentiarily? There is nothing in it of such import as to impute incompetency to Maria? Whatever may be the imperfections of memory, or other infirmities of this witness, there is support in his statement from other sources. Petronila Velasco testified that there was a Memoria left by Maria's father by which he had made special provision for her on account of her incompetency.

## NO DOUBT ABOUT THE EXISTENCE OF THE "MEMORIA" AND ITS APPLICATION TO MARIA.

There can be no doubt about the existence of this Memoria, whatever its weight as evidence. Miguel was asked about it on cross-examination as to a conversation he had had with Edward Cebrian and he referred to this Memoria and how the father had practically provided for the guardianship of Maria; then contestant, the door being opened, undertook to prove its contents, and in that way it came into the case. So with the will of the mother, Mrs. Cebrian was asked, "Do you know that your father or mother ever expressed any wish or purpose or desire that Maria should be particularly cared for by her brothers and sisters?" She said she had not. The question was then presented: "In your mother's will was not there some reference made to it?" To this query proponent's counsel objected that the will of the mother was the best evidence, whereupon an authenticated copy of the will was produced and admitted without objection. Mrs. Cebrian had denied that she knew that her father or mother had expressed any such wish or purpose concerning Maria, but, the will of her mother being produced, she admitted that it contained language to that effect. The record in this respect is as follows:

"Q. Was Maria put under your care and protection by anybody? A. No, of course—why should she? Her father, he had died, and she was of age.

"Q. Did anyone—did either of your parents request you to—or confer upon you the care and protection of Maria? A. No, sir, no.

"Q. In no form whatever? A. In no form of anything.

"Q. Now, then, I will ask you if any request was ever made of you by your father or mother for the protection of Maria? A. Must I answer?

"The Court: Yes. A. No.

"Q. None whatever? A. No, sir; none whatever; none of any kind.

"Q. And you are entirely certain that your mother never made any request of you alone for the care and protection of Maria? A. No. I am positive that there was no such request.

"Q. Did she ever make any such request of you together with the other children? A. No.

"Q. Or any of them? A. No.

"Q. You are very sure of that? A. I am very sure of that."

#### MRS. CEBRIAN CONTRADICTED BY THE WILL OF HER MOTHER.

At the end of this inquisition counsel for contestant offered the will in evidence upon the ground that he was taken by surprise because the instrument contained exactly such a request as the witness had disclaimed.

The will of the mother was upon that ground thereupon admitted. It contained the very request and charge upon her and her coexecutors, for the care and protection of their younger sister Maria as long as she might live, that Mrs. Cebrian was very sure had never been made of her or imposed upon her.

This is, of course, important in its suggestion that Maria was not competent to care for herself, otherwise why impose such an obligation?

Mrs. Cebrian was positive that there was no such request and could not be dislodged from her position until the instrument itself was produced with its terse and solemn charge upon her and her brothers and sister for the lifelong care and protection of their younger sister, Maria Concepcion.

#### THE BURDEN OF PROOF.

The counsel for proponent advert to the enormous record in this case, saying that it is not easy to analyze minutely

all this evidence; all that can be done is to focalize the main facts in proof. In the absence of testimony to the contrary the presumption favors the validity of the will; the beneficiaries of a will are as much entitled to protection as any other property owners, the due execution of the will being admitted. But a will does not prove itself. Even if there were no contest, certain essential facts must be established before it is admitted. Under our system these facts should be carefully inquired into on the original probate, and no one knows that better than counsel for proponent; the due execution of a will may not be admitted; it must be proved, contest or no contest. It is the every-day experience in this court to insist on exact ascertainment of the fundamental facts necessary to sanction the court's adjudication of the right to admission to probate in the first instance. Even in the progress of this trial, off and on for more than a year, delays have occurred owing to the care of the court to see that the proper evidence was adduced in many other matters of probating wills, where attorneys seemed to assume that it was a formal affair where no opposition was offered, and frequent friction has occurred through judicial insistence upon affirmative and precise evidence of the essentials of execution, soundness of mind, freedom from undue influence, absence of fraud, menace, misrepresentation or other constituents invalidating the instrument proffered for probate. In all cases of holographic wills the handwriting must be proved affirmatively by or on behalf of the proponent.

### WHAT IS INCUMBENT UPON PROPONENT.

If there were no contest in the case at bar, it would be incumbent upon the proponent and, perhaps, her husband and others, to establish the authenticity of the handwriting of the decedent and the circumstances of the execution of the document to the extent of their knowledge; and it would be a careless court that would depart from the strictest scrutiny in this regard or indulge any assumptions or presumptions on account of the standing or reputation of the parties presenting the paper for judicial approval. It is true that, in a sense, the burden of proof rests upon the contestant;

that he must bear his own burden as to the issues set up by him; it is also true that it is not denied that the instrument is in the handwriting of decedent, that it is her own manuscript; and that, so far as the contest is concerned it is incumbent upon him to prove a negative, that she was not competent; that the will was not the voluntary emanation of her own mind, or that she was not free from circumstances of constraint; any one of these facts established justifies the contest; but this does not relieve the proponent ultimately from her burden of establishing all the elements necessary to entitle her to letters testamentary. She cannot escape this obligation nor evade its consequences, under our statutes. She must show, even if no person appear to contest the probate that the will was executed in all particulars as required by law and that the testatrix was of sound mind at the time of its execution and an holographic will must be proved in the same manner as other private writings. These are matters to be proved, concerning which testimony must be taken, "the court must hear testimony in proof of the will"; if holographic, it must be proved by one who saw the writing executed, or by evidence of the genuineness of the handwriting of the maker; or by a subscribing witness. Here there is no subscribing witness; but there are two persons, proponent and her husband, who testify that they were present when the decedent executed this instrument, and their evidence, irrespective of contest would seem to be indispensable to its probate as to the act itself and her mental competency to perform the act.

THE ADMISSIBILITY OF EVIDENCE AS TO THE WILLS, "MEMORIA," AND CORRESPONDENCE.

The testimony as to the wills of the parents of decedent, the "Memoria," and the correspondence of the Cebrians has been censured as improperly admitted. Counsel for proponent has contended with energetic eloquence that the evidence respecting the letters of Mr. and Mrs. Cebrian and "Nacha," and especially as to the so-called "Memoria" was not competent, has no legal place in the record; but even if it were conceivable that these were admissible, they have no such sig-

nificance as contestant seeks to give them, and they are not susceptible of the sinister interpretation sought to be ascribed to them, and that all of this testimony should be excluded from the consideration of the court, whose attention should be focused entirely on the evidence connected with the date of the will in 1893; that is to say, that the court must not concern itself with any act or fact except what occurred in or about the transaction of February 15, 1893, as to which there is no evidence except that of the proponent and her husband; they alone of living witnesses know what then transpired, no other mortal can contradict them on that score, and perforce the court is bound by their statements. If this be the law, the problem is easy of solution, because there is no direct evidence as to what happened there and then but that of the parties immediately interested, and if their word is in no wise to be doubted or contradicted, there is an end of controversy; but it is not the law, for in the same breath that it is asserted that there is no direct evidence to sustain the averment of contestant it is conceded that indirect and circumstantial evidence may be introduced to that end.

### LIMITATIONS OF EVIDENCE.

Proponent says that we are to address ourselves solely to this act of February 15, 1893, and that only out of the mouths of the surviving persons then and there present, the beneficiaries of that act, can we elicit evidence as to the condition and competency at that moment of the decedent testatrix, and that all testimony such as the contestant offers tending to show that she was not mentally competent or that she was under constraint has no evidentiary value and that the documents introduced here have no evidentiary existence and must be discarded by the court in coming to its conclusion. As to the transaction itself it is axiomatic that the evidence must be indirect and circumstantial, for, as it is said in the books, very seldom does it happen that a direct act of influence is patent, and usually we must gather from the circumstances the existence of the influence.

### CONSISTENCY OF ISSUES.

It seems to be suggested here that the issues of unsoundness and undue influence are not consistent; but while the issues are distinct as a rule, there may be a case where a person of immature intellect may be so influenced by one of superior power as to direct the manual performance of mechanical act. It has been held that while undue influence is entirely distinct from unsoundness, yet a person of unsound mind may be a victim of undue influence, and if it be shown in this case that decedent was incompetent the testament loses its force, assuming that she was circumvented by fraud.

### SURROUNDINGS OF TESTATRIX.

It is not improper, therefore, to allude to the surroundings of decedent at the time of making the will and for the years prior and subsequent thereto.

At the time this document was drawn Maria was alone; no one about but Mr. and Mrs. Cebrian, and, they have testified, she produced it without their foreknowledge. Proponent's counsel claim that the fact as demonstrated by the record that no one but Maria had aught to do with the drafting of this will and no suggeston was made except by José Vicente that she should make her will and that he did not desire her to include him in its terms, as he was already well to do; so that it was out of her own head that she composed this testament and it is to her mind alone that we must attribute the act. As to what occurred at that time and place there is no human power invocable to tell us except the proponent and her husband, and the truth of their testimony must be tested by the entire record. José Vicente, to whom is ascribed advice as to the act, cannot contradict or corroborate what they have affirmed. Practically it all depends upon the word of Cebrian himself; his wife always agreeing with whatever he did or proposed to do; it does not appear that she ever disputed him. This will is dated in February, 1893, done in San Francisco, kept from the knowledge of Miguel, who having made inquiry as late as 1904, eleven years afterward, as to Maria's making a will, Mrs. Cebrian

concealed the fact from him, saying, "if you say anything to her about making a will, she will think she is going to die"; and yet at that time the paper was secreted in one of her trunks in the Cebrian house on Octavia street. There was certainly a lack of candor in this remark; and it was maintained throughout until it could no longer be withheld that such a paper existed and was in her possession.

CONCEALMENT OF FACTS FROM MIGUEL BY THE CEBRIANS.

Now in all this course of conduct of the Cebrians toward Miguel, in which it would seem, he being as she described him "a loving brother," he was entitled to information as to this fact, which was concealed from him; there was not only what lawyers call a *suggestio falsi,* but a *suppressio veri;* a suggestion that no will was in existence and a concealment from an heir that there was such an instrument which discriminated against him.

It would appear from this that they led Miguel to believe up to and long beyond the last moment of her life that Maria had attempted no testamentary disposition of her property and during all of this period they were in confidential communication and correspondence with him.

When Maria wrote her name to that paper nobody was about but Mrs. and Mrs. Cebrian; his wife had not remained during the whole of the reading, but had gone out and left him alone with Maria. If advice were necessary he was the only one to give it; there was no advice, no suggestion, according to his statement, except that he says that José Vicente talked with her and told her about making a will and that she did not wish to do it, because she did not wish any publicity or any witnesses and Vicente informed her that she did not need any witnesses; all she had to do was to make it in her own handwriting, all of it, and to look out that there was no writing on the paper besides her own; but he gave her no other form; that is the only intimation of any assistance given to her.

How are we to ascertain the facts of this transaction? There is no contemporaneous evidence except that of the beneficiaries. Are we bound to rely solely upon their state-

ments, or may we not inquire into circumstances confirmatory or contradictory? For all the years preceding her death and for seven weeks subsequent Miguel had not been advised that Maria had made a will, and then he wrote to Mrs. Cebrian that it was not the will of Maria; that it had been copied and made for her; that Maria was incompetent and hence he was entitled to one-half of the estate, and no reply was made, except that Mrs. Cebrian wrote that he might have one-half, and this was in connection with the protocol of the petition to the court prepared with her assistance by her husband for Miguel's approval. She did not in terms contradict the accusation of Miguel, but simply said that he might have his share under the law, which meant the law of succession in intestate estates.

### DIFFICULTY IN DEALING WITH THE RECORD—ITS SALIENT FEATURES.

The difficulty in dealing with this record has been dwelt upon by counsel on both sides, but the court here tries to summarize as much of the evidence as is feasible, presenting the salient features.

Mrs. Lalla S. Highton first came to know Maria when the De Laveagas were living on Dupont street, near Pine, about 1869; the family had been here about a year before from Mexico; Mrs. Highton knew the whole family; she herself was about 14 years old then; Maria was about 7 or 8 years, wore short dresses, a little girl; Pepita, now Mrs. Cebrian, several years older; Mrs. Highton's parents, Mr. and Mrs. Scoofy, visited the De Laveagas freqeuntly, her father had known the elder De Laveaga in Mexico; the families interchanged calls; Mrs. Highton was especially intimate with Ignacia; closer to her than the younger ones; called her "Nacha"; always intimate with her, closer to each other as the years went by; she often visited their house and would be at table with them and would help Maria to speak English, she did not speak that language in those days; Mrs. Highton would talk Spanish with the young girls, but she would take books and teach Maria how to pronounce the words; she knew the family very well; visited them when

they moved to Stockton street, and after on Geary street. When Mrs. Highton was in Paris she visited Ignacia and Maria at their apartments several times during the two weeks in 1886 she spent in that city; conversed with Maria on those occasions; Maria told her she did not like San Francisco; preferred Paris; in her conversation with Maria she assumed the same attitude as she did with Ignacia or Mrs. Cebrian, but Maria had an individuality of her own; she had her own characteristics, but she was practically the same as other people to talk to or with; this was always the case during the period of their acquaintance; when she first knew her; when Maria tried to speak English she did not do very well, but she could always carry on a conversation in Spanish or say anything she liked, but in English she was slow, did not know it very well, not like an American; Maria was very affectionate toward Mrs. Highton, who had been a very close friend of the family, and her affection seemed to be really genuine; always called her by her first name and embraced her when she had not seen her for a long time, differing in this respect from conventional friends. Maria was naturally shy and reserved, but not so with her own people; if a stranger would come in she would have very little to say; she was modest, extremely shy, but when one came to know her very well, this shyness would gradually disappear and she would talk; if she would not like a visitor "she would shut up like a clam, have nothing to say," her mother was just the same, she was exactly like her mother, who was extremely shy and very reticent.

## MRS. HIGHTON'S TESTIMONY.

Mrs. Highton was very fond of Spanish cooking and the De Laveagas invited her frequently to breakfast and dinner; she would talk to Maria at the table and sometimes help her with her English, help her to pronounce words, and Maria would ask Mrs. Highton all sorts of questions about English; she was not very well with it then and Mrs. Highton would go over and over it with her and aid her to get it right. Maria gave her a copy of Don Quixote, and it came about because Mrs. Highton had been reading it in English and criticising it and she remarked to Maria that she thought Don Quixote

was a lunatic, but Maria said that it was a wonderful book; that was the gist of her comment, not the literal language, and she said it lost so in translation, that if Mrs. Highton only read it in Spanish she would enjoy it more; so she gave her a copy in Spanish, "from Maria with love," something like that, Mrs. Highton could not remember exactly the inscription; this talk about Don Quixote was many years ago, Maria thought he was the ideal gentleman because he always aided people that were stricken and oppressed and, with all his madness, there was an underlying current, so to speak, in him that manifested the true gentleman, and that this was what the book intended to show. This was the interpretation Maria gave to the novel, that it was a sort of parody on those times, the days when knighthood was in flower and chivalry was carried to an extreme. Maria's thought was that Don Quixote in Spanish had a deeper meaning than fighting windmills; this was the substance of what she said in seeking to correct the criticism of Mrs. Highton, as she did not like her ideas derived from the English translation, so she gave her the original in Spanish to arrive at the true meaning of this creation of Cervantes, which she said was not conceived with the notion of writing the life of a lunatic, but with a better purpose, a different meaning; this was not word for word what Maria said, for it would be impossible after this lapse of time to repeat exactly her expressions in her endeavor to impart her idea of the motive of the book, but it was the purport.

### MARIA COMPOSES A MENU—A MOST SATISFACTORY REPAST.

Mrs. Highton also testified that Maria composed a menu for a luncheon given by the former to some of her foreign guests at the Baldwin Hotel; it was cooked at the De Laveaga house by their cook and brought to the Baldwin. Mrs. Highton never had anything in all her life as fine as that lunch, and Maria did that all herself, and arranged everything; "it was just lovely," toothsome Spanish dishes, enchiladas, tortillas, frijoles and everything nice, done by the cook of the De Laveaga family, but under the inspiration of Maria, who took charge of the whole matter herself. Maria acted for

Mrs. Highton voluntarily; the latter called the next day upon her and wanted to pay whatever it cost, for "it must have cost quite a little bit," but Maria would not accept any money, and said, "I will never speak to you again if you ever suggest such a thing," this she said in Spanish; Maria told her when she called to speak about the matter that she would take charge of it herself and would make it with her cook in the house, so that there would be no trouble at all, and it was so done and sent over to the hotel by Mrs. Highton's messenger whom she sent with baskets to bring it and it was served to her guests, a most satisfactory repast, to their gustatory delight, as related.

### TELLS MRS. HIGHTON ABOUT TRAVELS IN EUROPE; ALWAYS SPOKE SPANISH—ENGLISH NOT EASY TO MARIA.

Maria told Mrs. Highton about her European travels; she did not like San Francisco, she preferred Paris, she wanted to live over there all the time; they did not talk about politics, but gossiped somewhat about people they knew in common, mostly Spanish, Maria knew very few of Mrs. Highton's American friends, did not want to know them, she did not care for strangers; she talked about pictures, seemed to love them, loved music; she talked with Maria about paintings that were in the Cebrian house. Mrs. Highton called there one day and she was shown very beautiful pictures, a Titian, some Rubens, Velasquez and others, Maria told her they belonged to Mr. Cebrian, and that he had inherited them from his mother, and that he came from a splendid Spanish family and she seemed very pleased telling the history of these paintings and she often spoke of her grandfather's pictures; she said he was an admiral in the Spanish navy, he was her grandfather on the De Laveaga side; Mrs. Highton was fond of art, had studied painting all her life, and naturally was much interested in this subject, and had never seen such pictures in San Francisco, and very few museums of Europe had finer specimens of those artists. Maria was very much given to exercises of charity, and Mrs. Highton went with her and her sister, "more with Nacha than with her," to visit poor people and bestow alms; she was a very charitable

girl and very kindly to anyone in distress; it would appeal to her more than society.

### SHY, RESERVED, RETICENT; BUT SOUND IN MIND.

Mrs. Highton was, among her other activities, a member of the Women's Exchange, and had a talk with Maria about that institution and wanted her to aid in erecting a building, but she declined and said she wanted what she had for other purposes; she said "Pepa" (Mrs. Cebrian) had so many children she thought she would give what she had to them. The Women's Exchange proposition did not appeal to her at all, it was too costly, would take too much money so she did not subscribe. The result of all of the observation and knowledge of Mrs. Highton was that Maria was of sound mind. Mrs. Highton's husband, the late Henry E. Highton, sometimes accompanied her on her visits to the family, but Maria did not converse much with him, was rather aloof, as she was usually with those she did not know as well as she did her own people.

### THE REV. MR. COWLEY-CARROLL'S ACQUAINTANCE WITH MARIA.

The Rev. Hubert Cowley-Carroll, at present the rector of the Episcopal Church at Ross, Marin County, became acquainted with Maria early in 1905, at Mrs. Cebrian's house, 1801 Octavia street, San Francisco. He went there with Miss Claire Marshall, who is now his wife, to be introduced to the family, because the Cebrians and his affianced had been great friends for many years, and he was there for inspection, his fiancee took him there to introduce him to her friends, and among those present was Miss Maria de Laveaga; there were a great many others present, Mr. and Mrs. Cebrian, Edward, Josie, Louis, Harry and the two children, all of them in fact; he could not remember how many there were at the table at that time; it was at luncheon and took an hour or so more, he was there for more than three hours in all, they were all engaged in conversation; he talked with Maria, it would be difficult to recall the words but the sum and substance of it was that she congratulated him on his coming marriage, which was to take place in two or three months or more, and said how good a girl Claire was and

the usual pleasantries that would follow such an introduction; Miss Maria joined in the conversation which took place at the table, but he could not recall any particular thing that she said; all were talking; after the luncheon he took his leave and bade farewell to her and to everybody else. Subsequently he saw the family several times and had luncheon with them; he went always with Miss Marshall, met Maria, had a talk with her; he dined there on one occasion but he did not remember who was there at the dinner table; everybody was there that he knew, he should say that she certainly was there; in all, he had been there from a dozen to twenty times or more, until June, 1905, when he was married and went to Visalia; whenever he was in town he was welcome to go there. After his marriage upon his return from the country he visited the house accompanied by his wife and conversed with Maria; on the occasion of the July visit the only topic of conversation was about the wedding, at which she was in the church, but he could not recall what she said. He saw her after the earthquake and fire of April 18, 1906; he made two calls with his wife; Maria spoke upon that subject and about the incidents and experiences of that time.

Mr. Carroll said that on another occasion, when he was present at the house, there was a piano playing machine, a Cecilian or an Angelus, not a pianola, that was out of order and he undertook to repair it; Maria came to look at it and see the inside of it, she wanted to know what made it work and he undertook to show her its mechanism, and he explained to her how it worked; he was about an hour engaged in that operation and she was around practically all of the time. Mr. Carroll was familiar with the construction of musical instruments and had built an organ in his church in Ross. After he had about finished the repairing of the music machine Maria handed him a roll of perforated music and asked him if he could play it with the machinery exposed or words to that effect, which he said he could, and did, she watching the performance. On that occasion Mrs. Carroll accompanied him to the Cebrian home with their older boy, then two months of age; this was in July or August, 1906. Maria looked at the child and kissed him and said that the

baby was very bright for his age, the brightest baby of that age she had ever seen; he was not positive about that, however, but anyway the baby was exceptionally bright; he could not recall anything else in her actual words. His wife was there during the time that he and Maria exchanged words; the two ladies spoke with each other in much the same vein; after this they said good-by to each other and she requested that he should call again and play the music machine for her. He next saw her in the month of June, 1907, at the same residence; he was there a dozen times or more, meeting her there each time, occasionally having lunch. He was staying at this period for about three months in Alameda, at which place Maria called on him and his wife; she was accompanied by the two children, Isabella and Beatrice; after spending about a quarter or a half an hour in the house, where he lived, they went to his church, on his invitation, a short distance from where he lived; he opened the church and showed them around, and she remarked upon the beauty of a window over the altar, which attracted her attention; she asked him if he would play the organ for her, but he said he could not because he had no one present to blow the bellows; he offered to show her the keyboard of the organ as a rather inadequate substitute for his playing, but she said she would rather not go up in the chancel where it would be necessary to go to get to the organ; and that is all that took place in that church building. After showing them all over the building and its different apartments, including a room called the tower room, a very fine and large room where he told her he prepared his sermons and meditated in general, she remarked it would be a very beautiful place to read in; he did not remember in exact words, except what he had related about the organ and the window. In the company this time there were Miss Maria, Miss Josie and the two little children and his wife; they were together until the Carrolls took leave of them. In the several visits he made to the Cebrian house the average length of his stay would be about two hours. He conversed with Maria about a book of architecture which he had been looking over while there had been no one in the reception room before she came in. He

spoke to her of the subject of ecclesiastical architecture, to
which he had devoted study, and which was sort of a hobby
of his. He was looking over one of the books and she looked
over his shoulder and as he passed the leaves over, she
pointed to the things she admired; cathedrals, churches; she
said there were a great many of these she had seen person-
ally; she asked questions and he explained to her the charac-
teristics of architecture at different periods; after laying
aside the book they went in to lunch with the family, and
during the meal engaged in conversation; after about two
hours' stay, they bade adieu to each other. Subsequently
to that occasion he did not see her so often, after going over
to Ross, in 1908, at which time he saw her at the Cebrian
house, and paid a visit of about two or three hours, and had
conversation with her, his wife being with him but not the
baby, and other people being in the room, Mrs. Cebrian
among them; he recalled the subject matter of the conversa-
tion but not the exact words; she hoped that now that the
Carrolls were to be near her, she would see them oftener, or
words to that effect; on parting she went to the door and
awaited until they were down the steps as she invariably did
with the rest of the family; this was about the middle of
March, 1908. Between this meeting and the time of the de-
parture of Maria and her relatives to Europe, he made but
one call upon the family; he was very busy in his new work,
the parish, and called but once with his wife and remained
for lunch and had conversation on the subject of the beauties
of Ross Valley; it was a beautiful place; Maria commented
on that, and said it was very nice that he was there, a very
nice place, nice people; he agreed with her; she asked him
if he had as large a church as the one she had seen in Ala-
meda; he said no, but they hoped to build one. One thing
that was spoken of by all and participated in by Maria, was
the fact that soon they were to leave for Europe; he asked
her where she would rather be, there or here, and she replied
that she would prefer Paris to anywhere else and that she
was very fond of that city, or words to that effect; he could
not remember that she went into any details to explain why
she was fond of that city; he never saw her again. From

all that he had seen of her, from her acts, talk, manner, demeanor, which he considered those of a rational person, he had formed the opinion that she was of sound mind; she was attentive to and interested in what was going on about her; independent, her conversation was pertinent, spontaneous and to the point, showing a knowledge of the subject with which they were dealing, and in all respects she acted like a normal person.

### HIS CONVERSATIONS WITH MARIA IN ENGLISH—HE DID NOT SPEAK SPANISH.

Mr. Carroll did not speak Spanish, neither did his wife; Maria spoke another language, which he presumed to be Spanish but which he did not understand; all of his conversation with her, as well as that of his wife, was in English, which Maria spoke as fluently as he did and his wife did. On the first visit to the house he could not recall that he had any conversation with Maria during the luncheon; he was strange there and did not speak much to anybody on that occasion there at the table; afterward he spoke more freely. The order in which they were seated at the table was: Mrs. Cebrian was at the head, he was at her right, Mr. Cebrian next, on his right, Edward on the same side, then Maria and then Louis or probably Harry, and they came in that order each time invariably; she was three removed from him on the same side. The only conversation he could recall on his first visit was with Mrs. Cebrian, on the subject of his approaching marriage with Miss Marshall at that time, her remarks were congratulatory, but he could not recall their substance. Miss Josie sat opposite; all of the conversation that remained in his mind was their pleasure in meeting him and knowing that he was to marry Miss Marshall and how fond they were all of her, possibly some words were used by everybody in different forms, but that was the substance. Miss Marshall sat opposite him next to Josie; Mamie or Mrs. Caleya sat on the same side; Dr. Caleya perhaps sat with some of the boys; he did not recollect distinctly the order on the first occasion, but his recollection was crystallized by these subsequent visits in which they sat in identical order. When he

was looking at the book of architecture during one of his other visits he was awaiting the ladies to come down to lunch and Maria came in and looked at the pictures with him; she did not exhibit any shyness; she was not shy with him and he never noticed any particular shyness at any time in her conduct; she spoke as freely to him as she did to anyone else, after the first two times he visited them when she merely greeted him; she spoke English all the time, it would not have been any use if she had spoken anything else, as far as he was concerned; he could not recall distinctly particular conversations with other members of the family; usually they were together when the conversations occurred; when some of the subjects came up he did practically all of the talking because they were seeking information from him; on all of these occasions when he called there he aimed to be agreeable and entertaining; Maria was not talkative compared to himself, because he was rather gifted, if it be a gift indeed, nor compared to some others, and she certainly was not as talkative as he was, which he thought was to her advantage; she was not as voluble as some ladies whom he knew, nor was she on any account a silent person, habitually silent; she spoke freely whenever she desired to do so apparently.

MARIA A TALKATIVE PERSON—HAD COMMAND OF THE ENGLISH
LANGUAGE—SPOKE FLUENTLY AND VOLUBLY.

In his opinion she was a talkative person. On the occasion of the visit to Alameda at the church Miss Josie came with her and the two children; Miss Josie spoke on that occasion on the shape of the church, the fact that it was in the shape of a cross, and he said that was customary to build their churches in the shape of a cross if the architectural conditions permitted. Mr. Carroll said that Maria spoke English fluently, as much so as Mrs. Cebrian, they both had command of the English language; Maria spoke equally as readily as Mrs. Cebrian. To Rev. Mr. Cowley-Carroll she spoke fluently and volubly in English, as he did not understand Spanish, English was the one medium of expression with him, but with Mrs. Highton, who spoke Spanish, Maria used that language

exclusively. English was not easy to Maria. She spoke it very slowly. Both these witnesses, however, agreed that she was with them communicative and companionable. Mr. Carroll said that at the time he sat at the table at luncheon at the Cebrian house, Mrs. Caleya (formerly Mamie Cebrian) and Dr. Caleya, her husband, sat there; he did not speak much to the doctor because the latter spoke little English and he conversed with him through Mrs. Caleya, who expatiated largely upon the mutual friendship subsisting between herself and his fiancee, who was a very dear friend of hers. During the taking of this testimony there was a short intermission of court proceedings, and when he resumed the stand he was asked if he had not spoken with anybody during the interval on this subject, he answered that he had done so and that it was called to his attention by Mr. Edward Cebrian that "Mamie," this is Mrs. Caleya, had not arrived for two months after that time and consequently Mr. Carroll realized that he had made that mistake.

### SISTER MARY VINCENT'S RECOLLECTIONS OF MARIA.

Sister Mary Vincent, of the order of Saint Dominic, with which she had been connected for fifty years, coming to California in 1859, beginning at Benicia, where she was until she came down to San Francisco in 1863, and was teaching at Saint Rose's Academy for about ten years, on Brannan street, and after she was recalled to Benicia and remained there for about ten years, until in 1909 she returned to San Francisco, where she has been ever since at Saint Rose's. Sister Mary Vincent first met Maria early in 1867, at the Academy on Brannan street, where Maria was with her two sisters, Ignacia and Josephine, now Mrs. Cebrian, as day scholars. Maria was the youngest of the girls, she seemed to be about seven or eight years of age, Josephine was the second, she might have been twelve or fourteen; Ignacia was the oldest. Maria was in the primary class, Sister Mary Vincent had an intermediate class, but she had charge of the study hall and had the opportunity of seeing Maria daily and a number of times throughout the day; she might have been there some months and after that she went to Saint

Catherine's Academy at Benicia; Maria was not in Sister Mary Vincent's class, but she saw her often in the school; Sister Mary Vincent did not speak Spanish, and Maria spoke no other language at that time; the sister observed Maria talking to other children, for there were some other Spanish children there, and she talked to them; she did not see anything in Maria that was remarkable; after the few months spent at Benicia, Maria came back to Saint Rose's where she was for three or four years, where the sister was again teaching; and she saw her every day; by this time Maria could speak English, but the sister was never her teacher; she talked with her frequently. Sister Mary Vincent never visited her family when they lived at South Park, which was near the school, but she did call on the family on Stockton street and also on Geary street. When the sister was called to Benicia she would visit the city sometimes for a month or so at a time, and during that time she saw Maria, and and afterward as long as Maria was in San Francisco. In the St. Rose's school there were about three hundred pupils; the children all played together in one yard, Maria with the rest; when the school was over Maria went home with her sisters Ignacia and Josephine. Maria left the school about 1873; she was living on Stockton street at that time; it was about the year of her father's death; she had frequent talks with Maria, who told her about her travels and what she had seen, about friends and topics of the time, always greeted her in a very voluble manner, would embrace her frequently when she met or when she was taking her leave; Maria told her about the time when she was in Rome and the Pope and his Jubilee, described the ceremonies; said there was one she remembered, one very striking figure among the cardinals, and the sister asked who it was, and she said it was Cardinal Howard.

HER LAST CONVERSATION WITH MARIA—MARIA WAS NEVER ALONE—ALWAYS HAD A COMPANION.

Sister Mary Vicent remembered the very last conversation she had with Maria the day before the family left for Europe; Maria told her why they were taking the trip; it

was for Mr. Cebrian's health; the doctor told him to go to Vichy, in France, to take the baths and she said the doctor had ordered so many baths, and on that account they might have to remain a month at that place, and afterward they were to visit various places; she told the date they were to leave New York for Cherbourg, France, and the day they were due to arrive there, it was the 8th of September, 1908, and Sister Mary Vincent said wouldn't that be lovely, it was the Blessed Virgin's birthday, and Maria said "Yes, and that is my little niece's birthday, too." She had her two little nieces with her, she brought them to say good-by and she expressed great delight that she would have in meeting her niece, Mamie, Mrs. Caleya, a daughter of Mrs. Cebrian's who lived in Madrid. This conversation occurred in St. Rose's Academy, the day before they left for New York, and took about an hour; she had many other conversations with her at different times, and the result of all of them was that she believed her to be a rational person; in her opinion she was of sound mind. When Sister Mary Vincent went to the Cebrian house she always had a companion with her, and when Maria came to see her she always brought Mrs. Cebrian's little girls, her nieces, always someone came with her; Josie and Mamie and Maria came together and her conversation was with all of them; so when she went to the Cebrian house, the sister went to see the whole family, that is all the lady members of the family, Mrs. Cebrian included, and she talked with all of them on the same subject. Maria was never alone.

### MISTAKEN AS TO MARIA'S AGE.

When Maria first came to school, early in 1867, she seemed to be about seven or eight years old; she was quite a little girl; the sister was accustomed to seeing a great many children and from observing Maria formed the opinion that she was about seven or eight years of age at that time. As a matter of fact Maria was eleven years old at that time, but Sister Mary Vincent judged her to be only seven or eight years of age, she thought that Josefa (Mrs. Cebrian) might be about thirteen or fourteen; five or six years older than

Maria, and Ignacia might have been sixteen or seventeen; that was the way the three looked to her.

## AT SCHOOL MARIA COULD NOT SPEAK ENGLISH; SISTER MARY VINCENT SPOKE NO SPANISH.

There were several hundred children in the school; of course, she did not speak to each one of them every morning and afternoon, and did not wish to be so understood, but she spoke to them collectively; she never had Maria for a pupil, and Maria at that time could only speak Spanish, and the sister addressed the pupils in English. There was a little prayer said there at school in the morning and also in the afternoon; Our Father and Hail Mary, before the school would begin their lessons, and Maria would join in that prayer, it was said in English, she could not speak it very well, but did the best she could until she could speak English; that prayer was recited by the three hundred children present, the sister was where she could see them all, facing them, and kneeling down, but she did not look at any one in particular; of course, she did not see her when the family was in Europe, but when they were in San Francisco she saw her frequently, and when she called at their house Maria would embrace her, Josefa and Ignacia would do the same, Josie and everyone of them in the same manner; when Sister Mary Vincent spoke of calling to see Maria at the house, she was really calling there to see all the family that might be at home; it was a family call; she could not remember any particular conversation that she had with Josefa, now Mrs. Cebrian, but it was on general topics; she was very confidential with Ignacia who told the sister all her secrets; when Ignacia went to Europe they corresponded all the time, and Ignacia wrote her from Paris and she knew that the sister knew her secrets, and she wrote her confidentially; but Maria never wrote to her at all.

### SISTER CLAIRE'S SCHOOL MEMORIES OF MARIA.

Sister Claire, also of the Order of St. Dominic, with which she has been connected for over thirty years, for the past two years in San Francisco at St. Rose's Academy on the corner

of Pine and Pierce streets, and before that in San Rafael for fourteen or fifteen years, and prior to that for a while in St. Rose's on Golden Gate avenue; she entered the Order in St. Catherine's Academy in Benicia, in 1870, and was there for about seven or eight years, thence transferred to the Academy on Golden Gate avenue, where she spent about sixteen years; she recalled meeting Maria first at Benicia, when she came there as a pupil in 1868, Sister Claire was also a pupil there at that time; Maria came with her sister, now Mrs. Cebrian; they were all boarders; Sister Claire was a more advanced scholar than Maria, who was in a much lower grade; her English was very imperfect and for that reason they did not have any very long conversations at that time; she saw Maria from day to day when they assembled for recreation in the evening, and at the play ground, and at the dinner table, and in the chapel; she did not remember in what part of the building Maria slept, but knew it was in the common dormitory with all of them, but the particular place she did not know.

DID NOT KNOW MARIA INTIMATELY AT SCHOOL—DID NOT SPEAK THE SAME LANGUAGE.

She did not come to know Maria very intimately, but they met as girls will at school; Maria was there about five months, she thought it was the first term of 1868; they never had any prolonged conversation for the reason of not speaking the same language, but they might have exchanged good-morning, or good-day, or say something. Sister Claire continued in school until she became a member of the Order and then remained as a teacher; met Miss Maria afterwards and continued acquaintance with her until the time of her death; there was an interruption of years at a time; called at her home to see her first on Geary street, but only once or twice; had conversation with her; they were just breaking up house, preparatory to going to Europe, and she told the visiting sisters the pleasure she anticipated from the trip; she could not remember the words it was so long ago, but that was the impression the sister received; she thought it was in 1881 or 1883, or around there, could not locate it

exactly; her manner was always cordial, pleased to see the sisters, would ask how they were, and on parting she was equally affectionate and hoped to see them again; Sister Claire thought this was in 1881, immediately before they left for Europe, it was along in the early eighties, 1882, it was, while Sister Claire was in St. Rose's Academy on Golden Gate avenue; afterwards that convent was burned down and they were temporarily on Fell and Fillmore streets, and there she again saw Maria, she thought it was in October, 1893; they were in the house that the sisters took on Scott street, where Sister Claire chanced to be on a visit.

SUBSEQUENT ACQUAINTANCE AND CONVERSATIONS—MARIA RETICENT AS A RULE.

Maria came to see Sister Mary Vincent and the conversation turned upon her trip to Europe, Sister Claire could not remember the exact words that were used by Maria, but she spoke about the Alhambra, mentioned the delicate effect of the lace, of the walls, of the fountains and their splashing of soft waters; she spoke of this old palace of the Moorish Kings and said there were a number of turrets or towers, and she spoke of the flowers that were in tropical splendor and said she loved flowers; she spoke of the architecture in general. As a rule, Maria's manner was reticent, but in describing the Alhambra, she was more or less animated; this visit lasted perhaps a half an hour. This talk about the Alhambra took place in the Cebrian home, at 1801 Octavia street, because there was something there that reminded her of it, there was a miniature of the Alhambra in that house. Sister Claire forgot the little details of the conversation, but remembered the general impression; she called at the house on that day with Sister Mary Vincent and met there Mrs. Cebrian and Miss Maria. This conversation at the Cebrian home was after they had returned from their second trip to Europe; Sister Claire was somewhat confused about the date, first putting it 1906, then remembered it was prior to the date of the earthquake, about a year or two; she herself was staying in San Rafael, but came over from there and called at the convent; but the conversation that she had with Maria was

on Octavia street. In the latter days of 1903, Sister Claire saw Maria perhaps ten times, usually at her home, up to the time they left for Europe in August, 1908; the day before she went to Europe Maria came to the convent; she spoke to Sister Mary Vincent and said that the family were going to Europe because of the ill health of Mr. Cebrian who had been advised by his physician to visit some springs, or baths; she also mentioned the name of the steamer which had escaped her memory, Sister Mary Vincent had testified that it was the Crown Princess Cecilia; she bade farewell in the usual manner, embraced them tenderly and that was the last time they met.

### SISTER CLAIRE'S CONVERSATION WITH EDWARD LE BRETON.

Sister Claire knew the late Edward J. Le Breton, and had a conversation with him after the commencement of this contest, at St. Rose's Academy, it was in the evening of Sunday, September 26th, 1909; she had known him for some time; he called to see her at that place in the parlor; in the course of that conversation he asked her if Maria acted like other children and if she played as other children did there at Benicia and Sister Claire told him that she did, and she told him that the little girl at that time did not speak English well, and on that account was not on speaking terms as the English-speaking girls were, one with another. Le Breton asked her as to whether Maria was of sound mind, and Sister Claire told him that she always found Maria rational and sensible in every respect, that she never heard her give expression to a thought that might not have emanated from a thinking brain, or was she ever the author of an action that was inconsistent with a well-balanced mind. Sister Claire asked Le Breton why he was figuring in this case, he said, ''I am simply doing what my mother and my sister would wish me to do if they were living, I am helping my brother-in-law out who is receiving a great wrong, and injustice''; Sister Claire thought he said injustice; he also said, ''I am only helping my brother-in-law, who has left all this matter to me.''

SISTER CLAIRE'S REPLY TO THE QUERY, "WAS MARIA COMPETENT
TO MAKE THIS WILL?"

Le Breton said that he did not believe that Maria had written that will, that she was not competent, and asked her if she thought that Maria did make it, to which Sister Claire responded: "Well, I said that fools rush in—cowards rush in where fools—dear me—fools rush in where angels fear to tread and that she showed her wit and wisdom—if she consulted any one else she showed her wit and wisdom in consulting some one who was a little more experienced than she was in dispensing of so large an amount of money." Le Breton asked her if she thought Maria was of sound mind when she was at school and she told him that she was sure that she was; she told him that Maria played as the other children, but because of her limited Spanish vocabulary, or English, the conversations were more in gestures than in language, and that after Maria left school, Sister Claire did not see her for a number of years until in 1881 at St. Rose's. Later in 1903 and 1904 and 1905 Sister Claire met her.

SPOKE BUT LITTLE WITH MARIA; SAW HER SELDOM, AND ONLY
ONCE ALONE.

When Sister Claire conversed with Maria it was only a word or two because the sister's vocabulary was very limited in Spanish, but in her last conversation it was in English. Sister Claire did not speak French, and but little Spanish. When they were at school in 1868, Maria spoke very little English and Sister Claire very little Spanish, the study of which she did not pursue to any extent. From all Sister Claire observed of Maria she concluded that she was a rational person; the sister always spoke with Maria in English. Sister Claire had given much consideration to her answers about the reasons for her opinion and had thought the matter over and had spoken of it and had heard it spoken of; had met Mrs. Cebrian and had spoken to her about her interview with Le Breton and also to Mr. Cebrian and perhaps Josephine, and to the sisters of her community, to the Superior, and also to Sister Mary Vincent; she had taken considerable

interest in the matter, had met Mrs. Cebrian and talked about the case frequently, and about its different phases. When Le Breton came to see Sister Claire it was a remark of the sister's that led up to the object of his visit, he did not introduce it first; she remembered positively that she asked the question "Why are you figuring in this case?" She had the highest respect for Le Breton and regarded him as a gentleman of high character, but she did use that expression. Sister Claire first saw Maria at Benicia in 1867; she was there about five months; there were eighty or ninety other pupils there; she addressed her only occasionally in broken Spanish, "Como estamos Ud," or something like that, sometimes a word in English; Maria was not a pupil of hers; she did not see Maria again until 1881 or 1882 or 1883, she could not tell exactly when, just happened to meet her, she was not attending school, they had not been in touch during all these years; apart from what she had related the sister remembered no particular conversation that she had with Maria at any time during their acquainance; she had spoken of her sister Nacha's death at Rome, and told the details of that event, which was very, very sad; she may have told her in reference to her sister's last sickness, whether she was with her or not, but the witness did not hold that in her memory; whenever she saw Maria there was someone else present, either her sister or her little nieces, except once when Mrs. Cebrian was ill, Josephine was out, and she saw only Maria not the children; Sister Claire did not call very often at the house. The conversation with Le Breton took about three-quarters of an hour; the sister remembered the time by the church bells although she did not time it; she remembered the precise date of the interview because she inquired of another sister and she remembered; Sister Claire inquired some time ago, and she fixed that date in her mind because she thought it would save time; she inquired of the sisters if they remembered the evening that Le Breton called, simply because she wished to have it ready in case she should be asked; when she made the statement to Mrs. Cebrian about this conversation with Le Breton, she gave her the exact date when it took place and the hour; she was not keeping it for

Mrs. Cebrian, but it was simply for this court that she was keeping it.

### SISTER CLAIRE IN ERROR AS TO MARIA'S AGE—OTHERS ALSO MISTAKEN ON THIS POINT.

Sister Claire thought that when Maria was at Benicia she was eight years old, the sister was sixteen herself at that time, eight years older than Maria. As a matter of fact, Maria was twelve years old at that time. Sister Claire at first thought that she was six years older than Maria but admitted that she made a mistake and that she was eight years older; Sister Claire repeated that she was sixteen years old when Maria was eight.

As to Maria's age, Sister Claire was in error, as was also Madame Narjot, a witness for proponent, who testified that she met Maria in 1874 and she said Maria was a little girl at that time perhaps twelve years of age, she was about the age of her own daughter Louisa, who was born in 1861, they were both very fond of sweets, to which the witness had treated them at a luncheon after they had been at church. In point of fact, Maria was then eighteen years old. Another witness, Mrs. de Peña, said that Maria was six years old when she first knew her, at the Ranch La Labor, in Mexico and last time Mrs. de Peña saw Maria was in 1879 and during that time she observed no change; she had grown physically, but otherwise she was always the same Maria, she noticed no change in her conduct, or manner, or the words which she used from the first time she saw her until the last time and then Maria was twenty-one years old.

### SISTER CLAIRE'S OPINION AND REASONS AS TO SOUNDNESS OF MIND OF MARIA.

The reasons assigned by Sister Claire for her opinion as to the soundness of mind of decedent were: "She never uttered a word that it did not contain an idea and the idea had its corresponding reality"; "her conversations were not only reasonable but sensible," "all her acts were rational"; "an attentive listener"; "attention is a voluntary act of the mind and may be suspended at will"; "never saw her

do. anything that a rational person would not do''; an idea
is intangible and imponderable; she deduced judgments from
other judgments and was impressed by what struck the outer
senses; she never interrupted by foolish, frivolous, or irrele-
vant questions; her voice was low and gentle, her movement
and manner deliberate; her natural tendency was to speak
slowly, if excited or enthusiastic she would speak rapidly, the
very expression of her face would show what she felt.

### SISTER CLAIRE'S PREPARATION FOR EXAMINATION IN COURT.

Sister Claire's reasons for her judgment as to the mental
condition of Maria were scholastically stated and the result
of reflection for examination in court; provided the premises
were perfect the conclusion was correct; she gave definitions
of "attention" and "idea," and applied them to her obser-
vations of Maria, and that she might be sure that she was
right as to certain points, as to the duration of the time, for
instance, occupied in the conversation with Le Breton,
she made inquiry of another member of her community and
she told her, and thus Sister Claire recalled the fact, that
is to say, she depended on the recollection of some one else
for the precise date of that interview; she remembered the
time by the church bells, although she did not time it; it
seems to have been made the subject of discussion in the
community and the result was the fixing of the date in her
mind; this was done so as to save time in case she should be
interrogated; she wanted to be ready for examination in
court; she was preparing for that ordeal by this process;
she communicated the matter of the conversation to Mrs.
Cebrian and the exact time and date of its occurrence; but
this preparation was to preserve the matter for the court
and not to gratify Mrs. Cebrian. Sister Claire contradicted
Le Breton in essentials as to that conversation. He testified
in November, 1909, and was asked particularly as to certain
points of his interview with Sister Claire and the answers
he made were gainsaid by her.

### DEATH OF EDWARD LE BRETON—HIS TESTIMONY IMPEACHED AFTER HIS DEATH BY SISTER CLAIRE.

He died in May, 1910, suddenly while on a visit to the
Home for the Aged, an institution which he had established,

conducted by a religious order, the Little Sisters of the Poor, under ecclesiastical jurisdiction. While his death was in a manner sudden, it was not unprovided, for he was fortified by the rites of the church of which he was a member. In the following month, June, 1910, Sister Claire took the stand and testified, impeaching his testimony in important particulars.

The counsel for proponent pronounced a panegyric upon the priests and the sisters who had testified to the soundness of mind of Maria, eulogized their sancity and sincerity; and seemed to consider that their conclusions as to her competency should be binding because of the exalted character of these witnesses and their vocations.

There need be no confusion here as to credibility of witnesses; there is no occasion for invidious comparisons; witnesses may be sincere and religious, pious and philanthropic, honest as the world goes; even scrupulous in the performance of their religious duties, and strict in the ordinary affairs of life, and yet mistaken in their impressions, erroneous in their judgments, and wrong in their deductions, according to their experience or limitations of observation.

### HOW CONTRADICTIONS SHOULD BE CONSIDERED.

We must consider their opportunities, their intimacies, their relations to the parties, many other major or minor elements, before we accept as absolute their opinions upon a matter of such moment as the mentality of any person.

This applies to all who undertake to pass upon such a question, whether they be in religion or in the world, religious or secular, for there is a human side to all of them. It is an every-day event to examine judicially persons alleged to be of infirm intellect, and yet some are committed who are free from taint and others enlarged who should be restrained.

The Sisters are entitled to the encomium bestowed upon them; their character needs no eulogium; their works are universally manifest, although their part in them is not always recognized, their humility preventing any claim to worldly recognition; and yet, while on earth, even they may err in matters common to mortals not consecrated to religion,

We are asked to deny credit to Edward J. Le. Breton and to reject his corporal oath because it is opposed to those who are in sacred orders, and who differ from him in recollection. Either may be in error, neither need be willfully wrong. Father Viladomat testified that he had a conversation with Edward Le Breton after the death of Maria, at Hayward, where the priest was pastor, and he made a memorandum of that conversation with Le. Breton about a week before his own testimony, which was given September 23, 1910 (Le Breton had died in June, 1910), Father Viladomat had already seen the testimony of Le Breton and read it over several times; he received it by mail, it came from Mr. Cebrian; he made a statement in the office of the attorney for proponent, and he had talked with several persons about the case; he was at variance with Le Breton as to the recollection of the conversation with him at Hayward after the death of Maria.

### FATHER VILADOMAT AT VARIANCE WITH LE BRETON.

Father Viladomat came to San Francisco in June, 1892, he was ordained December 8, 1892; was connected with the Spanish church as assistant pastor until May, 1901, now pastor of Hayward, Alameda County, for several years; knew Maria, saw her frequently, conversed with her, visited her at the Cebrian home, she visited him at Hayward; other members of the family were always with her; saw her at church; came to him to confession; not her regular confessor; while he lived in San Francisco a frequent visitor at the Cebrian home, spending as much as an hour and two hours there at a time; Maria and others came to see him before their last trip to Europe; never saw her again; in all that he saw of her acts and conversation she was rational and of sound mind. It appears that he had been sounded by both sides to this controversy and had made a statement to the proponent's attorney. Father Viladomat differed in many respects in recital of the conversation between himself and Le Breton, whom he had told that it was a shame that Miguel had made this contest, that he ought to know that his sister was sane; that the case had been talked over

among the Spanish people, the Spanish colony, and they all shared the same opinion that Maria was of sound mind; Le Breton asked him if he had known her and had met her often, to which Father Viladomat replied, "Yes, I met Miss de Laveaga many a time; and in fact she has been here in Hayward; she has taken lunch with me in Hayward, and I have seen her in Paris. I have seen her in San Francisco. I have seen her on many occasions, and my opinion is already in shape and form; that is, that I firmly believe that she was of a sound mind"; to this Le Breton said: "Don't you know that Maria left only $80,000 to Miguel? Don't you think that if she were of a sound mind she would have left a larger fortune to Miguel? If she were of sound mind she would have divided it among the two?" To which Father Viladomat replied that that would not prove that she was of unsound mind, that would simply prove to him that she had a mind of her own; then from that they went to another point and the priest put the points in a book that he had with him, so he would not make a mistake; the other point to which he referred in their conversation was about charity; Le Breton asked if he did not think that if Maria was of sound mind she would have left more for charity, to which the priest replied that he supposed Maria knew that Mrs. Cebrian would attend to that; and the conversation ended in this way: "But don't you, Father Viladomat, know that there are priests who differ in opinion from you about this matter?" He said, "Mr. Le Breton, I don't see how any priest, if he bases his testimony on the fact—I don't see how any priest could go and testify that Miss De Laveaga were insane." Then Le Breton told Father Viladomat that she had no business capacity; she did not know what she was doing, and the priest said: "Mr. Le Breton, you know that one thing is to have business capacity and another thing is to be incompetent; you know that there is a difference between the two."

### DENIES STATEMENTS IMPUTED TO HIM BY LE BRETON.

Father Viladomat denied several statements imputed to him in the testimony of Mr. Le Breton; as to one statement

.of Le Breton, however, to this effect: "I said that she did not have any idea, when she made that will, what property she was disposing of, she was giving away, and I think, Father Viladomat added 'perhaps they didn't tell her.' " Father Viladomat said that he could not take it for certain whether he said that or not, but the question was propounded to him, the words of his answer was that he could not remember for certain. Father Viladomat's memory was faulty sometimes, he was certainly mistaken in his statements as to certain times of meeting Maria, during part of that four years she was in Europe, and he here. At the time that he had this conversation with Le Breton, he had already talked to people about the case; with Father Antonio, Father Figols, Petronila Velasco, Mr. and Mrs. Cebrian, and with other members of the family in the Cebrian house, after the trial had started, he went in there on purpose for the case on more than one occasion, and on the second visit he met Edward Cebrian and this was before he had made the statement to counsel concerning his testimony; after the second visit he went to the office of the attorney to make the statements there of what he knew of Maria; with him went the eldest Cebrian and the son, Edward; he thought that these two visits were prior to the conversation he had had with Mr. Le Breton, that was the first statement he made; the second statement which was after the conversation with Mr. Le Breton was made about two or three weeks before the time of testifying, that date being September 23, 1910, and took place three or four weeks, perhaps, after that conversation.

### PREPARES STATEMENTS OF TESTIMONY IN ADVANCE—COPIES AND CORRECTIONS.

Prior to making that statement he went to see Mrs. Cebrian and told her how Le Breton had called and what passed in the conversation; there were two copies made of the statement, by that he meant that there was a main statement referring to the conversation with Le Breton about the testimony given by the latter, and there was a copy there, sent with it, in regard to the statement which the attorney had sent to him after he went to see him, for corrections, for him

to correct; that was the main thing; Father Viladomat remembered that he sent another statement, and there were some things that he knew were not so, so he corrected them; so there were two statements.

The court is asked to accord absolute credence to one of these witnesses and to discredit another of the same class. The category is that of two witnesses similarly situated expressing opposite opinions on the same subject. Father Viladomat thought that any priest who said that Maria was not of sound mind was wrong; Le Breton had been asked if Father Viladomat, in the course of the conversation between them, speaking of and referring to Maria, had not used these words, "Whoever knew her and has a clear conscience believes as I do"; Le Breton denied that Father Viladomat used that language in substance or tenor; "he used no sentence or phrase containing that idea"; of this Le Breton was positive, the priest to the contrary notwithstanding.

### OTHER PRIESTS DIFFER FROM FATHER VILADOMAT.

As has been shown in this record two other priests differed radically from Father Viladomat. One of them, Father Garriga, gave it as his opinion that Maria was not of sound mind and he gave his reasons, based upon a score of years of intimate personal and pastoral acquaintance with her and her family; but counsel for proponent said that Father Garriga's evidence had no value, that in it there was not a statement of a concrete fact indicative of unsoundness of mind and that all his evidence was consonant with the presumption of intellectual capacity and full intelligence; and yet this counsel's own client, Mrs. Cebrian, accredited Father Garriga as worthy of confidence, and advised Miguel in a letter dated April 29, 1898, to confer with him, for this Father was a great friend of the family, frequently breakfasted with them, she had great confidence in him, and if she were here she would not hesitate to consult him in regard to affairs.

### FATHER GARRIGA VOUCHED FOR BY MRS. CEBRIAN—A GREAT FRIEND OF THE FAMILY.

After this tribute to his character, the court is asked to throw out the testimony of Father Garriga because of its un-

worth and remoteness, and because it contains no affirmation of fact coming within the observation of this priest, who for twenty-three years had been the pastor of the church which they attended and a particular friend of the family, a frequent visitor at their home, enjoying their hospitality, and the recipient of their confidence, one whom they would not hesitate to consult regarding their intimate internal affairs, and whom they commended to Miguel as entirely trustworthy in the matter of the Anselmo litigation.

There is no reason developable from the record why the confidence reposed in him in 1898 should be withdrawn in 1910. As to the facts upon which he based his conclusion as to her competency they were similar to those of other persons who testified upon the same point within the same period, and as to its remoteness it came close up to the date of the will, within two years; and from the time she was 12 years of age until she was 35 years old he saw no evidence of mental growth in her. Is it reasonable to suppose that in those two years she caught up with the preceding twenty odd years? If Father Garriga was creditable in 1898, why should he be discredited in 1910 by the same persons who then vouched for him?

FATHER VALENTINI'S FIRM CONVICTION AS TO MARIA'S MENTALITY: UNSOUND BY ALL MEANS

Father Valentini's evidence is treated by counsel for proponent as of no concern, although for a period of four years continuously from the time of his arrival, and while he was acting as pastor at St. Francis Church on Vallejo street, he was well acquainted with the De Laveaga family; he saw the family every Sunday, the ladies, Ignacia, Josefa, Maria and the others; visited their house occasionally and had luncheon there and dined several times; after he was transferred to Half Moon Bay in 1879 he came to town about twice a month, he called on them at their home about eight or ten times; before that he had been the spiritual adviser of Ignacia; he saw Maria about every time, she was always with Ignacia; he never saw Maria alone; he never saw her hold conversation with other people; he had a most decided opin-

ion as to whether she was of sound mind or not; she was not of sound mind; unsound by all means; he was firm in this conviction of her mentality. Proponent's counsel discounts the judgment of Father Valentini and undertakes to analyze the priest's reasons for his opinion, claiming that Maria's shyness, reticence and reserve merely prove her modesty and humility and respect doubtless for other persons present; and the counsel says that the priest's infirmities of memory are responsible for his mistakes of recollection and that in his testimony there was no irrational or unusual act shown in her conduct, and that the instances assigned as implying immaturity of intellect in Maria are insignificant, and that there is an absence of substantive acts to establish any such issue; besides it is all too remote, and is of no worth whatever.

Maria was 23 years old the last time Father Valentini saw her. At that age certainly Maria should have shown evidence of mental maturity. It is said that his reasons were inadequate and too remote and that he saw no active irrational act; but the condition here is a continuous one, and his testimony is a part of the chain showing its continuity.

### EDWARD J. LE BRETON'S RELATION TO THE CASE.

Edward J. Le Breton was the brother-in-law of decedent; his sister had married Miguel; he was a bachelor; a native son of California, born in 1852, living all his life in the state, except for about three years when he was at school abroad. He became acquainted with Maria about the end of 1871 when his own family, consisting of his father, mother, older brother and sister, was living at 1117 Stockton street and the De Laveagas at 1115, next door, a double house; that acquaintance continued until she died; the two families became socially intimate and some years thereafter, in 1877, on the 23d of July, Miguel married Le Breton's sister; they interchanged visits; were on cordial terms, after their removal to Geary street, subsequent to the death of the senior De Laveaga, about 1875, their mutual acquaintance was even more intimate; in all of these visits he would meet Maria Concep-

cion, the youngest member of the family; met her at meals frequently, and in the parlor, and the members of the family visited his house; after the death of Maria's mother she continued to live on Geary street until they went to Europe in 1884; he saw her next after the family came back from Europe in 1888 after Ignacia's death; subsequently he saw her occasionally, she then lived with the Cebrians on Octavia street, he did not see her as frequently as before she went to Europe in 1884; they remained here until 1896, when they made another trip and they came back about 1902 or 1903; he did not see much of Maria after they came back from Europe; occasionally he visited the house on Octavia street; he remembered their going away again in 1908.

LE BRETON'S OPINION OF MARIA'S COMPETENCY AND HIS REASONS.

From all of his observation of and acquaintance with her from 1871 until 1908, Le Breton had formed an opinion as to whether she was of sound mind, and in his opinion she was not of sound mind; she certainly was deficient intellectually; it was one of those cases where the deficiency or unsoundness of intellect was indicated by an absence of those acts which a person of sound mind does; it was not manifested by acts of insanity but there was an undeveloped intellect; she never would join in the conversation, and if he addressed a sentence to her on any subject that he thought might interest her, it was met in an averted way, her face turned down, and she would answer yes or no, in a way that could not but impress itself upon him that she was absolutely deficient in intellect, and that manner of intercourse continued all the time; it seemed to be a sort of inaction of intellect. Le Breton explained to the court that what he meant by absolute deficiency of intellect was that he did not think that in all those years that he ever heard Maria give expression to a thought, or to issue a complete sentence when he was present. From his testimony it appeared that there was an inability to compose complicated sentences, and an incapacity to grasp and exploit an idea.

### LE BRETON'S PERSONAL HISTORY AND OCCUPATIONS.

In the cross-examination Mr. Le Breton said that his then principal occupation was receiver of the California Safe Deposit and Trust Company, a position to which he had been appointed by the judge of this department; he had been executor and administrator of a great many estates; in a fiduciary capacity he had had a great deal to do with estates, but it had not been his principal business; he had not been educated for the bar, nor a student of law; he had been estranged from his brother-in-law for something over nine years until recently. Mr. Le Breton was three years in Europe at school from July, 1868, until May, 1871; he was with his parents, brother and sister in France and Germany and acquired a knowledge of the French and German languages and returned to San Francisco when he was about 18 years of age and went to work as a clerk in a stock-broker's office and subsequently as a bookkeeper and afterward in a banking-house; he was appointed administrator of a large estate, that of Theodore Leroy, June, 1882, and continued in that service until the end of the administration in 1892; he had other occupations, was intrusted with all the probate business of the French consulate for many years and other positions of trust; he had his own office, he had become independent, had bought a large interest in a bank and became its manager, the French Savings Bank, which he sold to a syndicate, and then he engaged in the management of his own capital; he withdrew from active employment because he wanted to devote a certain portion of his time to a particular purpose.

### THE RECEIVER'S BOND ON WHICH MARIA WAS SURETY.

When he was appointed receiver of the California Trust Company he was required to give a million dollar bond. He did not ask Maria Concepcion de Laveaga to go on that bond; nor did he ask his nephew to go and intercede with her and solicit her to go on the bond for that sum; he did not personally present the bond to the court; but he caused it to be presented through his attorney, Joseph Vincent de Laveaga, his nephew, and the son of contestant, with his knowledge and approval; at that time Maria was of unsound mind, abso-

lutely deficient in intellect; the others on that bond were Herbert Fleischhacker for $500,000, Mortimer Fleischhacker for $500,000, Mrs. Cebrian for $500,000; he signed the bond as principal, but did not see it after he signed it, until the taking of the deposition in this case. He had been estranged from his brother-in-law, the contestant, for some years, but had entertained no unkindly feelings toward him; after this contest began they were reconciled.

### LE BRETON'S CONVERSATION WITH SISTER CLAIRE—HIS INTEREST IN THE CONTEST.

Le Breton had taken an interest in the result of the contest, had visited some witnesses, among others Sister Claire, with whom he had had a conversation; he had known her a long time, and had learned that she had been a schoolmate of Maria at Benicia; he did not tell her in that conversation that he had charge of the contest; he did not tell her that he was only representing his brother-in-law who had left all the matter to him; he did not make such a statement. He told her that he was seeking information in a straightforward way, and that while what she had said was not what he expected he was thankful to her for having given it to him and for the time she had devoted to him; he did not say he "was glad to hear her say this because he knew she was telling the truth": she did not ask him why he was figuring in the case. It appears that Mr. Le Breton was quite industrious in seeking information from sisters and priests and from others in behalf of the brother-in-law with whom he had been recently reconciled, but the prospect did not pan out, and he had to be content with the result. His interviews at any rate were unsatisfactory to him; and none of those with whom he conversed quite agree with him as to what was said. They nearly all differ diametrically from him.

### HOW MARIA CAME TO BE SURETY ON RECEIVER'S BOND—A FAMILY ARRANGEMENT.

In relation to the bond which Mr. Le Breton gave as receiver he identified the signatures of himself as principal and of "Maria C. de Laveaga" and others as sureties; he never

saw the bond after he signed it; he said he did not know her handwriting, but there was no question that it was her signature; he had nothing to do with the signing of the bond by Maria; had nothing to do with her; did not see her; he did not cause her to execute that instrument; he did not ask his attorney to see her; he was appointed receiver on January 14, 1908, and the bond was fixed at a million dollars; he informed his nephew, whom he had selected as attorney, that he could get two sureties for a million, but inasmuch as the attorney would profit by the receivership, and as he intended to take the attorney's brother into the office with him to train him in business, and furthermore, he was going to take Mr. Cebrian's son in and give him a position in the same office, Le Breton thought it was only just that Joseph Vincent should lay before his father, Miguel, the propriety of his father's serving as one of the bondsmen. In this snug little family arrangement, somewhat suggestive of nepotism, Le Breton thought his relative should furnish the balance of the bond, he having secured a promise from his friends of a part. Le Breton told his nephew that he had promises of getting the full bond from some other people who told him that they would go on as security, but he thought it was more proper that his brother-in-law and some member of his family, not having in mind Maria at all, should furnish the balance of the bond; the nephew thought so too and said he would talk to his father about it, and on the next day they had another interview upon the subject, when the nephew told him that he had laid the matter before his father, but because of the strained relations between him and Le Breton the father preferred not to go individually on the bond, but he would get his sisters to do so; so the next day the nephew reported to Le Breton that Mrs. Cebrian and Maria would each go on for $500,000, and thus complete the bond; when the nephew reported to him this reply of Miguel, he told Le Breton that his father had arranged for his two sisters to sign that bond and that he had given his guaranty to these sisters, that if they were subjected to any loss he would be responsible for it and that Miss Maria signed on the bond with the consent

of her brother and of her sister, Mrs. Cebrian; the nephew then took charge of the matter and completed the bond.

### NEVER SPOKE TO MARIA ABOUT THE BOND.

After that bond was filed in the court he met Maria coming out of St. Dominic's Church one Sunday morning on the east side of Pierce street, between Bush and Pine; she was in company with one or two of the youngest daughters of Mrs. Cebrian, girls about 16 or 17, Isabel and Beatrice, he did not know that at that time they were 12 and 13 years of age respectively, they looked older, they were growing into womanhood; he had no conversation with Maria, coming out of church he waited for them, he said good morning to them, he spent about a minute with them, he had no recollection of saying anything except, "I hope you are well"; he lived within a block and a half of that place and went home for breakfast; he had no recollection of having mentioned the bond or having thanked her for having gone on that bond, nor having requested her to convey his compliments and thanks to her sister, Mrs. Cebrian; he walked along the street with Maria and the girls to the corner of Pine street and bowed them good morning, parted and went to his home and had his breakfast; this was about ten minutes to eight in the morning, but he did not remember the date, they had been to 7 o'clock mass; he had seen her at church occasionally at St. Dominic's, which was convenient to his own home and perhaps at other churches, but his memory was not clear about any specific occasion. He remembered when they went to Europe in 1908, that was after Maria had gone on his bond, he had never called at the Cebrian home after that incident; he remembered when the Cebrians returned from Europe, had made two visits to them about two months prior to the time at which he testified, which was November 17, 1909, after the contest had commenced.

### NEVER SAW MARIA ALONE.

He had never dined or lunched in the Cebrian house during the lifetime of Maria, he sometimes called in the evening when some other guests were present; he had

never seen the library of Maria; he had never heard her speak French; he spoke English; he never, addressed her in Spanish; he never understood that she spoke French; he never saw her alone, she was always in company with someone else; he had sent through some friend or messenger or relative his thanks to the ladies for going on his bond; he knew that the bond had to be presented to the court and to be approved by the judge; he went to the court and took the oath before the judge who had appointed him; he. did not say anything to the judge in regard to the condition of mind of Maria; because in the opinion of his attorney and in his own judgment it was a good bond; Miguel was the business manager of the affairs of Maria; as he, himself, was a man of considerable means, and the judge no doubt knew that; the bond was approved, as he believed, because the court was satisfied of the financial responsibility of the principal and the court's confidence in its own appointee and general knowledge of the pecuniary circumstances of the sureties; it was all done in the best of faith, no injury to anybody could ensue, and it was a necessary legal step in the completion of the appointment of the receiver and that part of it he left to the decision of his attorney; she had never been legally declared incompetent; she had in her own name a great deal of property; it was done upon the advice of her brother and business manager and in the best of faith, while he believed that she was of feeble mind, she was a living human being, although easily influenced for good or for evil, yet it did not follow that the act was wrong since it was done in perfect good faith by the direction of somebody who knew her and who was the manager of her property, and her sister, Mrs. Cebrian, was present and knew of the act and acquiesced; he thought it was better that it should remain in the members of the family and he felt at liberty to call upon the De Laveaga branch, since several members of that family were beneficiaries of the receivership, and of the hard labors that he expected to perform.

### DISCLAIMS ANY MATERIAL INTEREST IN LITIGATION.

Mr. Le Breton said he had no direct or material interest of any kind in this litigation; he expected no pecuniary

advantage from it in any way. Edward J. Le Breton disclaimed any material interest in the result of this litigation, but he had busied himself out of consideration for the family; he had been accused of intermeddling in their affairs, and had been threatened with legal proceedings for his officious actions and conduct; but his only concern was to observe the character of the family; in this as in the Anselmo litigation his thought was about the family reputation. In the Anselmo litigation his assistance was enlisted by Miguel, with whom he had previously consulted about the business interests of Maria and the management of her property and it was he who had selected the attorney of record in that case for the respondents, and there was no end of consultations between himself, that attorney, and Miguel about the necessity of keeping Maria in Europe; at the time that Mr. and Mrs. Cebrian and the family and Maria went to Europe it was absolutely understood among them all that it was to escape testifying and appearing in the Anselmo contest; every possible means was discussed to avoid the taking of Maria's testimony as it would disclose her incompetency.

### MARIA ABSOLUTELY INCOMPETENT TO MAKE A WILL.

It was talked over as a fact that Maria was absolutely incompetent to make a will, and, therefore, she would die intestate, and so the same people would repeat their raid upon the estate, and it was essential in some manner to bar that contingency; finally, when the settlement was made, care was taken to insert a clause forfeiting any claim upon Maria's estate, and all this was done upon the assumption that she was utterly incapable of making a will. She was not consulted at all in the premises. The subject of these consultations was the danger of Maria's mental incompetency becoming known, by reason of the fact that attempts were being made to have her deposition taken and the question of a compromise came up very often, Miguel being desirous of ending the litigation and avoiding the notoriety and bother of the business. Mr. Le Breton had endeavored in like manner to compose the controversy in the case at bar. He had been friendly with the Cebrians; after the fire of April, 1906,

he had afforded them and Maria shelter at the house of the Little Sisters of the Poor (an establishment of his own endowment), immediately after the earthquake, when the entire family, including Maria, came there with their appurtenances and they were temporarily accommodated.

### FUTILE ENDEAVORS TO ADJUST MATTERS.

Mr. Le Breton's endeavors to adjust the matters in this case were futile, although it appears that he had availed himself of the intervention of one Daniel Meyer, a conspicuous local capitalist, and friend of all concerned, who very much desired to see all the parties reconciled; Meyer called on Cebrian on Octavia street in July, 1909, and suggested a reconciliation, purely as a business proposition, but, although Cebrian had previously called on him, not to consult with him, but simply as a social call, to convince himself of Meyer's feelings in the matter, after Meyer had called Cebrian's son Louis in the street to let him know his opinion in the matter. Cebrian did not relish the intrusion of outsiders; besides Le Breton ought to have borne in mind that Miguel should have taken the first step toward reconciliation, that he was the aggressor, that Mrs. Cebrian had tendered him four times her sisterly love, which was brutally rejected, and compelled her to secure the services of an attorney and then later, by his unnatural aggression, the aid of another, against her own will. To these remarks in writing made by Mr. Cebrian, Mr. Le Breton made response recounting the circumstances which brought about Mr. Meyer's interference in the case, Le Breton wrote to Cebrian acknowledging the receipt of the communication of July 28, 1909, saying:

### LE BRETON WRITES TO CEBRIAN.

"Early last week Mr. Daniel Meyer called at my office, while I was absent. Later in the week I accidentally met him on the cars and he told me the object of his visit to my office was to try and effect some compromise between Miguel and his sister. This is the first and only time I have ever spoken to Mr. Meyer about the present trouble. Mr. Meyer explained that being an old friend of the different branches

to this controversy he would be pleased, purely out of motives of kindness, to render his assistance toward a compromise and thus avoid publicity, scandal and embittered relations.

"I reported this message to Vin and his father upon their return from the country on Monday.

"Miguel and Vin saw Mr. Meyer personally, and Mr. Meyer's visit to your house was sanctioned by Miguel.

"It was a spontaneous effort by Daniel Meyer, an old and well meaning man, to do a kindly act. All honor to him for his worthy motives. I think Miguel's parents, your parents and my own parents would be thankful to him. For of course any scandal would scatter on the Cebrian and Le Breton families, as well as on the De Laveagas, if there is to be a bitter contest.

"I am not acting without authority in these matters, and I am quite willing to have a further conference with you, either at your house or at the offices of your attorneys, looking toward a settlement of the business end of this important affair. No harm can come of it. We cannot hope for a reconciliation at this time. I trust this may follow later, if we all act in the right spirit.

"It is beyond accomplishment that Miguel should go to you or your attorneys as a supplicant for compromise. We must deal with the elements we have as they are and not as we would like to have them.

"I trust you will accept this letter in the spirit of good will which prompts it."

### CEBRIAN REPLIES.

Next day, July 30th, the reply to this forthcame from Cebrian:

"Your letter of the 29th inst. asking for a conference about the present controversy was received this morning and we are glad for it. I have tried, in vain so far, to see Mrs. Cebrian's lawyers, so as to make an appointment. As soon as I see them I will notify you. I hope it will be for to-morrow, Saturday.

"In regard to Mr. Daniel Meyer, I see your opinion coincides with ours; I wrote him that same day expressing our

earnest thanks for his good intentions; because I believe they (our parents) do thank him, because they do see his disinterested motives, as well as they see our motives (yours, Miguel's and mine).

We thank Mr. Meyer for his efforts in avoiding scandal, which unfortunately has already been started. But this has only proved the truth of what I told you on the 14th and 15th June last, when you called in the evening at our house, to wit: 'that all Cebrians' friends would think of the Cebrians as well, and as much, after the scandal, as they used to think of them last year' and in fact, if you could see, or know, all the messages of love, of sympathy, of offers and attachment, we have received by phone, by letter and in person, since the newspapers began to insinuate scandal you would be amazed. The scandal, if continued, will not besmirch the Cebrians, but the scandal-promoters themselves. The Cebrians' good name is founded on solid ground, not on humbug, nor on false pretenses.

"Sometimes scandal appears, for some little time, as TRUTH . . . just as there occurs miscarriage of justice- in every land; and scandal bites fiercely when there are shady financial transactions; and scandal like cases of heredity (now so much in vogue) ; of heredity for instance when uncles on the paternal and the maternal sides are deficient, each one in its own way, and coupled with a physically defective parentage; scandal prefers people in prominent social positions; scandal bites and gnaws always . . . but in the end TRUTH prevails.

"Coming to the last paragraph of your letter, I appreciate your statement that 'we must deal with the elements we have as they are, and not as we would like to have them.'

"I suppose you fully realize that Mr. Miguel, as well as we all, cannot avoid the law of Nature.

We accept your letter in the spirit of good will you sent it; animated of the same good spirit, I answer it, trusting that some good will come out of it.''

LE BRETON'S ACTIVITY TO AVERT SCANDAL AND NOTORIETY.

Mr. Le Breton insisted that all the activity he had shown in this case was to avert scandal and notoriety and that he

had no material interest directly or indirectly in the contro-versy; so far as he was concerned all idea of interest was eliminated; all his endeavors had been to promote peace, to preserve tranquility, and to establish just relations between the members of the family; he was in no wise to be materially benefited by the outcome; but he was conscientiously convinced that Maria was not competent to make a will, that the instrument could not have originated in her mind, that a great injustice had been done to his brother-in-law, and that he himself was justified in seeking to prevent the wrong being consummated, by whomsoever it was premeditated, or whosoever was its actual author. He repeated that he personally had no interest in the result; his fortune was not to be augmented nor diminished and his own circumstances could not be affected one way or another, whatever the event of the litigation, and he had no animus either way; he had no bias or prejudice, not in the least, nor was he affected by the fact that Mrs. Cebrian had withdrawn from his bond as receiver, nor by the character of the correspondence from her and her attorney in connection with this case; he had received a letter from her in which she announced her withdrawal from the bond, because he had acted aggressively and treacherously towards her. This was followed by a long letter from her attorney, sent by registered mail, criticising the activity of Le Breton in this controversy and imputing to him impertinent interference. Nevertheless Le Breton harbored no resentment and testified to the truth according to his conscience.

MRS. BASMAISON, NURSE IN THE CEBRIAN FAMILY, TESTIFIES.

Mrs. Emilie Basmaison, a native of Alsace-Lorraine, born in Phalsbourg, in 1872, whose native tongue was German, although French seemed also to be vernacular, became acquainted with the decedent through the medium of an advertisement in a newspaper, the "Figaro," in Paris, in June, 1897, when the witness was seeking employment as a nurse; she was then about twenty years old; in response to the advertisement she obtained a situation in the Cebrian family in the Avenue Marceau; the family consisted of Mr. and

Mrs. Cebrian, their children, Mamie, Josie, Edward, Louis, Harry, Rafael, Isabel and baby Beatrice, then eight months old; Maria was included in the family; Mrs. Cebrian employed the witness as a nurse for the little baby Beatrice, and she continued in that capacity for three years and a half; she quit the service at the time of the French Exposition in 1900, in the latter part of August, to get married, her general duties were to nurse the baby and to do a little sewing and sometimes accompany the little boys to school; while her native language was German she had learned French and spoke that only in the family. Maria spoke only French to her. She traveled with the family to various places. She used to dress Maria's hair every day and sometimes do a little sewing for her and conversed with her frequently in French; when they went traveling she went along with Maria sight-seeing and talked with her, the others of the family were present, and the servants were with them; the witness was minding the baby Beatrice; when they went out to visit stores or take the air the other children and the other servant, Diega, were always with them.

MARIA SPOKE WITH THE NURSE ALWAYS IN FRENCH—SPOKE AS

READILY IN ONE LANGUAGE AS ANOTHER—TALKATIVE.

Maria spoke French always with her at that time; the witness subsequently learned something of Spanish, Maria helping her; the language used in the house was generally Spanish, but sometimes it was English or French; after the witness was married she came to America, finally to San Francisco, which she reached about February, 1901; she knew Mrs. Cebrian was here because they were in constant correspondence; it was in 1904 when the Cebrian family came again from Europe that she next met Maria at their house on Octavia street; met her frequently thereafter; at the time of the earthquake and thereafter; the witness was employed to do washing for the family and left clothes in Maria's room and talked with her, always in French; Maria said that she was glad the witness came in the house and spoke French with her as she was afraid she was going to forget as she had no opportunity to speak French; Maria gave her many presents, supplied her for a long time with necessary gar-

ments, gave toys to her children, she was very fond of children, she gave to her "novenas" and other booklets; she remembered the family going to Europe in 1908; Maria gave her a souvenir, a satchel, on that occasion, the last time she saw her. In her opinion Maria was always of sound mind; she was like anybody else, never saw anything particular about her conduct; never knew or heard that she had nervous prostration, she had stomach trouble, she had heard; as to Maria's French she could not say that she spoke correctly or grammatically, but she spoke the most necessary words; Maria was a talkative person; she spoke as readily in one language as in another, so it seemed to her; the members of the family generally spoke in Spanish; but sometimes in English and sometimes in French; they all understood and spoke French; she never was in a store alone with Maria, always someone else with her, Mamie or Josie, the nieces, or Diega, the servant, who spoke only Spanish; after a while the witness herself learned to speak Spanish, but not with facility, just the most necessary Spanish. This witness testified that Maria spoke as readily in one language as another, and it was argued thence that she was a linguist.

One of the counsel adverts to the fact that Maria's knowledge of French acquired after she went to Europe when she was twenty-seven years old at that time and lived there for three or four years during which period she must have learned and spoken that language, an acquisition at her age impossible to a person of immature or defective intellect, is of prime importance in proof of her mental capacity; the Basmaisons testified that she spoke French to them, and Josephine Cebrian's evidence is confirmed in this respect by them; this demonstrates that Maria possessed unusual mental power and mental application; she could speak three languages. Edward Cebrian said she spoke French, English and Spanish; he conversed with her in all of them, and heard her speak a few words in Portuguese, and heard her read Latin and sing in Latin.

### MARIA'S KNOWLEDGE OF LANGUAGES AND LITERATURE.

The other counsel for proponent alluded to her knowledge of general literature and languages, and seemed to think it

remarkable that she could and did recite the "Pater Noster" in Latin. It would appear, therefore, that she was to some extent versed in five languages. If we are to accept this as a conclusion of her mentality, the facility for acquiring colloquial familiarity with languages, she is shown to have had some power of mind; but this, in itself, is not proof of intellectual power, because, as was once said by one person of another who prided himself on his linguistic attainments, he spoke in seven languages and thought in none. The deduction is too broad, even if borne out by the proof. It is said that industry and capacity were requisite to accomplish this result. In the opinion of counsel it was a remarkable achievement to acquire her knowledge of French at such an age; but she had been several years in France, and it would have been more remarkable if she had not learned sufficient to talk to the maid who dressed her hair, and who said "she spoke the most necessary words." It does not appear authentically that she was proficient in the language; she did not speak it in her own family circle; Spanish was there the language; according to Edward Cebrian she picked up a few words of Portuguese, which was one of the languages he did not know; she certainly had not acquired a grammatical knowledge of the French tongue; she had not even in English attained to such a standard, and it is quite evident, by the examples of her writing, that in her native idiom she had not made such progress as is claimed for her. It is said that she read and sang Latin, and recited her "Pater Noster" therein, and this is claimed as exhibiting even precocious faculty; but it is open to common observation that children of tender age, singing in choirs, repeat the words of the service accurately in unison of time and tune, without comprehending their meaning, and that the acolytes serving the priest at mass follow him with their responses in a language that they do not always understand, but which they have learned by rote, although they may, in a manner, appreciate their relation to the solemn occasion.

### MARIA'S FREQUENT SERVICE AS SPONSOR.

Much stress has been laid upon the importance of the fact that Maria acted as godmother for the children of Mrs. Ceb-

rian and that therefore she must have been competent, and this was one of the reasons that Father Antonio gave for his opinion that she was of sound mind, and a record was produced by him which showed that on February 5th, 1891, she had been godmother and her brother Vicente, godfather, for one of the Cebrian children. It is argued by counsel that she must have had a high degree of intelligence in order to participate in this ceremony as sponsor, whereby she assumed great responsibilities, to stand in place of the parents, if need be, and that she understood and gave the answers necessary to the questions addressed to her by the priest, but it frequently happens that on such occasions, very young persons act in that capacity, sometimes those who are only thirteen or fourteen, and that the priest not only asks the question, but gives the answer which is repeated by the sponsor, and this is the usual formula. On this particular occasion, it appears from the testimony of Father Antonio, and from the record produced, that José Vicente, the godfather, who participated in the ceremony, did not make the responses the same as Maria. Father Antonio was asked these questions, and answers as follows:

"Q. He participated in that ceremony? A. Yes, sir.

"Q. He made responses the same as Miss Maria? A. I guess not; no.

"Q. He was one of the sponsors? A. Yes, sir, he was.

"Q. Why didn't he? A. Most probably he didn't know how.

"Q. That is the only reason, that he didn't know how?

"A. I guess, yes.

"Q. Didn't know how? A. Yes, sir.

"Q. You were acquainted with him and knew him?

"A. Yes, sir.

"Q. You knew him and say the only reason that he did not make the responses and participate in the ceremony was that he did not know how? A. I said probably he did not know how."

### WHAT IS REQUIRED OF A SPONSOR.

This was the answer of Father Antonio who performed the ceremony of baptism, which required, as it seems, that

the sponsors should make answers which betoken their spiritual and temporal obligations to and for the child. It is claimed that each of the sponsors must have an intelligent apprehension of their acts and of their words, and it is argued that Maria's answers were spontaneous and recognitive of her responsibility, and conclusive of her competency; but over against this we have the fact in this particular ceremony that one equally bound to these conditions, to wit, her brother Vicente, was almost stone deaf, and that that was the reason that he made no vocal responses to the questions; there is nothing in the church records to disclose this fact, but we are asked to infer therefrom that both sponsors took part in them, whereas from Father Antonio's evidence it appears that Vicente did not, because probably he did not know how, and from other evidential sources it is seen that Vicente was unable to respond because through his defective hearing he could not make out the questions, and so he made no actual responses, yet he went through the ceremony and satisfied the requirements although he never said a word. It is also argued that because Maria was devout and performed her religious duties with punctuality that she must have possessed testamentary capacity, but it goes without saying that children of six or seven years of age, certainly of seven, may receive the sacraments, and, indeed, it is obligatory upon those who are in charge of such children that they shall be induced to attend to these duties at least as early as the age of seven, and Maria adhered to these devotional habits throughout her life, the same as when she was a child in years as well as in understanding.

### MARIA'S INTEREST IN LITERATURE. HER LIBRARY.

Counsel comment upon the interest of Maria in literature as evinced by the number and character of the volumes constituting her library, which show her mental culture, even intimating her familiarity with the higher tenets of theology and her knowledge of the Lives of the Saints, which counsel say is a history in itself of Christianity, a wonderful book, in which it is suggested she was well versed; this book, which is written in Spanish, and comprises five volumes, averaging

six hundred pages to the volume, all fine print; there is no mark or inscription in any of these volumes, and very little in or about them to indicate that they have been subjected to severe study; they seem to be about as clean as when they came from the press. It is said she had a special fondness for Spanish books, and it has been noted in connection with the evidence of Mrs. Highton that she was peculiarly acute in her interpretation of some of the characters depicted in the works of fiction, such as Don Quixote, the meaning of whose satire she penetrated with unusual acumen.

### COMMENTS ON CONCLUSIONS OF COUNSEL.

If we are to accept the conclusions of the counsel for the proponent as to the testamentary capacity of the decedent she was a person of unequaled natural gifts and of uncommon cultivation of intellect. Was she not possessed of the full faculties of the mind, memory, will, understanding; she had an extraordinary memory, strong and powerful, a splendid and retentive recollection, names, dates, faces; every witness, quoth counsel, bears testimony to the marvelous development of this faculty; a perfect apprehension of everything about her, relatives, friends, places of travel; understood all about her natural and moral duty to every one; well versed in literature, her library showed her mental culture; fond of books; the character of her books proved her familiarity with general literature, the Bible, Shakespeare, Cervantes, history, poetry, philosophy, religious books, novels, she read the books she owned and treasured.

### NO EVIDENCE THAT MARIA STUDIED THESE VOLUMES.

If the mere ownership or possession of books necessarily implied their reading Maria might be said to have read considerable, but there is no sufficient evidence that she was a sedulous student of Shakespeare, the Bible, or of any of the learned treatises and scholarly tomes alluded to by counsel; what is called her "library" were not originally her books, they had belonged to Ignacia, and so far as examination goes there is not an inscription in those volumes traceable to Maria's pen; possibly there is an exception here and there,

but as a rule this is true; they cover a wide range of reading, in English from Shakespeare, Walter Scott and Swift, to Dickens, Bulwer-Lytton and Lew Wallace; in French Jules Verne, and in translation Goethe's "Faust"; besides the many volumes in Spanish, among them is a worm-eaten volume, "The Commentaries of Cesar," translated into Spanish accompanied with the Latin text, which has on a flyleaf, "I. de Laveaga, 322 Geary St.," this volume bears the imprint year "MDCCXCVIII' (1798). In some of these books, as in the English edition of Shakespeare, we find the inscription on the flyleaf, "Miss I. de Laveaga, 322 Geary St., San Francisco, Cal.," and under that in pencil, "Josie de su queridisima tia Maria," and in the lower left hand corner of the same flyleaf, "Dec. 1904"; and in the Spanish book "Monje Negro," at the top of the page on the flyleaf, "Miss I. de Laveaga, 322 Geary St., San Francisco, California"; and and at the bottom of the page in pencil, "Recuerdo de mi Maria queridisima, San Francisco, 1914"; and in another book, "Los Novios," on the inside of the cover, in ink, "Miss I. de Laveaga, 322 Geary St., San Francisco, California"; and then on the flyleaf opposite, "Josie Cebrian de mi queridisima Maria"; the name in ink, is in the writing of Ignacia, in two other volumes, "Don Juan de Austria," Ignacia's name is not written, but there is in each, at the top of the flyleaf, "Josie from Mary," and towards the bottom of the page, the figures "1895"; in another book, "The Last Days of Pompei," in English, by Lytton, the only inscription is in pencil at the head of the title page, "Josie from dearest Aunt Maria"; all of these pencil inscriptions are in the handwriting of Josephine Cebrian, and they serve as samples of the most important books in the list; in none of these is there any writing by Maria; it is the theory of contestant that these pencil inscriptions were inserted during the pendency of the trial of this case; they have the appearance of recent origin. The original list of these books was made by Josephine, as she said, from the books in the book-case, and the lists offered; they are said to be taken from the original memoranda, which, although made not long before she testified, was no longer in existence, and the typewritten memorandum was produced as

being a copy of her list, had been interlined, corrected, edited, names erased and substitutions made in different hand-writings, and after that a revised list made, and both lists offered in evidence as the "List of Books belonging to Miss Maria C. de Laveaga."

### THE BOOKS NOT ORIGINALLY HER PROPERTY; PART OF IGNACIA'S LIBRARY—MARIA NOT CONVERSANT WITH THEIR CONTENTS.

But there is nothing in the books themselves, as has been said, to show that they were her property originally, all the indicia showing that they had constituted a part of the library of Ignacia, and had nothing to prove that Maria was con-versant with their contents, and while the bestowal of a book may be evidence of affection and esteem of the most exalted type, there is nothing to indicate in Maria's handwriting that she presented any of these books to anybody. In some other books, however, we find her name on the flyleaf, as in a book entitled the "Martyrs of the Coliseum," by Rev. A. J. O'Reilly, on the flyleaf of which appears, in ink, "Maria C. de Laveaga," written by her; under that is in pencil, "To the girls," in the handwriting of Josephine Cebrian, as tes-tified to by Mr. Cebrian himself; he did not know when the pencil writing was put there. In another book, a translation into Spanish from the German work, "Schmidt's Tales," on the flyleaf is written "Maria C. de Laveaga," in her hand-writing, and below it is written "21 April, 1888, Paris, 27 Avenue Marceau," this was not written by her, but by Jennie de Laveaga, that is Juanita, now Mrs. Valdespino. In an-other book there is a rubber stamp impression repeated three times, "Mclle M. C. de Laveaga"; from this book there was a flyleaf torn, but Mr. Cebrian had no idea when or by whom that was done, he had no explanation to make about the loss of that flyleaf, it was gone the first time he saw the book, when that was, he did not know. In another book, in Span-ish, entitled "Doña Luz," there was written the name of "Maria C. de Laveaga" by her in pencil, on the top of the front page, and there were other rubber stamp names three times in the book on the back and once on the front; still another Spanish book, "Corona Catolica," by J. Gallardo, on

the flyleaf of which are two lines written in ink, "M. C. de La-
veaga," and the other one, "63 Avenue d'Alma"; in one
of these lines there was an erasure which Mr. Cebrian could
not account for, he had been examining the book-cases the
night before he testified, and out of two or three hundred
books he had looked at perhaps ·fifty, had found these and
also others of a devotional character, among them a prayer-
book in Spanish by the name of "Nuevo Novenario Sclecto,"
translated into English it is "A New Selected Novenary," in
the flyleaf there is a line written in pencil by Maria, "M. C.
de Laveaga"; no other writing in that book. In another book
in Spanish the title of which is "Ejercicio Espirituel
Cotidiano," in English translation it is "Daily Spiritual
Exercises," there is in her handwriting in pencil, "M. C. de
Laveaga"; and in another book in Spanish "Novisimo Officio
Divino," which in English means "Newest Divine Office,"
there is on the flyleaf "M. C. de Laveaga," written by Maria, ·
and below "63 Avenue d'Alma, Paris," in a different hand-
writing. He thought this addition of the address bore some
resemblance to Juanita's handwriting; as to the figure "63,"
he did not know whose handwriting it was. Apart from
these examples of books of devotion and, perhaps, some other
similar books of a like character, there is no inscription by
Maria. It is a far-fetched conclusion that she was versed in
these volumes, outside of the primary prayer-books, noven-
aries, and catechisms, all within the comprehension of a child.

### MR. MOLERA'S OPINION AND REASONS.

Eusebia J. Molera testified that he lived here for over forty
years; he was a civil engineer and architect; knew the De
Laveaga family, had been a business partner of Mr. Cebrian;
he visited the De Laveaga family on Geary street; had
luncheon there; at that time he lived on Stockton street, be-
tween Clay and Washington; the witness, at the time of
giving his testimony was living at 2025 Sacramento street;
in the fall of 1874, or in the beginning of 1875, at the time
of the accident to Miguel when his arm was broken, he vis-
ited him often and then met Miss Maria; subsequently, in
December, when Mr. Cebrian married Miss Josefa, he at-

tended the reception there; exchanged greetings with her; both Maria and he were godparents of Edward Cebrian, in September, 1882, at the church of Guadalupe, Father Garriga officiated; she made the responses, he did also; Maria and he spoke about the new relationship they had assumed and their responsibilities as. compañeros, or godparents; compadre and comadre; they generally spoke in Spanish, sometimes in English; he saw her on the street with the children of Mr. and Mrs. Cebrian; once the children, the girls, wanted to go somewhere, but she would not let them, and they told him that she was very exacting; the girls were then about 12 or 13 years old. He frequently saw Maria on the street with the children, also at his house and at the house of his sister-in-law, Mrs. Anna Wohler. Maria's acts, conversation, demeanor and deportment were perfectly rational. He went to Europe in June, 1900, he went with Dr. Jules Callandreau; he visited Paris, he called at the house of the Cebrians, in the Rue Hoche, and met the members of the family and Maria, also "Vincent" or J. V., the son of Miguel; Dr. Callandreau and they called together; Maria engaged in conversation with them; he traveled about a good deal for five months; visiting Paris three times, each time he visited the Cebrian house; dined with them; Maria being present; on the second visit Dr. Callandreau was not with him, he had already gone home; on their first visit they were there more than an hour; when he dined there he spent three or four hours; when he saw Vincent there he observed him talking with Maria; he left Paris finally for home in October, 1900; bade them all good-by; on his return he saw the family again on their arrival at their home on Octavia street; in or about 1903 or 1904; visited them and had conversation with Maria about their travels, said to her that she must be pleased to be back in San Francisco, she said "no, no, Paris for me"; he said that he thought this place was preferable and their friends were here and this was everything to him; but she repeated that Paris was better, streets cleaner, houses handsomer, churches more numerous and finer, more places of amusement and greater opportunities of diversion, and so on, enumerating Parisian advantages and attractions; he had

other conversations with her on many occasions; she was very fond of the Cebrian children, and they of her; his home at that time was where it is now. On the morning of the fire in April, 1906, he saw the family at the gate of the Presidio, where they went for refuge; he spoke to Maria there; he spent a night at the Presidio, then returned to his home; saw the Cebrians frequently after that until they went to Europe; he saw Maria shortly before they left, at their house; it was a general call; he did not remember any particular conversation on that occasion; Maria was very modest and retiring in manner, natural voice; during all the time he knew her, her acts, conduct, conversation and deportment were those of a rational person; sound mind. He was a native of Spain and came here in 1869; in his country and with his people it is the custom to send the girls to convents and they are taught modesty and reserve and acquire and retain such habits so that when grown up, as ladies, they appear to strangers as shy and diffident, and those who are unacquainted with them may consider them short of intelligence because of their quiet demeanor, when it is only a result of their rearing; so it was with Maria.

### EFFECT OF EVIDENCE OF MOLERA—COMPARED WITH OTHER WITNESSES FOR PROPONENT.

Her appearance, modesty, shyness, reserve, might give the impression to a stranger that Maria lacked intelligence; this was Mr. Molera's impression; she was very chary of talk with strangers, she might exchange a few words, but there was nothing that could be called conversation, no interchange of ideas with them; this was the effect of the evidence of Mr. Molera; but other witnesses for proponent, commended as credible, said that Maria was talkative, bright and lively with strangers as with others, and entered with ease into conversation upon many subjects. Mr. Molera had stood sponsor with Maria for one of the Cebrian children and they had made the usual responses in the customary mode and exchanged some words about their new relationship. When they talked about travels she always expressed a preference for Paris, of which she was very fond, because it was so

much more attractive than San Francisco; no place like Paris for her, which admiration was not really remarkable, and did not necessarily signify anything more than the ordinary appreciation by a young person for a beautiful capital full of alluring attractions. Mr. Molera did not remember any other subject of conversation after their return except Paris. He never talked to her about business or property; the conversation was all about her travels, amusements, theaters, churches, the sights she had seen, her preference for Paris; her desire to return and remain there; but she never talked on any matter of serious import; their conversation was casual and colloquial; in fact there was nothing whatever striking in any of her remarks, nor anything that lived in his memory of importance.

### WAS MARIA VERSED IN COMMERCIAL AFFAIRS?

Proponent's counsel claims that the contention of contestant that the decedent was not versed in commercial matters is unsupported by the evidence which is to the contrary, for it is shown that she came into immediate contact with most important affairs of business, the numerous papers signed by her and acted upon in the banks, proxies, receipts, powers of attorney, drafts, orders, checks, surety bonds signed before notaries, evince her commercial capacity; especially is this said of the receiver's bond and also of another bond which came into light through a providential and unexpected circumstance, which brought forth the bond saved in the vaults of the county clerk's office, after the fire; this may not have been a "miracle," but it was a surprise to all, when the deputy county clerk under the subpoena issued at the instance of and produced by the process invoked by contestant, exhibited that bond or undertaking given by Miguel as special administrator, as principal, and signed by Maria and Mrs. Cebrian, as sureties in the estate of Jose Vicente de Laveaga, approved August 28, 1894, for $50,000; proponent's counsel says that this was saved providentially out of the fiery furnace to condemn the case of contestant. There are numerous other documents signed by her and acknowledged before notaries, such as certain undertakings on appeal in the Anselmo case, proofs of loss in insurance matters made

out by Joseph Vincent de Laveaga, attorney at law, which is asserted to be proof positive that he came into contact and conversation with her; and dealt with her as competent and capable to act, and receipts for insurance money signed by him as her attorney in fact; and it is claimed that these incidents argue Maria's full capacity, because it is perfectly inconceivable that these documents could have been executed without the parties coming together in conversation. In reference to the receiver's bond it appears by the testimony of Henry P. Tricou, the notary who acted in that capacity when Maria signed the bond, that he never spoke to her or conversed with her at all, he never talked to her in French, or in Spanish, or in English, with all of which languages he was more or less familiar. Tricou was of French origin, born in Louisiana; he had never been in France; she did not speak to him in French, nor in any other language. There were others present on that occasion, he did not know this lady, except having been called to the house in his official capacity as a notary, and this lady was one of the signers; he could not recall the conversation he had with any of them, but he was certain he had none with her.

Counsel for proponent says that the presumption is that the notaries and other officers who took these acknowledgments and who administered these oaths performed their official duties. The presumption of the law is that official duty has been regularly performed; but this is a disputable presumption and may be controverted by other evidence, and in this particular instance Tricou himself controverts it. It is claimed that his course is characteristic of other notaries in other circumstances where Maria's signature appears. It does not seem by this record that Maria ever appeared in any court, or before any magistrate, as a witness, or to execute any document, the instruments referred to having been signed before notaries, and the argument is made that Maria's action was as automatic in one case as in another, it all being treated as a simple formal matter; the other notaries who took her acknowledgments and verifications were not called to testify as to what actually occurred at the time of their transactions with her, at least two of them having died prior

to this trial, Blood and Meininger. Tricou had been a notary for twenty-odd years and the others were also old notaries.

MR. COSTA'S ACQUAINTANCE WITH DECEDENT—HIS OPINION AND REASONS—NEVER HAD A THOUGHTFUL TALK WITH HER ON ANY TOPIC.

José Costa testified that he resided at 1926 Pine street; he had lived in this city for thirty-eight years, coming here in 1873. The witness related incidents of his acquaintance with the decedent and her family and testified as to his visits to the Cebrian family and conversations with the members of the household, Maria being present and engaging in the colloquies. Maria took part in the conversations. He frequently dined at Miguel's house when Maria was there with others; he remembered two occasions when she was there; he did not recall talking with her specially; he saw her talking to others; he met the Cebrian family on all the returns from their trips, but did not specially remember the Yellowstone trip; went to the theaters with them; he recalled a visit to the Columbia Theater on Powell street, Miss Maria was one of the party; went also to the opera, the Grand Opera on Mission street; he also remembered introducing his niece to Miss Maria in Paris, in 1897, when he was returning from his trip to Europe; he went with his niece, on the invitation of Maria, to the grand opera in Paris, the family all went; he was a guest, with his niece and his brother-in-law, General Pons de Doña, in the home of the Cebrians for the four days that he and his niece remained in Paris; his brother-in-law remained after his departure. During their stay in Paris of four days, they lodged and had all their meals at the home of the Cebrians; Maria frequently asked his niece to play the piano and she praised the playing. The witness testified to various incidents occurring during this period of his sojourn as a guest in Paris; also while as a guest at the Cebrian home in San Francisco; also in Spain during travels in Madrid, visiting places, museums and other public buildings, churches, convents and picture gallaries; Maria expressed opinions on points of observation. Arriving at Madrid he dined with the Cebrians, Maria was there; they made a day trip to Toledo, saw various places of interest, among others the Cathedral,

where she said the carvings in the choir were beautiful; then they assembled in the hotel and back to Madrid; Maria said that she liked Madrid very much, but Paris was better; he bade adieu to her, and they met again in Paris where he and his niece were guests for seven days; this was in April, 1903; they assembled at meals and in social converse; they went to the opera, Maria with them; when their visit was over, he and his niece continued their journey home; he did not remember anything especial that Maria said except that she asked to be remembered to his sister Señora Clemente Garcia, The next time he saw her was in December of the same year, 1903, when he went to Sacramento or Truckee to meet the family on their return here; he came down the road with them and to their home; he did not recollect that he went as far as the house; he did not recollect then that he dined with them at their house on their arrival, whither he accompanied them at about 8 o'clock; he was a very frequent guest at the Cebrian home from that time until 1908, when they went to Europe; he called there four or five times a week; he was here on April 18, 1906, the day of the earthquake; he went to the Cebrian house on that morning; he did not see Maria that Wednesday morning, the day of the earthquake, but at about 5 o'clock that afternoon he saw her, they were all looking out of the window; she said, "Mr. Costa, all my buildings have been burnt," he said it was too bad; he accompanied them to the Presidio on Friday; on Saturday they returned; he often heard Maria admonish the children as to their conduct. As to her conduct, conversation, acts, behavior, demeanor, deportment, in everything, she was rational; a person of sound mind; the opinion of the witness was based on so many years of acquaintance and observation of Maria, at home and abroad. Mr. Costa never had a business conversation with Maria in all these years, nor a really thoughtful talk with her upon any topic; on many occasions he did not recall talking with her specially; had actually nothing to do with her directly; others acted for her.

#### FATHER FIGOLS ALWAYS SAW HER WITH OTHERS.

Father Figols, an assistant pastor of the Spanish church, born in Catalonia, Spain, testified that he had been here since

1901; it was in 1904 that he was introduced by Father San-
tandreu to Maria; he used to visit the house, called there
several times thereafter, always went alone; his visits were
social and pastoral; these visits were usually made in the
afternoon; during these visits they conversed in Spanish on
various topics. All her acts, conduct, conversation and de-
meanor were those of a rational person. In his opinion, she
was of sound mind, his reasons being that he never noticed
anything about her that was not that of a person of sound
mind; she would follow conversation of other members of the
family; she would start a conversation. Father Figols said
that he had given communion to a child at the age of eight
years, but generally here it is eleven or twelve years. He had
but one brother here; he noticed Maria at church usually when
there was some feast or celebration, she may have been there
at other times, but he had no distinct impression about seeing
her on such occasions; when he saw her at her own home, at
the Cebrian house, she was always with others, members of
the family; she and other members of the family went to con-
fession to him.

### MRS. APELT'S INDISTINCT IMPRESSIONS.

Mrs. Felicitas Apelt testified that she was the wife of
Charles M. Apelt, and resided at 736 Fell street; she had lived
here since 1872; she personally became acquainted with the
De Laveagas in the '80's; knew the mother, but not the
father; also became acquainted with Maria before they went
to Europe in 1884; went to bid them good-bye; she could not
tell the date, but that was her first visit, although they had been
to see her at her home, 1305 Stockton street; when she went to
bid them good-bye she saw Maria; did not remember the con-
versation particularly. Norberta Martinez lived with Mrs.
Apelt; the De Laveagas paid for her room and gave her some-
thing every month; she sewed for her and lived with her
eighteen or twenty years; her husband was a shirtmaker and
dealer in gentlemen's furnishings; the ladies, Maria and
Ignacia, "Nacha," used to call together. She saw Maria at
Guadalupe church more than once. The witness knew Mrs.
Cebrian; was there at her marriage like other people in Guad-

alupe church. Norberta Martinez was not a forewoman or "boss" for her; she occupied no particular position, except to help in sewing. She saw Maria at the Aurrecoecha funeral; did not pay any attention as to whether or not she went out with the body of the congregation; saw her at communion; in all she observed of Maria she acted as a rational person; when she was in Europe she sent the witness some postal cards; she never saw her write; they were burnt in the fire; they were addressed to her and were inclosed in letters to Norberta Martinez, who handed them to her; on one side of the address, just "Mrs. C. M. Apelt," was written. She was of the opinion that Maria was of sound mind, for reasons already given; she was a poor judge of ages, she said, but Maria might have been twenty or thirty years old; Norberta Martinez worked for her not exactly as a working woman, for she was supported by the De Laveagas, and whatever sewing she did was over and above what she received from them, Norberta was not a "boss" or a forewoman, but helped her in sewing.

### SOME OTHER WITNESSES CONSIDERED.

Another witness, Matthew O'Connor, testified that he lived at 140 Ninth avenue, Richmond; was at that time, and had been for twenty years, a conductor on the California streetcars; came to know Maria as a passenger seventeen or eighteen years before the time he testified; she rode with the members of the Cebrian family. In all he saw of her she was rational; she was of sound mind; her acts, conversation, and demeanor were those of a person of sound mind.

Miss Manuela Velasco testified that she was born here, but when two years old was taken to Hermosillo, Mexico, and returned here in 1899; became acquainted with Maria in 1904 at 1801 Octavia street, where her sister took her to get acquainted; she saw Maria frequently thereafter; on all occasions she was rational and of sound mind; in everything the witness saw of her she was rational.

Mrs. Maria Lugea Figols was born in Navarra province, Spain; knew the witness Mrs. Nicolini who was born in the same province, but in a different town; Mrs. Figols was a sister-in-law of Father Figols, who was assistant pastor of

Guadalupe church; she was married on April 4, 1904; had a pew in Guadalupe church, about the middle of the church; the pew occupied by Maria was to the right ahead of hers. She remembered when Mrs. Rosa Nicolini was married; it was after that time that she was introduced to Maria, on the occasion of her second visit to the Cebrian house; she had not met Maria the first time she called, but was formally introduced to her at the time of her second visit; the witness was in the parlor conversing with Mrs. Cebrian when Maria and Josie came in; Mrs. Cebrian introduced her, saying: "This is Father Figols' sister-in-law," and "This is my sister, Miss De Laveaga," who said she was glad to meet her; Mrs. Figols said the same to Maria; they had more conversation. All Maria's acts and conversation were rational; she never met her to converse with her except on that occasion, but she saw Maria and observed her in church when she was at mass. The witness was of the opinion that she was of sound mind and acted like anybody else, like Mrs. Cebrian or Josie or anyone on the occasion of her visit to the Cebrian home, and at mass she was engaged in her devotions. On her visit Mrs. Figols did most of the talking, spoke about her then recent illness, and Maria said in Spanish, "Poor thing, *probrecita,* how she must have suffered"; she also spoke about the sermons of Father Figols, saying that his preaching almost moved her to tears, he spoke with so much feeling; their talk was in Spanish; this was Mrs. Figols' only opportunity of meeting Maria socially, although she saw her frequently in church.

### DR. ARMSTRONG THE CEBRIAN FAMILY DENTIST—HIS OPINION AND REASONS.

Dr. W. H. Armstrong testified that prior to the fire he had his office at 503 Montgomery avenue; he did some work for Maria there; after the fire when the "Delbert Block" was erected on Van Ness avenue he had his office in that building and did some dental work for her there in 1906 and 1907; after that at his present office on California street, southeast corner of Kearny street, in 1907 and 1908; the last time in August, 1908; had conversations with her; in that month of

August, 1908, he discovered that the cementing of the teeth that he had done in 1904 needed attention and suggested that to her, but she said "not now," that she was going to Europe and when she returned he might make it permanent; he did other work for her there; he gave her several sittings; on the 18th, 20th August, 1908, were the last treatments; he had refreshed his memory from his dental register and day book kept under his direction by his bookkeeper. All her talk and conversations and acts were those of a rational person; he found her a very rational person; in his opinion she was of sound mind, very sound mind; his opinion was based upon his observation. She spoke very little English; Josie Cebrian was with her and would sometimes take up the subject; Josie would talk Spanish with her, assisting her as interpreter; he did not speak Spanish; Josie was always with her; their conversation was usually limited to the details of the dental work.

## THE COMMON FORMULA OF THE WITNESSES. WHAT SOME OF THEM MEANT BY "RATIONAL."

The common formula of the witnesses at the end of their direct examination was that her conduct, conversations, demeanor and deportment were those of a rational person; and what some of them meant by "rational" is illustrated in the testimony of Leonor Padilla, who said that by "rational, I mean she was *not idiotic.*" Miss Padilla saw Maria mostly at her mother's house, where she would call with Beatrice and Isabel; "we used to make dresses and waists and wrappers for Maria," whom we first met at the house of Mrs. Cebrian who introduced her to Maria; Leonor's mother and sister were present and Josie Cebrian and they all talked together; Maria talked about her travels in Europe; this was in December, 1903; the last time she saw her was in 1908, just before the family went to Europe. Leonor Padilla never saw Maria alone; she was always with somebody; the witness did not know what was meant by "opinion," but what she did mean was that Maria was *not idiotic.* Another witness for proponent, Adelaide Carmona, said that what she meant was that "*Maria was no fool*"; this witness had been a laundress

in the De Laveaga family for about two years more · than thirty years ago; she had last seen Maria after the fire at the Cebrian house; she went there, but not to work; she was a regular attendant at the Spanish church and saw Maria there frequently.

### DR. ARMSTRONG HELD NO DIRECT CONVERSATION WITH MARIA. HER INABILITY TO SPEAK ENGLISH—JOSIE CEBRIAN ACTED AS INTERPRETER.

It is noted in connection with Dr. Armstrong's testimony that although he met Maria many times in 1904, in 1905, in 1907 and in 1908, and did dental work for her, that he said she knew so little English that when he tried to talk to her he had to do so through Miss Josie Cebrian. All the Cebrians testified that Maria spoke English as well as she did Spanish, but, nevertheless, she was unable to make Dr. Armstrong understand her in either language, and he was equally unable to make her understand him; he said, "I would tell her to move her hand up if it hurt her, and her hand would go up— she would say, 'not, not yet'; I told her it would throw me off, and with the assistance of Josie, who explained to her in Spanish, she would keep her hand still"; "she did not seem to grasp what I said; Miss Josie would then speak to her in Spanish and tell her that the doctor said so and so." So it seems that although Dr. Armstrong had seen her numerous times in his professional capacity, he had never been able to converse with her directly, and had no communication, except through the medium of Josie Cebrian; he was the Cebrian family dentist, and when Maria called upon him she always came with Miss Josie and some of the children; in dealing with them he made no distinction with any member of the family, with whom he was on very good terms.

### MRS. ANNA ROGER'S OBSERVATIONS AND OPINION—MARIA NOT OF SOUND MIND—ALWAYS LIKE A CHILD.

Mrs. Anna Roger worked for the Cebrian family for about two years and a half beginning about the year 1890 and then, after an absence of sixteen or seventeen months, she went back and worked for another two years and a half, leaving finally in the month of April, 1896; she was employed as a

second girl and her duties were generally to wait upon the table at luncheon time and sometimes in the evening, and to make the rooms upstairs; in the afternoon she used to sew. The family was made up of Mr. and Mrs. Cebrian, Miss Maria de Laveaga and the children, Mamie, Josie, Edward, Louis, Harry, Rafael, Isabel and another, a little one. Mrs. Roger was not married when she began to live with the Cebrians, her name was then Furon. While the witness was employed there, Maria was always in the house. Maria did nothing for herself; this witness would comb her hair every day and aid her in dressing; if the day was fair, Maria would go out with the children and the nurse until lunch time, and then afterward she would stay at home or might go out again with them when the two girls came home from school; she would go to the nursery or stay in her room doing nothing, except, once in a while, a little sewing; the witness usually used to sew every afternoon in the room of Maria, who did not do much of anything. Sometimes she would see her with her prayerbook, but did not observe her reading any newspapers, or any other books; she did not talk very much; had very little conversation with her; never talked to her about music; the witness was French by birth, but learned a little Spanish in the Cebrian family; she spoke very little English when she went there, but gradually acquired some knowledge of English and Spanish. The result of these years of observation of Maria was that Mrs. Roger was of the opinion that Maria was not of sound mind; she used to act like a child; play with the children, just like they did; generally she was good-natured, but once in a while she would get mad; she was always the same, however, like a child.

MISS ANNA GRESMEIL, MARIA'S MAID, CORROBORATES MRS. ROGER.

Miss Anna Gresmeil was a native of Germany and came to the United States in 1891, living ever since in San Francisco. She went to the Cebrian house in the fall of 1892, about October, and for about a year thereafter, as a maid. Mrs. Roger was there a few months before her. Her duties were to attend to Miss Maria de Laveaga in the morning; not dress her exactly; hook her dress, button her shoes and such details as that, and

during the day Anna would straighten out the rooms, and then sew also occasionally and serve at the luncheon table; in the Cebrian family, when she went there, were two grown-up daughters, Mamie and Josephine, three boys, Edward, Harry and Louis, and a smaller one, Ralph; Maria also was of the family and there were visitors sometimes. In the forenoon, after breakfast, Maria would go out with the children and the nurse, and then she would come home and get ready for luncheon. The witness substantially corroborated Mrs. Roger as to the routine from day to day, and the result was, that, in her opinion, Maria was not of sound mind; she never acted for herself; if she was of sound mind she would have acted and have done things for herself, but she had not been so doing; she had others to do for her, and so she came to the conclusion that Maria was not competent.

### EVIDENCE COVERS THE PERIOD OF MAKING WILL.

These two witnesses were in the Cebrian household at the time the will was made and for some time previous to that and thereafter, and there is nothing to show that they were unworthy of credit, except as may be argued from the fact that they were domestics and not on the upper grade; but it is not said that they were untruthful and they had daily and hourly occasion to observe Maria, and they are in no wise implicated in interest on either side of this controversy; their sphere may be humble but their testimony true within its range. They both testified that when Maria went out of the house with the children the nurse always went along; and there was some effort made to establish that Maria was in charge of the children. Mr. O'Connor, the car conductor, testified that in 1892, when he first saw Maria, she used to take two little girls who were between 5 and 8 years of age out on the car with her, and he was positive on that point; he could not be mistaken, but the pedigree proves that in that year there were no two little girls, Mamie being 16 and Josie about 15 years old.

### EVIDENCE CIRCUMSTANTIALLY CORROBORATED.

Anna Roger and Anna Gresmeil were corroborated in other particulars, as for instance, that Maria did not talk at the

table and she sat there with the children. Both of these maids so testified and they were borne out by others. Edward de Laveaga said that his aunt, Mrs. Cebrian, Mr. Cebrian, and his own father used to sit at one end of the table and engage in conversation on various topics, but his aunt Maria always took her seat at the boys' end of the table and would laugh when they laughed, but he did not remember that she ever said anything. Anna Roger was asked in cross-examination if she ever saw Mr. Costa talk with Maria at the table and she said "no," except "how do you do?" Beyond that she never saw Mr. Costa converse with Maria. When Mr. Costa was asked a similar question he answered that he very seldom had any special conversation with Maria at dinner. The two domestics had given their testimony about twelve months before Mr. Costa took the stand. Dr. Perrone also confirmed their statement, when he testified that he very seldom engaged in conversation with Maria at table because he was seated near Mr. and Mrs. Cebrian and Maria was sitting on the other side of the table with the children; Dr. Perrone could not "listen at her" because he was engaged in conversing with the chief of the family and Madame Cebrian, but he could see at the other end Maria sitting among the children; "always among the children."

### HARRY CEBRIAN'S TESTIMONY ABOUT DECEDENT'S ABILITY TO CONVERSE AND WRITE.

Harry de Laveaga Cebrian testified at great length about conversations with his aunt; she told him she had made a will and left it with his mother, but wanted him to say nothing about it, and he never said anything to anybody about it during her lifetime; she had a wonderful memory for dates and events, made use of every mental faculty that a normal person usually does; all that Harry had testified had been evolved from his own memory; of course it had been assisted to some extent by what he had heard in the courtroom in the progress of the trial, but on the whole it was the result of his recollection of his conversations with his aunt Maria; was well posted as to all her possessions; *she wrote fluently, without stopping or hesitating.* Harry testified that he received

a watch purchased by decedent in Europe as a present for him and sent through his parents to him, but it was proved by the deposition of the salesman that it was bought by his father in Tiffany's in New York three months after the death of Maria. Frederick Brunner, the salesman for Tiffany and Company, the jewelers, in New York, testified that he sold a watch to J. C. Cebrian, May 3, 1909, for cash, delivered to Cebrian personally, engraved with initials in monogram, "H. de L. C.," delivered on May 5, 1909, sold for $110. The testimony of the other members of the Cebrian family was much to the same effect in essentials, all going to the point that Maria was sound in mind and memory and rational in all respects.

Edward I. de Laveaga testified that he never had any conversation with his aunt Maria; in answer to a question she would say "yes" or "no"; she never conversed; what he meant by conversation was the interchange of thoughts or ideas, an exchange of relevant and responsive thoughts, and in this respect she could not converse.

Many pages might be used in an endeavor to consider the testimony of other witnesses on either side, but it would be merely cumulative, and if needed hereafter the court's memoranda are available.

### WAS MARIA ASSISTED IN MAKING THE WILL?

Was Maria assisted in the preparation of this will? Counsel for proponent says that it is not contested that it is her handwriting, and that the record shows that she wrote it without aid except the advice of her brother Vicente, and that she had some general knowledge of legal proceedings and the forms of legal documents and that this may account for some of the formal phases in this document; and it is asked, What is the evidence that shows that this paper emanated from any source other than her own mind? The question is answered by its asker, that there is no evidence inherent or extrinsic to induce any conclusion that she was not perfectly competent. We have already alluded to Mr. Cebrian's testimony in reference to his knowledge of the paper, that he knew nothing of it and furnished no form or model. It must,

therefore, in shape and substance have come from the mind and hand of Maria. Nothing whatever to assist her at the moment of its manufacture. As to the advice of Vicente, the testimony is quite vague and that she carried the details in her memory so perfectly as to contrive so correct a legal form without any prompting is difficult to credit. Sister Claire testified that when Edward Le Breton asked her if she thought Maria made this will she answered, in a manner perhaps not definitely responsive, that Maria showed her wit and wisdom in consulting someone who was a little more experienced than she was in the dispensing of so large an amount of money. The Cebrians deny that they were consulted, and the counsel contend that she was so expert in such matters as not to need anybody's aid in the premises. If she showed her wit and wisdom in consulting others, according to the suggestion of this witness, whom did she consult? The Cebrians make denial and affirm that it was her spontaneous act, and there was nobody else on the ground to advise her. Cebrian was there alone with her for about twenty-five minutes. As to what transpired during that interval we have his word. In the nature of the case we can have no other word. Some repetition upon this point must be indulged, because it seems to be assumed that the court can go no further than to accept this statement, and that, consequently, the presentation of the paper itself by the proponent, virtually the sole beneficiary, is proof of its probity. There is neither inherent nor extrinsic evidence to the contrary, say her counsel; it bears upon its countenance the imprint of veracity and there is no one to contradict the assertion that it was entirely the intelligent work of its apparent author.

### HOW THE WILL WAS MADE.

As to the handwriting, it is said that she wrote fluently without stopping or hesitating, and she could spell as well as the average. Indeed, if one of the witnesses is to be believed, she could dictate to others and impart instruction in the written and oral elements of language. She is in her room alone, without any book of forms, without pattern or precedent to guide her, without any aid whatever except her

recollection of what Vicente told her, to write her will on a piece of paper, that was all, only to be careful that it should have no initials, no printed matter and all written by her own hand. Primed with these precepts she undertakes to dispose of an estate in value, in round numbers, of two millions of dollars, of a complex character, in the creation of which she had no hand or part, the common inheritance of herself and her brothers and sisters from their parents, none of the children having produced a dollar of the original capital, all coming from their ancestors Don José Vicente and Doña Dolores, whose sense of natural equity and repugnance to ruinous and scandalous litigations are exemplified in the provisions and injunctions of their own testaments, by all means possible to keep out of court, and in which Maria was committed to the care and protection of the elders, as long as she might live.

CONFIDENTIAL RELATIONS BETWEEN TESTATRIX AND BENEFICIARY.

At the date of the instrument here in question, but two of those encharged with the trust survived, the proponent beneficiary and her brother, the contestant, one the virtual custodian of the person, the other the actual custodian and manager of the estate. Neither was appointed guardian by court order, but if we could be permitted to construe the wills of the father and the mother according to their tenor the elder brothers and sisters might be considered testamentary guardians for life of this younger sister Maria. Most fervently and for her life was this charge made upon them. By an understanding Ignacia took the personal care, Miguel the charge of the local property interests. Ignacia dying, Mrs. Cebrian, as we have seen, assumed the charge of the person, and while she was in such personal care Maria made her will in favor of Mrs. Cebrian. It is said that she gave to Miguel a substantial portion of her property, but terms are relative; he received say less than one-twentieth of the possessions which he had managed for her for three decades, without any recompense. Sufficient has been said on this score.

The relations of Maria and Mrs. Cebrian as outlined were peculiarly confidential and intimate; nothing could be closer; no influence more immediate; no tie more binding except that which joined the proponent and her husband, and how close and firmly fastened that was and is may be seen by the thread of the testimony in this case.

In such circumstances this paper was produced, omitting mention of Vicente, leaving to Miguel a comparatively small portion of the estate; a trifle for charity, something for masses; a benefaction to the children of Clemente Laveaga; clothes and furniture and jewels to her nieces Mamie and Pepita; all remaining to her sister Pepa, or to her children if she should not survive.

### WHAT MAY BE CONSIDERED IN SUCH A CASE.

It is argued that if the person be of sound mind it matters not whether the will be equitable or inequitable, just or unjust, the testator has the right to do as he pleases with his property; but, nevertheless, equity, justice, the relations of the parties, the surroundings of those benefited in connection with the testator and other points, may be considered in connection with the transaction where the competency is questioned or susceptibility to influence suggested.

In such a case the improbability of a person ignoring or discriminating against one who had been a great service to her for many years and who had conserved her estate without the diminution of a dollar, indeed with increase, and without retaining anything for personal benefit, is a proper subject of inquiry, as to whether if she were of full faculty and free from the impediment of influence she would have done otherwise; and it might be inferable that those who had been in such close propinquity and who were the beneficiaries of her bounty had improved their opportunities to their own advantage.

### THE COMPOSITION OF THE WILL.

As to the composition of this instrument, it is difficult to reconcile its inherent characteristics with the statement that she wrote fluently without stopping or hesitating or that she had no assistance in framing its manuscript. As a legal

document, in form, abstracted from other considerations, it may be considered correct, but here again there is a problem as to how she managed without aid in the seclusion of her apartment to express her ideas or intentions with such statutory exactitude. It is asserted that she had been informed as to the law, and there was no necessity to call in a witness and no need of a notary, and she did not want to make it public; she had told Harry that she had made a will and left it with his mother, but wanted him to say nothing about it, and he never did during her lifetime. It was a family secret with the Cebrians and kept from the knowledge of Miguel until it could no longer be concealed.

### DISCREPANCIES IN TESTIMONY AS TO HANDWRITING.

About this matter of Maria's facility in writing there are obvious discrepancies in the testimony of the witnesses for proponent as in the text of the script of decedent. Mr. Cebrian said that she wrote with facility, as readily as anybody; and, yet, he had written to Miguel as an excuse for Maria's not writing, "you know how much it costs her to spell and write"; and it is shown in the record that every one of the writings of Maria passed under the inspection of the Cebrians. It is not too much to say that not one of the few writings attributed to her is free from signs of interference.

The will is written on one side of a sheet of foolscap, lined, the photograph does not of itself suffice to satisfy expert examination; the original must be before the eye of the examiner; and when so placed we have to consider the evidence as to her ability to write and to spell in connection with this paper; and the proposition that she completed it all by herself alone. She was at least more than 35 years old at that time; had all the advantages of education accessible to the other members of her family; it is said by the Cebrians that she was capable of writing with accuracy and fluency, and without stopping or hesitation, and we have here the most important exhibit of her proficiency in penmanship. She begins the invocation, "en nombre de Dios Amen," with a small initial "e" in "en," the word being made with two strokes of the pen, the second word "nombre"

the "m" is first an "n" and then altered into an "m," the word "ochenta," in the fifth line, has the appearance of having been first written without the initial letter, which is afterwards rather awkwardly prefixed. She had difficulty with the familiar name "Cebrian," which she misspelled in a manner difficult to reproduce; she seems to have started "C-e-b-i-e-a-n" and then attempted to make an "i" out of the second "e" by placing a dot over it, and then crossing out the "e" by a stroke, and then the effort ended and the name was written without the "r." So with the word "Miguel," naming her executors, she wrote first "Miguel" and then inserted another "l."

## THE WILL CONSIDERED AS AN EXAMPLE OF HER ABILITY TO WRITE FLUENTLY AND SPELL CORRECTLY.

Certainly these were familiar names about which a competent person should have made no mistake, and this writer did make mistakes, but the mistakes were corrected in a manner. It is pointed out in this record that in some of her own signatures she made mistakes in her own name, sometimes leaving out her middle initial, sometimes dropping the "a" in "Laveaga," making it "Lavega," and sometimes duplicating the "g" making it "Laveagga," and that she was indifferent as to punctuation marks. In the will, however, her own name was accurately set down. Dottings of "i"'s and crossing of "t"'s, and punctuation marks, may be left out of account, but when it is said that she wrote with fluency and spelled as well as the average, we must take this instrument as an example of her ability to do either to the extent claimed.

It is said that she told Mr. Cebrian that Vicente had instructed her how to make a holographic will and when she saw it was so easy she just made it. She did it of her own accord. Was it easily done? Are there no traces here of effort or labor in the making of this manuscript? It is quite plainly the product of much manual exertion. If she was not following copy or taking dictation, she was certainly engaged in hard work in the writing of this will; it is not an example of fluency in penmanship nor of accuracy in spelling; we

find the word "limosnas" misspelled; other words and letters with difficulty traced or written; and the whole document exhibiting deficient mental culture, if not intellectual incompetency.

In connection with the method of producing this paper reference is made to the testimony of Mr. Cebrian in regard to his contemplated preparation of an affidavit for Maria to copy to be used instead of a deposition in the Anselmo case.

CASE VIEWED FROM EVERY POINT—CONCLUSION OF COURT.

The mere fact that one can write does not imply soundness of mind; there are many writers who are quite unbalanced or defective, yet their writings taken alone would deceive even the elect; but we must consider the circumstances and inquire into all the facts and history, the conduct and the surroundings of the person whose mental condition is at issue before passing judgment. We must view the case from every angle of vision. Many witnesses here saw but a part, scarcely one, outside of the persons financially interested, had an entire view of the testatrix throughout her life. Granting that they testified all in good faith, many of them of unquestioned character, they differed radically in opinion on certain material points of observation; their veracity is not to be impugned because their opinions may be erroneous; counsel themselves in their ardor of advocacy have made estimates of evidence that may be wanting in the accurate adjustment of the final balance; but it is reserved for the trial court after listening to evidence and arguments for upward of a year and devoting several weeks to an examination of the record and a study of the case from every point of view to express its judgment; which is that the paper propounded be refused and denied probate.

---

As to Capacity of Infants to make wills, see note in Ann. Cas. 1914A, 621.